**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| JAMES BRUNER, MICHAEL ZEECK, and ED BEATTIE, individually and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| POLARIS INDUSTRIES, INC. and POLARIS SALES INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs James Bruner, Michael Zeeck, and Ed Beattie, individually and on behalf of the other members of the below-defined nationwide and statewide classes (collectively, the "Class"), hereby allege against Defendants Polaris Industries, Inc. and Polaris Sales, Inc. (collectively, "Polaris"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel, as follows:

## I.  INTRODUCTION

1.     For almost a decade, Polaris has been the industry leader in off-road vehicle sales.  In 2016, Polaris sold 480,000 off-road vehicles for net sales of $3.36 billion. Polaris's off-road vehicles include the popular Ranger and RZR lines.

2.     The 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018

Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, and 2017-2018 Ranger 500 (collectively, the "Class Vehicles") all suffer from a design defect that creates a significant and unreasonable risk of the vehicles overheating and catching fire.

3.     In fact, since 2013, Polaris has recalled, at different times, all of the Class Vehicles because of fire hazards that have caused more than 250 fires, in excess of 30 severe injuries, and at least three deaths.

4.     None of these recalls, however, addressed the root problem of the fire risk in the Class Vehicles, and have thus failed to remedy the risk for vehicle owners.  Indeed, vehicles that have been repaired pursuant to Polaris's ineffective recalls have nevertheless caught fire and otherwise continued to subject Plaintiffs, the other Class members, and the general public to acute safety risks.

5.     Although Polaris has blamed multiple root causes for the fire risk in its RZR vehicles, it has failed to come forward with the ultimate cause of the fire risk.

6.     Polaris has asserted that only certain Ranger vehicles have exhibited a fire risk and that those are solved by a distinct fix.  Complaints of fire in unrecalled vehicles demonstrate that this asserted root cause is also a ruse to conceal the extent of the defect from customers.

7.     The true cause of the fire hazard is a design defect that is common to all of the Class Vehicles.  The Class Vehicles are equipped with an unusually high-powered "ProStar" engine that is tucked directly behind the occupant compartment.  The ProStar engine produces more power than the engines in competing vehicles and, accordingly,

more heat. The ProStar's exhaust gas piping routes forward toward the occupants, then turns 180 degrees, creating a U-shape, and exits from the rear.

8.      The piping lacks proper ventilation and heat shielding, and is positioned within inches of combustible plastic body panels. Thus, the hottest area of this high-performance engine is located inches behind the occupants, in an area of the vehicle that is enclosed with little room for air flow to dissipate the high heat. The extremely high temperatures, combined with inadequate cooling and heat shielding, result in the melting of the plastic body panels and the ignition of any combustible material surrounding the engine, including organic debris, leading to potentially deadly fires. Hereinafter, this flawed design is referred to as the "Engine Overheat/Fire Defect."

9.      The Engine Overheat/Fire Defect stands in stark contrast to the design that is disclosed in the 2006 patent application for the vehicle that became the RZR. That patent application disclosed a 50-horsepower engine that exhausted to the right side of the vehicle, rather than directly forward toward the occupants, thus allowing for more efficient engine cooling.

10.     But, in a quest to gain a performance edge, and thus increase its sales and profits, starting with the 2011 Ranger RZR XP, Polaris installed a much more powerful 88-horsepower engine that exhausted forward into an inadequately vented, and inadequately shielded, compartment placing passengers at risk of overheating and fire.

11.     Polaris introduced the high-performance ProStar engine in this center position over three years in all 500cc and larger models. Every Class Vehicle has a ProStar engine located directly behind the occupant compartment. In fact, the first recall for this

fire risk in 2013 began with the first model to receive the ProStar engine – the 2011 RZR XP 900.

12.     As a cost-saving measure, Polaris designed the ProStar engine in-house rather than outsourcing.  The design process was rushed and Polaris failed to take adequate time to design and test the engine and its new placement.  In hurrying the Class Vehicles to market, Polaris failed to install components necessary for safe operation, such as: heat shielding in areas where plastic body panels sit mere inches from hot engine components, metal body panels in place of combustible plastic, electric cooling fans for engine heat removal and a more efficient closed cooling system.

13.     At that time, Polaris was significantly increasing its sales and profits, and, as Polaris acknowledged in its 2016 Annual Report, the accelerated pace created systemic quality control issues that exacerbated the defective design that led to the Engine Overheat/Fire Defect.

14.     Class Vehicle owners and lessees are unable to drive their vehicles without putting themselves at risk of injury and property damage due to the fire hazards they present.  They are also injured if they sell these vehicles before a proper fix is determined and the vehicle is repaired, as the vehicles have a reduced value.  Most 2017 model year vehicles have not even been recalled despite their inclusion in a warning from the Consumer Product Safety Commission (CPSC) and Polaris that the RZR vehicles have an unresolved fire hazard, putting occupants at risk without any recourse.

15.     As a result of Polaris's unfair, deceptive, and/or other wrongful conduct, owners and lessees of the Class Vehicles have suffered monetary loss and/or lost value. Plaintiffs and the other Class Members suffered injury in fact and incurred damages.

## II.     JURISDICTION AND VENUE

16.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than Defendants.

17.     This Court has personal jurisdiction over Polaris Industries, Inc. and Polaris Sales, Inc. because each of these entities has its principal place of business in the State of Minnesota, and in this district.

18.     Venue is proper in this district under 28 U.S.C. § 1391 because Polaris Industries, Inc. and Polaris Sales, Inc. reside in this district.  Additionally, Polaris has marketed, advertised, sold, and leased Class Vehicles within this district.

## III.     PARTIES

**A.     Plaintiffs**

**1.     Alabama**

19.     James Bruner is a resident of Tallassee, Alabama

20.     Mr. Bruner owns a 2017 Polaris Ranger XP 900 with the Engine Overheat/Fire Defect.  Mr. Bruner purchased his Ranger new, in 2017, from Shoals Outdoor Sports in Tuscumbia, Alabama.

21. Polaris failed to disclose the Engine Overheat/Fire Defect to Mr. Bruner before he purchased his Ranger, despite Polaris's knowledge of the defect, and Mr. Bruner, therefore, purchased his Ranger with the incorrect understanding that it would be a safe and reliable vehicle.

### 2. Illinois

22. Michael Zeeck is a resident of Rushville, Illinois

23. Mr. Zeeck owns a 2017 RZR XP 1000 with the Engine Overheat/Fire Defect. Mr. Zeeck purchased his RZR new, in 2017, from Outdoor Power in Quincy, Illinois.

24. Polaris failed to disclose the Engine Overheat/Fire Defect to Mr. Zeeck before he purchased his RZR, despite Polaris's knowledge of the defect, and Mr. Zeeck, therefore, purchased his RZR with the incorrect understanding that it would be a safe and reliable vehicle.

### 3. Wyoming

25. Ed Beattie is a resident of Chappell, Nebraska.

26. Mr. Beattie owns a 2016 Ranger XP 900 with the Engine Overheat/Fire Defect. Mr. Beattie purchased his Ranger new, in 2016, from Power Toys of Riverton, in Riverton, Wyoming.

27. Polaris failed to disclose the Engine Overheat/Fire Defect to Mr. Beattie before he purchased his Ranger, despite Polaris's knowledge of the defect, and Mr. Beattie, therefore, purchased his Ranger with the incorrect understanding that it would be a safe and reliable vehicle

**B.** **Defendants**

28.     Polaris Industries, Inc. is a Delaware corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota and Delaware.

29.     Polaris Sales Inc. is a Minnesota corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota.

30.     Polaris Sales Inc. is a wholly-owned subsidiary of Polaris Industries, Inc., and has the same offices and same chief executive officer as Polaris Industries, Inc.  On information and belief, Polaris Sales Inc. operates as an alter ego of Polaris Industries, Inc., and Polaris Industries, Inc. is liable for all actions preformed in the name of Polaris Sales Inc.

## IV.     <u>FACTUAL BACKGROUND</u>

**A.** **Polaris's Defective Engine and Engine Configuration**

31.     Polaris first entered the off-road vehicle ("ORV") market in 1985 and produced its first Recreational Off-Road Vehicle ("ROV," also often referred to as a "side-by-side), the six-wheeled Ranger, in 1998.[1]   In 2000, Polaris unveiled the four-wheeled Ranger.[2]

---

[1] Polaris, 2014 Annual Report, Form 10-K, Dec. 31, 2014, at 4.

[2] *Id.*

32.     Polaris introduced the Ranger RZR in 2007 (for Model Year 2008), as a smaller more agile alternative to the utilitarian Ranger.[3]  Polaris subsequently shortened its name to RZR.

33.     Ranger models are utility variants often used in commercial applications on farms, land managements, and for maintenance jobs, and an inability to use them can affect livelihoods.  Class vehicles include two-person and four-person Rangers models, all with a plastic pickup bed mounting directly above the engine.

34.     RZR models are high performance vehicles with a narrow chassis, sport tuned suspension, and a plastic engine cover instead of the Ranger's plastic bed. Class Vehicles include two person through six-person models.

35.     The 2008 Ranger RZR could accelerate faster than any other ROV and its compact size made it capable of navigating narrow trails.  As Polaris describes it: "The new Ranger RZR delivers total Side x Side domination with its monstrous 800 Twin EFI. It's the only trail-capable Side x Side you can buy, going everywhere other Side by Sides can't.  With the fastest acceleration, the highest top speed, incredibly responsive handling, and all the utility you need, the Ranger RZR leaves all other Side x Sides in the dust."[4]

36.     Polaris's 2006 patent filing for a "Side-By-Side ATV" design, which became the Ranger RZR, was designed to reduce the width from the usual 54" to 50."  (The term "ATV," or "All-Terrain Vehicle," is sometimes used interchangeably with the term

---

[3] *Id.*

[4] Polaris Ranger 2008 Brochure, at 8.

"ROV.") Reducing the width was an important market advantage because the vehicles could move at an accelerated pace and could be loaded into the bed of a full-size pickup truck for transport.   However, reduced width typically increases the risk of rollover, a significant problem with ROVs.   Thus, Polaris's design attempted to mitigate the increased rollover risk associated with narrowing the width by lowering the engine position.   To accomplish this width reduction, the patent disclosed a behind-the-seat engine location, rather than the previous under-the-seat location.[5]

37.     The patent, which was granted in 2008, describes a narrower vehicle width and improved center of gravity.   The patent disclosed:   "In this embodiment, engine is a 760 cc engine producing about 50 horsepower.   Engine produces excellent acceleration characteristics and responsiveness.   ATV weighs about 950 pounds and has a power to weight ratio or about 0.053/1.   Any suitable engine may be used in ATV, and ATV may be constructed to any suitable weight, however the present invention contemplates ATVs having a power to weight ratio of at least 0.045/1."

38.     The patent drawings depict the exhaust pipe exiting the engine on the right side of the engine bay and then up and toward the rear of the vehicle, away from the occupant compartment, resulting in a less obstructed air flow, as shown below:

---

[5] U.S. Patent No. 7,819,220, "Side-By-Side ATV," filed Jan. 31, 2008.



39.     When it debuted in 2007, the Ranger RZR had an engine configuration and

offset placement that matched that described in this patent.  Its top speed was 55 mph, its

weight was 945 lbs., and its power-to-weight ratio was .055, which was 44% higher than

the competitor Yamaha Rhino.[6]  Polaris claimed its handling performance attributes were

the result of its low center of gravity design: "The RANGER RZR and RZR S use a

patented design that positions the engine behind the seat, creating the lowest center of

gravity. It's like you're riding on rails, with razor-sharp handling and performance."[7]

40.     Below is an image of this original, patented configuration on a 2011 RZR

800. The engine exhaust pipe is directed away from the occupant compartment and exposed

to a relatively open wheel well:[8]

---

[6] Polaris Ranger 2008 Brochure, at 6.

[7] Polaris Ranger 2009 brochure, at 21.

[8]     Product     Review     Polaris     RZR     800,     DuneGuide.com,
http://www.duneguide.com/ProductReview_Polaris_RZR800.htm, accessed Apr. 2, 2018.



41.     In 2011, Polaris unveiled its new ProStar 900 Twin EFI engine, specifically designed for the Ranger RZR XP 900.  Polaris said the ProStar 900 engine "cranks out an industry-leading 88 HP and delivers 29% faster acceleration than the closest competitor."[9] With a vehicle weight of 1,190 lbs., the new XP 900's power-to-weight ratio was bumped to 0.0739 – significantly more than originally envisioned with the patented behind-the-seat design.   The new engine "delivers fast throttle response, groundbreaking power and revolutionary acceleration."[10]

42.     The ProStar engine was the first engine designed by Polaris engineers rather than by suppliers, as suppliers cost 20-30 percent more money and require more time to develop a custom engine.[11]  On its website, Polaris states: "A ProStar engine is an off-road vehicle engine that has been designed, engineered, and manufactured from the ground-up by the experts at Polaris who share the same passion for off-roading as you do.  ProStar

---

[9] Polaris Ranger Brochure 2011, at 11.

[10] Polaris Ranger Brochure 2011, at 11.

[11] Polaris Indus., 2015 Annual Report, at 8.

engines are purpose-built, tuned, and designed specifically for your vehicle and application.  By leveraging cutting-edge technology from automotive influences, we have emerged as a trusted leader in off-road powertrain technology.  With over one million engines produced we've created the perfect balance of engineered features to ensure you are getting the maximum performance in every vehicle."[12]

43.    The ProStar engine would eventually come in both twin-cylinder and single-cylinder and varying power outputs depending on the vehicle model.  However, all models with the ProStar engine share a common engine and exhaust configuration.

44.    Unlike the original behind-the-seat configuration with the engine exhaust ported on the right side, the ProStar engine was placed squarely behind the occupant compartment, with the exhaust pipe exiting forward toward the front of the vehicle and directly behind the occupant compartment.  The exhaust pipe quickly makes a 180-degree turn mere inches behind the passenger seating and seat belt buckles.  The photographs below show this configuration from different angles in single-cylinder and twin-cylinder versions of the ProStar engine.[13]

---

[12] Polaris Indus. Website, ProStar Overview page, https://rzr.polaris.com/en-us/prostar/, accessed Apr. 2, 2018.

[13] Long Term Report – The Polaris RZR 570, ATV & SXS Illustrated, http://atvillustrated.com/content/long-term-report-polaris-rzr-570, accessed Apr. 2, 2018.







45.     The enclosed engine and exhaust pipe configuration in the Class Vehicles prevents airflow from dissipating the heat from the exhaust.  Heat buildup occurs particularly at low speeds and under high load conditions, frequently experienced while traversing inclines.  The excessive heat melts the plastic sheeting that covers the engine and ignites surrounding combustible materials.

46.     Compounding the problem, the ProStar engine was designed to allow easy access to components for maintenance.  This can be seen in the photos above, which show the pocket of space that provides access to the oil filter and spark plugs.  This area collects combustible organic debris that can ignite as a result of the Engine Overheat/Fire Defect.

47.     Before Polaris installed the ProStar engine behind the occupant compartment, Polaris ROVs were not plagued by engine fires.  The only Polaris recall involving fire risk in the RZR was a 2007 recall of 330 model year 2008 RZR 800 vehicles

---

[14]     2015    RZR    4    XP    1000    for    sale,    Haacke    Motors, https://www.haackemotors.net/2015_Polaris_RZR%204%20XP%201000_Layton_UT_1 1324333.veh.

for fuel tank could leaks, which according to Polaris had not caused any fires.[15]  Likewise the only recall for fire risk in the Ranger vehicles was a 2009 recall of 3,800 model year 2009 Ranger Crew and 6x6 vehicles, concerning a risk of electrical shorting and fire in the rear tail light wiring harnesses.[16]

48.     But two years after Polaris introduced the 2011 Ranger RZR XP 900 – the first model with the ProStar engine positioned on the centerline behind the occupant compartment – Polaris recalled the model because, "the firewall behind the driver and passenger seats can overheat and melt, posing a burn hazard to consumers."[17]  Like the recalls that would follow, Polaris advised customers to stop using the vehicles and bring them in for an unspecified repair.

49.     In the recall announcement, Polaris reported there had been one report of burn injuries to a finger.[18]  However, at least one owner of a 2011 Ranger RZR XP 900 notified the CPSC that in 2012, he was driving the vehicle through the woods when he and his passenger smelled a burning smell.  Moments after they exited the vehicle, they observed a flame behind the seat, which "immediately began to spread and subsequently engulfed the entire [vehicle], until all that remained was the burnt out frame of the vehicle."[19]  When he contacted the dealer and Polaris in May 2012, prior to the recall, they

---

[15] Polaris Indus., Recall No. 08-521, Dec. 6, 2007.

[16] Polaris Indus., Recall No. 09-762, Aug. 4, 2009.

[17] Polaris Indus., Recall No. 13-740, June 19, 2013.

[18] *Id.*

[19] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.

offered him a $5,500 credit toward another purchase.[20]   Thus, when it asserted in the recall that the firewall could melt and had only burnt a finger, Polaris concealed the fact that it was aware of at least one incident in which the entire vehicle burned in minutes.

50.     Polaris marketing shows the company was singularly focused on significantly exceeding the power output of its competitors' products, at the expense of safety.   As Polaris learned of the Engine Overheat/Fire Defect associated with its new centerline engine configuration, it continued introducing models with the defective engine configuration.   For example, in 2013, Polaris introduced the Ranger XP 900, which it touted as containing the new ProStar 900 engine that "pumps out 60 HP, with incredible class-leading torque across the power band.   All that power and torque lets you easily tow up to one ton, or haul up to 1,000 lbs."[21]   At the same time, Polaris advertised, "[i]t's also a quiet ride, thanks to a new engine placement behind the seat and below the box.   Ground clearance is a high, obstacle-clearing 12".[22]

51.     In 2014, Polaris debuted the RZR XP 1000, Ranger 900 and Crew 900, and Ranger 570 and Crew 570.   Each of these vehicles contained a ProStar engine with the exhaust pipe placed in the center behind the occupant space.[23]   The RZR XP 1000's engine "provides an industry-leading 107 horsepower and a true 999ccs of displacement, making

---

[20] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.

[21] Polaris 2013 Off Roads Vehicles Brochure, at 5.

[22] *Id.*

[23] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.

it the most powerful and largest engine in the class."[24]   Thus, this RZR had more than double the horsepower originally envisioned in the RZR patent.[25]

52.   In model year 2015, Polaris debuted the RZR 900 and S 900, which featured "unequalled power from their 75 horsepower ProStar 900 engine offering improved power-to-weight ratio and faster acceleration…"[26]

53.   For model year 2016, Polaris introduced the RZR XP Turbo and RZR XP 4 Turbo, stating in a press release: "The Polaris ProStar Turbo engine provides an industry-leading 144 horsepower – 30 percent more horsepower and 45 percent more torque than the RZR XP 4 1000 EPS.  The ProStar Turbo effortlessly carries a full load of thrill seekers over the most power-robbing terrain.   The new engine was developed for extreme performance. . . . For consistent performance at all temperatures, the vehicle also includes a new liquid charged air cooler with front-mounted, dual radiators with high-capacity fan and high-flow electric pump.   To control the massive power delivered by the ProStar Turbo, the engine management system has also been updated to include knock detection, boost control and a high-flow return style fuel system ensuring that the engine delivers maximum power under all conditions, altitudes and temperatures."[27]

---

[24] *Id.*

[25] *Id.*

[26] Press Release, Polaris Debuts 2015 ORV and Motorcycle Product Lines, July 29, 2014.

[27] Press Release, Polaris RZR Expands 4-Seat Line-Up to Share the Off-Road Experience with Friends and Family, Oct. 6, 2015.

54.     By 2016, all RZR and all gas powered 500cc or larger Ranger models contained a ProStar engine. Importantly, with the exception of the Youth RZR, all of the ROVs Polaris has recalled for fire risk since 2013 contain the ProStar engine directly behind the occupant compartment.

## B. Polaris's Series of Ineffective Recalls

### 1. RZR Recalls

55.     As discussed above, the first recall for the Class Vehicles was issued on June 19, 2013, recall number 13-740. The recall involved 4,500 model year 2011 Ranger RZR XP 900 vehicles. The specified cause: The firewall behind the driver and passenger seats could overheat and melt.

56.     The April 2013 Technical Service Bulletin (TSB) explaining the recall to dealers provided more detail: "Some Ranger RZR XP 900 models may experience hot air leakage from the engine compartment that travels over the service divider panel which can cause deformation of the panel. This hot air leakage into the passenger area can also create elevated air and component temperatures that could cause burns to the occupant of the vehicle. Polaris has developed an aluminum heat shield to deflect the hot air and prevent it from damaging the service divider panel."[28] The TSB noted that this safety bulletin updates a previous TSB issued in 2011 (R-11-03) that was completed through warranty claims, indicating that Polaris was aware of this problem two years before it issued the recall.

---

[28] Polaris Indus., Tech. Serv. Bulletin R-13-02, Apr. 25, 2013, at 1.

57.    On October 5, 2015, Polaris issued recall number 16-702 for 53,000 model year 2015 RZR 900 series and RX XP 1000 series vehicles.[29]  The cause stated in the recall notice was that the fuel vent line could be misrouted, causing it to become pinched.  That in turn could over pressurize the fuel tank and leak fuel.  Polaris's press release noted that it had also received reports of the driveline contacting the pressurized fuel tank, which also caused fuel leaks.[30]  Polaris said it had received four reports of fuel leaks in the RZR 900 series, including two fires and one minor burn injury, and 25 reports of fuel leaks in the RZR 1000 series, with no fire incidents.[31]

58.    What Polaris did not report in the recall was that in July 2015, 15-year-old Baylee Hoaldridge suffered burns over 65 percent of her body when the 2015 RZR 900 her family had rented tipped on its side and burst into flames.[32]  Baylee died from complications a month after the recall was issued.[33]

59.    When Polaris subsequently rolled this recall into another expanded recall, it provided more information that demonstrated the fuel vent problem was also related to the exhaust pipe's location. In addition to the kinked fuel vent line, "[a]n improperly routed

---

[29] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.

[30] Polaris Industries Recalls RZR Recreational Off-Highway Vehicles Due to Potential Fire Hazard, Oct. 5, 2015.

[31] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.

[32] Caroline Connolly, Attorney for Family of Teen Girl Severely Burned in Crash Says Polaris Should Consider Vehicle Recall, Fox 13 Salt Lake City, Aug. 27, 2015.

[33] Jeffrey Meitrodt, Polaris Recalls 133,000 Off-Road Vehicles After Reports of Fire, Minneapolis Star Tribune, Apr. 19, 2016.

fuel tank vent line may have insufficient clearance to the exhaust head pipe.  A vent line with insufficient clearance to the exhaust head pipe may pose a fire hazard."[34]

60.     The specified "fix" did not actually resolve the fire risk. On March 5, 2016, a fire started in a 2015 RZR XP4 1000 while a 19-year-old and 13-year-old were sitting in the occupant compartment.[35]  The fire engulfed the vehicle and burned it down to the metal chassis before help could arrive.[36]  The recall repair had been completed three months earlier.[37]  The CPSC report for the incident included photos:

 

61.     On December 10, 2015, in recall number 16-257, Polaris recalled 2,230 model year 2016 RZR XP Turbo and RZR XP 4 Turbo vehicles, stating that the turbocharger's oil drain line could leak, posing a fire hazard.  At that time, Polaris reported two reports of oil leaks and two reports of fire with no injury.  The turbocharged vehicles were first recalled only two months after they were released into the market.

---

[34] Polaris Indus., Tech. Serv. Bulletin Z-16-01-AD, Apr. 19, 2016.

[35] CPSC, Epidemiologic Investigation Report, No. 160309CBB1457, Mar. 28, 2016.

[36] *Id.* at 3.

[37] *Id.* at 1.

62.     This recall would be expanded to 13,000 turbocharged vehicles in September 2016, but this time the cause was connected to the Engine Overheat/Fire Defect: "The vehicle's engine can overheat and turbo system's drain tube can loosen"[38] Polaris reported it had received 19 reports of vehicles catching fire, causing six burn injuries.  Polaris stated one of those incidents involved a young child – that is a 6-year-old girl who was burned over 40 percent of her body when the RZR Turbo caught fire in Utah's American Fork Canyon, also setting fire to 15 acres of land.[39]

63.     As depicted in the photo below, owners of vehicles repaired under this recall posted on online forums that the heat shield their dealer installed on the exhaust pipe to repair this recall had burned shortly thereafter.[40]



64.     Realizing that the initial recall for the RZR 900 and 1000 series was inadequate, Polaris expanded the recall on April 19, 2016, to include a total of 133,000

---

[38] Polaris Indus., Recall No. 16-257, Sept. 1, 2016.

[39] Jed Boal, Recent ORV Explosion Raises Questions About Vehicle's Safety, KSL.com, Jul. 26, 2016, https://www.ksl.com/?sid=40821427&nid=148, accessed Apr. 2, 2018.

[40] RZR Forums.Net, 16 Turbo with Recall done heat shield allegedly burning, Sept. 24, 2016,    http://www.rzrforums.net/rzr-xp-turbo/336465-16-turbo-recall-done-heat-shield-allegedly-burning.html, accessed Apr. 2, 2018.

vehicles: the 2013-2014 RZR XP 900 (production ended after 2014, when it became the RZR 900), 2014-2016 RZR XP 1000 (entire production to date), 2015-2016 RZR 900 (entire production to date), 2015-2016 RZR S 900 (entire production to date), 2016 RZR S 1000 (debut year).  Each of these vehicles had a ProStar engine mounted on the vehicle's centerline behind the occupant compartment.

65.     Polaris did not specify a root cause on the recall notice, saying only the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[41] Polaris reported it had received 160 reports of fires with just those vehicles and 19 injury reports, including some for third degree burns.[42]  Inexplicably, Polaris still did not include Baylee Hoaldridge's death in the tally.

66.     According to the TSBs Polaris sent to dealers for this recall, the vehicles had one or more of several issues related to overheating and fire.  Every recalled vehicle also had the engine configuration associated with the Engine Overheat/Fire Defect.

67.     In a press release, Polaris stated it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles. Polaris also plans to include a warning on new-production vehicles instructing riders not to carry fuel and other flammable liquids in their vehicles, and cautions against carrying flammable liquids in previously produced models."[43]

---

[41] Polaris Indus., Recall No. 160146, Apr. 19, 2016.

[42] *Id.*

[43] Press Release, Polaris Industries Voluntarily Recalls Certain RZR 900 and 1000 Off-Road Vehicles, Apr. 16, 2016.

68.     Polaris's Chairman and CEO Scott Wine assured the public, "[w]e are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis.  We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."[44]

69.     However, on March 2, 2017, Polaris again expanded on previous recalls, re-recalling 13,500 model year 2016 vehicles that had already been recalled and adding model year 2017 for certain vehicles in the RZR 900 series, RZR XP 1000, and RZR XP 4 Turbo. It noted that many of these had already been recalled, meaning that those fixed under the expansive April 2016 recall still suffered from the Engine Overheat/Fire Defect.  It also added the 2016-2017 General 1000 and General 4 1000.[45]  Like the others, the recall for the General 1000 series encompassed its entire production run.  All recalled vehicles featured the ProStar engine.[46]

70.     This recall stated that the engine could misfire, causing the exhaust temperature and nearby components to overheat and melt.[47]  Polaris received one report of fire and two reports of melting related to engine misfire.[48]

---

[44] *Id.*

[45] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.

[46] Polaris General 1000 EPS: Full Test, UTV Action, Apr. 8, 2016, https://utvactionmag.com/polaris-general-1000-eps-full-test/, accessed Apr. 2, 2018.

[47] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.

[48] *Id.*

71.     Finally, on December 19, 2017, Polaris and CPSC issued a joint statement warning the public that fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and property damage.[49]   The warning noted that many of the vehicles were previously recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall continue to report fires, including total-loss fires."[50]   The warning also stated that some of the 2017 RZR vehicles not previously recalled have also experienced fires.[51]

72.     The joint statement offered no solution, saying only that "[t]he CPSC and Polaris continue to work together to ensure fire risks in these vehicles are addressed. However, at this time, the CPSC and Polaris want to make the public aware of the fires involving these vehicles."[52]

73.     To date, the CPSC and Polaris have failed to publicly specify root causes or offer a viable repair.   Thus, owners of the 2013-2017 RZR 900 and 1000 series vehicles are faced with a difficult conundrum: operate Class Vehicles with the risk of fire, park Class Vehicles until a fix is devised, or sell at a value depressed by the Engine Overheat/Fire Defect.

---

[49] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-Highway Vehicles (ROVs), Dec. 19, 2017.

[50] *Id.*

[51] *Id.*

[52] *Id.*

74.     The RZR recalls did not stop there.  Three days after the joint CPSC and Polaris announcement, the fire hazard was associated with model year 2018 vehicles, with Polaris recalling 560 RZR XP 4 Turbo vehicles for an improperly secured fuel line that could leak fuel.[53]  Polaris had received one report of fire related to this flaw.[54]

75.     On April 2, 2018, Polaris issued yet another recall related to the Engine Overheat/Fire Defect. The recall applies to 107,000 model year 2014-2018 RZR XP 1000 vehicles in which the exhaust silencer fatigues and cracks and the heat shield fails to manage the heat, leading to melting of nearby components or fire.[55]

76.     In sum, all RZR vehicles with the centerline-mounted ProStar engine have been recalled (except for the single-cylinder RZR 570 and the model year 2012 RZR XP 900).  Prior to this engine configuration, only 330 total RZR vehicles had been recalled and that was in 2008.

## 2. Ranger Recalls

77.     At the same time the series of RZR recalls was unfolding, the Ranger vehicles with ProStar engines in the central location were also recalled several times.  The Ranger recalls concern deficient and poorly constructed heat shields.

78.     In June 2016, Polaris recalled 43,000 model year 2015-2016 Ranger 570 and Crew 570 series vehicles.  The U.S. recall stated that the ROVs could overheat during heavy engine loading, slow-speed intermittent use and/or high outdoor temperatures,

---

[53] Polaris Indus., Recall No. 18-708, Dec. 21, 2017.

[54] *Id.*

[55] Polaris Indus., Recall No. not provided, Apr. 2, 2018.

causing them to catch fire.[56]  However, Canada's recall statement explained that the culprit was that the excessively hot exhaust system in a confined space could set the plastic engine cover on fire.[57]

79.     Polaris had received 36 reports of fire, including three minor burns and one sprained ankle associated with escaping the burning vehicle.

80.     In September 2016, Polaris recalled 42,500 model year 2014 Ranger XP 900 and Crew 900, stating it had received 36 reports of fire, including three minor injuries.[58] In April 2017, Polaris expanded the recall to include model year 15 after receiving 13 incident reports, including five fires.[59] This recall also asserted that the heat shield could fall off the vehicle.

81.     Polaris has not recalled model years 2013 or 2016 for the Ranger XP 900, but online forum participants have warned of the Engine Overheat/Fire Defect. In 2013, a firefighter posted a warning on a forum under the subject heading, "2013 polaris ranger 900 xp exhaust FIRE danger," saying after he purchased the vehicle, he and his fellow firefighters discovered that in the "new Polaris setup the muffler gets really hot."  That is a danger because of "the vehicle's exhaust and muffler placement," as well as the fact that

---

[56] Polaris Indus., Recall No. 16-755, June 28, 2016.

[57] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.

[58] Polaris Indus., Recall No. 16-264, Sept. 16, 2016.

[59] Polaris Indus., Recall No. 17-132, Apr. 13, 2017.

"a majority of the muffler is open and could easily start a grass fire if not watched carefully by the operator, especially when stopping in long dry grass or brush."[60]

82.    Another consumer posted in November 2016 that his new 2016 Ranger XP 900 had caught fire only three days after he purchased it after mud and straw ignited on the engine.  The consumer reported, "I am choked.  I have used this brand new item for 1.5 working days since Nov. 9.  The dealer and Polaris see me as 'overreacting,' and I can't get Polaris to contact me."[61]

83.    Polaris tells Ranger owners that only a dealer can conduct the replacement repairs.  Many Ranger owners use their vehicles as utility vehicles on farms or other remote locations, with dealerships miles away.   For example, one forum user who has a 2015 Ranger XP 900 stated, "According to my dealership, which is 90 miles away, I need to return it there and can't do the work myself.  He also stated that if it caught fire while riding it, neither Polaris nor my insurance company would be liable.  I'd be on the hook for damages myself."[62]

84.    Thus, Ranger owners whose vehicles have been recalled are also forced to make the decision between taking time to deliver the Ranger to a dealership, possibly

---

[60] PRC Ranger Club, 2013 Polaris Ranger 900 xp exhaust FIRE danger, July 26, 2013, http://www.prcforum.com/forum/154-ranger-xp-900-570-fs-discussions/50505-2013-polaris-ranger-900-xp-exhaust-fire-danger.html, accessed Apr. 2, 2018.

[61] Ranger Forums, XP 900 on Tracks Major Problems, by Frankie Paper Boy, Nov. 23, 2016, http://www.rangerforums.net/forum/polaris-ranger-xp900/30402-xp-900-tracks-major-problems.html, accessed Apr. 2, 2018.

[62] Ranger Forums.Net, 2015 XP900 Recall Notice, Apr. 24, 2017, http://www.rangerforums.net/forum/polaris-ranger-xp900/35433-2015-xp900-recall-notice.html, accessed on Apr. 2, 2018.

leaving it there for days while waiting for the repair, or use a vehicle that could catch fire while they are using it.

85.     The recent admission by the CPSC and Polaris that the RZR recall repairs was unsuccessful and that unrecalled vehicles are catching fire leaves many Ranger owners whose vehicles have not yet been recalled in fear of a vehicle fire.

86.     On April 2, 2018, the CPSC confirmed Polaris's duplicity, fining the company a record $27.25 million for failing to timely report defects and fire hazards in the RZR and Ranger models that it knew could result in serious injury or death.[63] Neither the CPSC's nor Polaris's press releases announcing the fine mentioned the unsolved defect situation with the RZR vehicles.

**C.      Polaris's Meteoric Rise Causes Systemic Quality Control Problems**

87.     During the timeframe the engines were designed and manufactured, Polaris underwent a meteoric rise in sales that led to dangerous cost-cutting measures.   As discussed below, Polaris began designing and building its own engine – the ProStar – to save money and development time.   The company has recently admitted this led to a decrease in research and development investment and engineering oversight. Concurrently, the company also allowed systemic quality control and manufacturing lapses, resulting in minimal oversight of design, testing and manufacturing just when the company was rapidly rolling out a significantly different design.

---

[63] CPSC, Press Release, Polaris Agrees to Pay $27.25 Million Civil Penalty for Failure to Report Defective Recreational Off-Road Vehicles, Apr. 2, 2018.

88.     The 2009 recession prompted Polaris to declare 2010 the year of "Making Growth Happen," which they planned to accomplish by "leveraging our industry-leading innovation, speed to market and burgeoning international presence."[64]  That year, Polaris experienced a 27 percent sales increase, requiring ramped up production, a new assembly line in Mexico, and enhanced U.S. facilities to lower production costs and manufacturing lead times.[65]  The company set a goal of reaching $5 billion in worldwide sales by 2019.[66]  Products that used to take six months to manufacture were now produced in as little as two weeks because representatives were meeting with dealers frequently to discuss sales and demand, rather than requiring that dealers guess what to stock.[67]  In its first year of operation, the Monterrey, Mexico facility alone produced 22,000 vehicles.[68]

89.     One cost-cutting measure Polaris took in 2009 was to begin designing and manufacturing its own engines.  In its 2015 Annual Report, Polaris explained the reasons for this evolution: "Lower cost – Suppliers typically charge 20 to 30 percent more to develop a custom engine than it costs to do it in-house. Faster time to market – A custom engine from a supplier typically takes four to five years to develop, an unacceptable timeline for a competitive company."[69]

---

[64] Polaris Indus., 2010 Annual Report, at 1.

[65] *Id.* at 2.

[66] *Id.*

[67] *Id.* at 4.

[68] Polaris Indus., 2011 Annual Report, at 10.

[69] Polaris Indus., 2015 Annual Report, at 8

90.    Polaris also explained that developing an engine in-house provides "[t]he flexibility to be more innovative – We can experiment more cost-effectively with radical ideas that help exceed customer desires."[70]

91.    In developing the ProStar engine, "[w]e borrowed a page from our chassis playbook and developed five platforms that serve as the foundation for all our engines. While each engine has its own distinct brand variances, they share some common elements to maximize our powertrain investment."[71]

92.    Thus, Polaris began developing the ProStar engine in 2009 and installed it in the first vehicle, the 2011 RZR XP 900, only two years later.

93.    By 2011, Polaris was making 24 models of ORVs, including Sportsman ATVs (themselves the subject of a fire-hazard class action lawsuit).[72]   The goal to reach $5 billion in sales was shortened from by 2019 to 2018.[73]

94.    The rapid growth continued in 2012, with Polaris emphasizing the thirst for growth at a rapid pace in its Annual Report: "Regardless of the challenges, the success of Polaris ultimately depends on leadership and teamwork. We have a deep and talented team that is the best in powersports, and we rely on their experience and ability as we expand into new markets. Our ability to innovate and execute faster and better than the competition provides Polaris with an advantage that plays anywhere; couple that with the global reach

---

[70] Polaris Indus., 2015 Annual Report, at 8

[71] Polaris Indus., 2015 Annual Report, at 9

[72] Polaris Indus., 2011 Annual Report, Securities Form 10-K Filing, at 16.

[73] *Id.* at 1.

of our strong brands and the potential of our business is practically unlimited. This Polaris team has aggressively and consistently executed our Strategic Objectives to create both value for shareholders and significant opportunities for additional growth."[74]

95.     In its 2013 report, Polaris proclaimed that its sales had risen so much it had expanded its sales goal to $8 billion by 2020.[75]   In that year alone, it launched 26 new models, bringing the total ORV models to 49 (double the number of models in 2011).[76] But there were signs that Polaris knew the pace might be affecting quality, as Polaris stated in its Annual Report: "Achieving our net margin goal five years early, in conjunction with our accelerated revenue growth, coincides nicely with the exponential expansion our market capitalization has undergone.   While we're certainly pleased with our progress, there are clear justifications for our intense motivation to be better: we must improve project execution, quality and speed; lower inventories and warranty costs; and generate significant returns on numerous investments that have, in some cases, diluted our margins over the past few years."[77]   The report also stated that the "financial results were arguably better than our operational performance" and "less-than-stellar execution."[78]

96.     To address some of those concerns, in 2014, Polaris created the division for Operations, Engineering and Lean [Management].   The executive vice president of this

---

[74] Polaris Indus., 2012 Annual Report, at 4.

[75] Polaris Indus., 2013 Annual Report, at 3.

[76] *Id.*; *see also* Polaris Indus., 2014 Annual Report, Securities Form 10-K Filing, at 30.

[77] Polaris Indus., 2013 Annual Report, at 2.

[78] *Id.* at 4.

division, Ken Pucel, said he was brought in to "make sure we not only drive industry-leading innovation, but that we also drive continuous improvement and efficiency and quality and safety and keep up with product demand."[79] To improve operations, Polaris was "better integrating engineering and manufacturing. We're involving manufacturing experts earlier in the development process and involving engineering experts further into manufacturing and supply chain."[80]

97. Sales in ORVs declined in 2015, prompting Polaris to proclaim an "all-out assault on costs." Polaris's 2015 Annual Report hints at its recognition that quality was suffering: "Quality and Delivery must also improve as we progress along our Lean journey. While an important commitment will always be to build the best vehicles, we know that winning in the future will require more than horsepower and suspension travel. With our multi-year global investment in assembly plants in its final stages – from Spirit Lake and Opole all the way to Jaipur and Shanghai – we are prepared to deliver higher-quality vehicles and shorter lead times to customers all over the world."[81]

98. After recalling more than 200,000 RZR and Ranger vehicles for fire hazards in 2016, Polaris, in its Annual Report, promised that the company was improving its engineering and quality: "As Polaris has always done, we attacked our problems head-on and learned a great deal as we addressed them. We are putting that knowledge to use as we continue to strengthen our Global Safety and Quality function. Safety and quality have

---

[79] Polaris Indus., 2014 Annual Report, at 18.

[80] *Id.*

[81] Polaris Indus., 2015 Annual Report, at 2.

been, and remain, our top priorities, but we know we still have much work to do.  We will continue to closely monitor our vehicles' performance.  When an issue arises, we will act swiftly to keep our customers safe."[82]

99.    Polaris also asserted it was "increasing our R&D investment significantly, adding engineering resources to ensure that our armada is stronger than ever before.  With stronger leadership, increased investments, more resources, improved dealer service and support, and of course, great vehicles, we are well-prepared to deliver better performance in a competitive ORV market."[83]

100.    The Annual Report included a description of the goals of the Global Safety and Quality Organization: "enhanced and monitor quality systems across the entire product lifecycle—from product and supplier development through manufacturing and end of life.  Enhanced and monitor safety training for all employees.  Conduct post-sale surveillance, tracking warranty data and social media to identify and address safety trends sooner."[84]

101.    Polaris thus *admitted* that the Class Vehicles were made during a time of less attention to design engineering and subpar quality control mechanisms.

---

[82] Polaris Indus., 2016 Annual Report, at 3.

[83] *Id.* at 4.

[84] *Id.* at 11.

## V.     TOLLING OF THE STATUTES OF LIMITATION

### A.     Discovery Rule Tolling

102.   Neither Plaintiffs nor the other Class members could have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation.

103.   Among other things, neither Plaintiffs nor the other Class members knew or could have known that the Class Vehicles contain the Engine Overheat/Fire Defect.

### B.     Fraudulent Concealment Tolling

104.   Throughout the time period relevant to this action, Polaris concealed from and failed to disclose to Plaintiffs and the other Class members vital information concerning the Engine Overheat/Fire Defect described herein.

105.   Indeed, Polaris kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

106.   Specifically, throughout the Class Period, Polaris was aware that the Class Vehicles were susceptible to catching fire, and that they contained the Engine Overheat/Fire Defect.

107.   Despite its knowledge of the defect, Polaris failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

108.   Plaintiffs and the other Class members justifiably relied on Polaris to disclose the Engine Overheat/Fire Defect in the Class Vehicles that they purchased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class members.

109.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

**C.     Estoppel**

110.   Polaris was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles

111.   Polaris knowingly concealed the true nature, quality, and character of the Class Vehicles.

112.   Based on the foregoing, Polaris is estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ACTION ALLEGATIONS

113.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

114.   Plaintiffs seek to represent a class ("the Nationwide Class") defined as:

> All current and former owner or lessees of a Class Vehicle (as defined herein) that was purchased in the United States.

115.   Plaintiffs also respectively seek to represent the following statewide classes ("the Statewide Classes") defined as follows:

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama ("the Alabama Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Illinois ("the Illinois Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Wyoming ("the Wyoming Class").

116.   Excluded from both the Nationwide and Statewide Class are Defendants Polaris Industries, Inc. and Polaris Sales, Inc. and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members.  Plaintiffs reserve the right to modify or amend these Nationwide and Statewide Class definitions, as appropriate, during the course of this litigation.

117.   The Classes expressly disclaim any recovery in this action for personal injury resulting from the Engine Overheat/Fire Defect, without waiving or dismissing any such claims.

118.   This action has been brought and may properly be maintained on behalf of the Nationwide and Statewide Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

119.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Nationwide and Statewide Classes are so numerous and geographically dispersed that

individual joinder of all class members is impracticable. While Plaintiffs are informed and believe that there are not less than 300,000 members of the Nationwide and Statewide Classes, the precise number of Nationwide and Statewide Classes is unknown to Plaintiffs but may be ascertained from Polaris's books and records. Nationwide and Statewide Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

120. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

   a. whether Polaris engaged in the conduct alleged herein;

   b. whether Polaris's alleged conduct violates applicable law;

   c. whether Polaris designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

   d. whether Polaris misled Nationwide and Statewide Class members about the safety of the Class Vehicles;

   e. whether the Class Vehicles contain the Engine Overheat/Fire Defect alleged herein;

f.       whether Polaris had actual or imputed knowledge about the alleged

defect but failed to disclose it to Plaintiffs and the other Nationwide and Statewide

Class members;

g.       whether Polaris's omissions and concealment regarding the quality

of the Class Vehicles were likely to deceive Statewide Class members in violation

of the state consumer protection statute alleged herein;

h.       whether Polaris breached its express warranties to the Nationwide

and Statewide Class members with respect to the Class Vehicles;

i.       whether Polaris breached its implied warranties to the Nationwide

and Statewide Class members with respect to the Class Vehicles;

j.       whether Nationwide and Statewide Class members overpaid for their

Class Vehicles as a result of the defect alleged herein;

k.       whether Nationwide and Statewide Class members are entitled to

damages, restitution, restitutionary disgorgement, equitable relief, statutory

damages, exemplary damages, and/or other relief; and

l.       the amount and nature of relief to be awarded to Plaintiffs and the

other Nationwide and Statewide Class members.

121.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims

are typical of the other Nationwide and Statewide Class members' claims because Plaintiffs

and the Nationwide and Statewide Class members purchased or leased Class Vehicles that

suffer from the Engine Overheat/Fire Defect.  Neither Plaintiffs nor the other Nationwide

and Statewide Class Members would have purchased the Class Vehicles, or, alternatively,

would have paid less for the Class Vehicles, had they known of the Engine Overheat/Fire Defect.   Plaintiffs and the other Nationwide and Statewide Class members suffered damages as a direct proximate result of the same wrongful practices in which Polaris engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Nationwide and Statewide Class members.

122.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Nationwide and Statewide Classes that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Nationwide and Statewide Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

123.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**.  Polaris has acted or refused to act on grounds generally applicable to Plaintiffs and the other Nationwide and Statewide Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

124.   **Superiority – Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Nationwide and Statewide Class members are relatively small compared to the

burden and expense that would be required to individually litigate their claims against Polaris, so it would be impracticable for the Nationwide and Statewide Class members to individually seek redress for Polaris's wrongful conduct. Even if the Nationwide and Statewide Class members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CLAIMS FOR RELIEF

**A.    Claim Brought on Behalf of the Nationwide Class**

### COUNT 1
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*

125.    Plaintiffs repeat and reallege paragraphs 1-124 as if fully set forth herein.

126.    Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

127.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

128.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

129.    Polaris is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

130.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

131.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

132.   In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship. . . . This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

133.   Polaris's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

134.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of Polaris's written warranty and implied warranty became part of the basis of the bargain between Polaris, on the one hand, and Plaintiff and each of the other Class members, on the other.

135.   Polaris breached these warranties as described in more detail above.  Without limitation, the Class Vehicles have an unreasonable propensity to catch fire, as described above.

136.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

137.    At the time of sale or lease of each Class Vehicle, Polaris knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff and the other Class members resort to an informal dispute resolution procedure and/or afford Polaris a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

138.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

139.    As a direct and proximate result of Polaris's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class members have sustained damages in an amount to be determined at trial.

140.    Plaintiffs, individually and on behalf of all the other Class members, seeks all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**B.**     **Claims Brought on Behalf of the Alabama Class**

<u>COUNT 2</u>
**VIOLATIONS OF ALABAMA'S
DECEPTIVE TRADE PRACTICES ACT
Ala. Code. §§ 8-19-1, *et seq.***

141.    Plaintiff Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

142.    Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

143.    The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

144.    By the conduct described in detail above and incorporated herein, Polaris engaged in deceptive trade practices.

145.    Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

146.    Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

147.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity

to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

148.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

149.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

150.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members' Class Vehicles with that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

151.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed.

Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq.*

## COUNT 3
## BREACH OF EXPRESS WARRANTY
### Ala. Code. §§ 7-2-313 and 7-2A-210

152.   Plaintiff Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

153.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

154.   Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

155.   In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship. . . . This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

156.   Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

157.   Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

158.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

159.   The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

160.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

161.   Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.   Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

162.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein,

and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

163.    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 4**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Ala. Code §§ 7-2-314 and 7-2A-212**

164.    Plaintiff Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

165.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

166.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under Ala. Code §§ 7-2-104 and 7-2A-103.

167.    Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

168.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class

Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

169.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

170.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

171.   As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 5**
**FRAUDULENT OMISSION**

172.   Plaintiff Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

173.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

174.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

175.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a

duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

176.   Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

177.   For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

178.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

179.   Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

180.   Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

181.   As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 6
## UNJUST ENRICHMENT

182.    Plaintiff Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

183.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

184.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

185.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

186.    It is inequitable and unconscionable for Polaris to retain these benefits.

187.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

188.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

189.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**C.     Claims Brought on Behalf of the Illinois Class**

<u>COUNT 7</u>
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 Ill. Comp. Stat. 505/1, *et seq.***

190.    Plaintiff Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

191.    Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

192.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

193.    By the conduct described in detail above and incorporated herein, Polaris engaged in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

194.    Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

195.    Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

196.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine

Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

197.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

198.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

199.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members' Class Vehicles with that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

200.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would

have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill. Comp. Stat. 505/1, *et seq*.

## COUNT 8
## BREACH OF EXPRESS WARRANTY
### 810 Ill. Comp. Stat. 5/2-313 and 5/2A-210

201.  Plaintiff Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

202.  Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

203.  Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

204.  In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship. . . . This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

205.  Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

206.   Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

207.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

208.   The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

209.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

210.   Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

211.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein,

and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

212.   As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 9
## FRAUDULENT OMISSION

213.   Plaintiff Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

214.   Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

215.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

216.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

217.   Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

218.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

219.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

220.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

221.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

222.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

### COUNT 10
### UNJUST ENRICHMENT

223.    Plaintiff Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

224.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

225.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

226.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

227.    It is inequitable and unconscionable for Polari to retain these benefits.

228.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

229.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

230.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**D.    Claims Brought on Behalf of the Wyoming Class**

**COUNT 11**
**BREACH OF EXPRESS WARRANTY**
**Wy. Stat. §§ 34.1-213 and 34.1-2.a-210**

231.    Plaintiff Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

232.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

233.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

234.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship. . . . This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

235.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

236.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

237.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

238.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because

Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

239.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

240.    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

241.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

242.    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 12
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Wy. Stat. §§ 34.1-2-314 and 34.1-2.a-212

243.    Plaintiff Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

244.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

245.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under Wy. Stat. §§ 34.1-2-104 and 34.1-2.a-103.

246.    Pursuant to Wy. Stat. §§ 34.1-2-314 and 34.1-2.a-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

247.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

248.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

249.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

250.     As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 13
## FRAUDULENT OMISSION

251.     Plaintiff Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

252.     Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

253.     Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

254.     Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

255.     Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

256.     For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

257.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

258.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Generation IV Vortec 5300 Engines, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

259.    Through its omissions regarding the Engine Overheat/Fire Defect within the Generation IV Vortec 5300 Engines, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

260.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 14
## UNJUST ENRICHMENT

261.    Plaintiff Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-124 as if fully set forth herein.

262.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

263. Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

264. Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

265. It is inequitable and unconscionable for Polari to retain these benefits.

266. Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

267. Polaris knowingly accepted the unjust benefits of its wrongful conduct.

268. As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## VIII. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the Statewide Classes, respectfully requests that the Court enter judgment in their favor and against Defendant, Polaris Industries, Inc., as follows:

a. Declaring that this action is a proper class action, certifying the Nationwide and Statewide Classes as requested herein, designating Plaintiff as Nationwide and Statewide Class Representative, and appointing Plaintiffs' attorneys as Class Counsel;

b.      Enjoining Polaris from continuing the unfair business practices alleged in this Complaint;

c.      Ordering Polaris to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Nationwide and Statewide Class members, as allowable by law;

d.      Ordering Polaris to pay both pre- and post-judgment interest on any amounts awarded;

e.      Ordering Polaris to pay attorneys' fees and costs of suit; and

f.      Ordering such other and further relief as may be just and proper.

## IX.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  April 5, 2018                 **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**


By:  s/  Robert K. Shelquist
Robert K. Shelquist, #21310X
Rebecca A. Peterson, #0392663
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota  55401
Telephone:  612-339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT & CASEY LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com
dferri@dlcfirm.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland  20874
Telephone:  703-901-1660
courtney@thedavenportlawfirm.com
***Counsel for Plaintiffs and the Proposed Classes***