## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:  Polaris Marketing, Sales Practices, and Products Liability Litigation | CASE NO.: 18-CV-00939 (WMW/DTS) **CONSOLIDATED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiffs James Bruner, Jose Luna, Clint Halvorsrod, Robert Lenz, Michael Zeeck, Chad Rogers, Richard Berens, Steve Bailey, Michael Jacks, Bryan Forrest and Ed Beattie, individually and on behalf of the other members of the below-defined nationwide and statewide classes (collectively, the "Class"), hereby allege against Defendants Polaris Industries, Inc. and Polaris Sales, Inc. (collectively, "Polaris"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel, as follows:

## I.    INTRODUCTION

1.    For almost a decade, Polaris has been the industry leader in off-road vehicle sales.  In 2016, Polaris sold 480,000 off-road vehicles for net sales of $3.36 billion. Polaris's off-road vehicles include the popular Ranger and RZR lines.

2.    The 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018 Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, 2017-2018 Ranger 500, 2017-2018 Ace 500, 2017-2018

Ace 570, and 2017-2018 Ace 900 (collectively, the "Class Vehicles") all suffer from a design defect that creates a significant and unreasonable risk of the vehicles overheating and catching fire.

3.     In fact, since 2013, Polaris has recalled, at different times, all of the Class Vehicles because of fire hazards that have caused more than 250 fires, in excess of 30 severe injuries, and at least three deaths.

4.     None of these recalls, however, addressed the root problem of the fire risk in the Class Vehicles, and have thus failed to remedy the risk for vehicle owners.  Indeed, vehicles that have been repaired pursuant to Polaris's ineffective recalls have nevertheless caught fire and otherwise continued to subject Plaintiffs, the other Class members, and the general public to acute safety risks.

5.     Although Polaris has blamed multiple root causes for the fire risk in its RZR and Ranger vehicles, it has failed to disclose the ultimate cause of the fire risk.

6.     The true cause of the fire hazard is a design defect that is common to all of the Class Vehicles.  The Class Vehicles are equipped with an unusually high-powered "ProStar" engine that is tucked directly behind the occupant compartment.  The ProStar engine produces more power than the engines in competing vehicles and, accordingly, more heat.  The ProStar's exhaust gas piping routes forward toward the occupants, then turns 180 degrees, creating a U-shape, and exits from the rear.

7.     The piping lacks proper ventilation and heat shielding, and is positioned within inches of combustible plastic body panels.  Thus, the hottest area of this high-performance engine is located inches behind the occupants, in an area of the vehicle that is

enclosed with little room for air flow to dissipate the high heat.  The extremely high temperatures, combined with inadequate cooling and heat shielding, result in the melting of the plastic body panels and the ignition of any combustible material surrounding the engine, including organic debris, leading to potentially deadly fires.  Hereinafter, this flawed design is referred to as the "Engine Overheat/Fire Defect."

8.     The Engine Overheat/Fire Defect stands in stark contrast to the design that was described in the 2006 patent application for the vehicle that became the RZR.  That patent application disclosed a 50-horsepower engine that exhausted to the right side of the vehicle, rather than directly forward toward the occupants, thus allowing for more efficient engine cooling.

9.     But, in a quest to gain a performance edge, and thus increase its sales and profits, starting with the 2011 Ranger RZR XP 900, Polaris installed a much more powerful 88-horsepower engine that exhausted forward into an inadequately vented, and inadequately shielded, compartment, placing passengers at risk of overheating and fire.

10.     Polaris introduced the high-performance ProStar engine in this center position over few years in all 500cc and larger models.  Every Class Vehicle has a ProStar engine located directly behind the occupant compartment.  In fact, the first recall for this fire risk in 2013 began with the first model to receive the ProStar engine – the 2011 RZR XP 900.

11.     As a cost-saving measure, Polaris designed the ProStar engine in-house rather than outsourcing.  The design process was rushed, and upon information and belief Polaris failed to take adequate time to design and test the engine and its new placement.

12.     In hurrying the Class Vehicles to market, Polaris failed to install components necessary for safe operation, such as: adequate heat shielding in areas where plastic body panels sit mere inches from hot engine components, metal body panels in place of combustible plastic, electric cooling fans for engine heat removal and a more efficient closed cooling system.

13.     At that time, Polaris was significantly increasing its sales and profits, and the accelerated pace and drive to maximize profit by reducing costs created systemic quality control issues that exacerbated the effects of the Engine Overheat/Fire Defect.

14.     Polaris concealed the Engine Overheat/Fire Defect from Class Members and potential purchasers, and concealed that it has not developed an adequate, permanent fix for the defect.  Polaris is aware that the best fix is a significant redesign, which is likely unavailable to Class Members.  In absence of that, the Class Vehicles will require an extensive combination of mitigating measures Polaris has not yet publicly revealed. Instead, it has implemented several band-aide repairs that even Polaris has now acknowledged are ineffective.

15.     Class Vehicle owners and lessees are unable to drive their vehicles without putting themselves at risk of injury and property damage due to the fire hazards they present.  They are also injured if they sell these vehicles before a proper fix is determined and the vehicle is repaired, as the vehicles have a reduced value.  Most 2017 model year vehicles have not even been recalled despite their inclusion in a warning from the U.S. Consumer Product Safety Commission (CPSC) and Polaris that the RZR vehicles have an unresolved fire hazard, putting occupants at risk without any recourse.

16.     As a result of Polaris's unfair, deceptive, and/or other wrongful conduct, owners and lessees of the Class Vehicles have suffered monetary loss and/or lost value. Plaintiffs and the other Class Members suffered injury in fact and incurred damages.

## II.     JURISDICTION AND VENUE

17.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than Defendants.

18.     This Court has personal jurisdiction over Polaris Industries, Inc. and Polaris Sales, Inc. because each of these entities has its principal place of business in the State of Minnesota, and in this district.

19.     Venue is proper in this district under 28 U.S.C. § 1391 because Polaris Industries, Inc. and Polaris Sales, Inc. reside in this district.  Additionally, Polaris has marketed, advertised, sold, and leased Class Vehicles within this district.

## III.     PARTIES

**A.     Plaintiffs**

**1.     Alabama**

20.     Plaintiff James Bruner is a citizen of Alabama and is a resident of Tallassee, Alabama.

21.     Plaintiff Bruner purchased a new 2017 Polaris Ranger XP 900 (for purposes of this paragraph, "Class Vehicle") from Shoals Outdoor Sports in Tuscumbia, Alabama in 2017.

22.     When Plaintiff Bruner purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Bruner operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

23.     Plaintiff Bruner purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

24.     Before purchasing his Class Vehicle, Plaintiff Bruner reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff Bruner also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff Bruner also discussed his Class Vehicle prior to his purchase with a salesperson at Shoals Outdoor Sports in Tuscumbia, Alabama. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Bruner would have seen and been aware of it.

25.     When Plaintiff Bruner purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Bruner suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Bruner's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Bruner believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

6

## 2.   California

26.   Plaintiff Jose Luna is a citizen of California and a resident of El Monte, California.

27.   Plaintiff Luna purchased a new 2018 Polaris RZR 4 XP Turbo (for purposes of this paragraph, "Class Vehicle") from Mountain Motorsports in Ontario, California on or around February 9, 2018.

28.   When Plaintiff Luna purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk. Plaintiff Luna operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used. However, Mr. Luna's Class Vehicle set on fire during operation and burned within one hour of its initial operation. Luckily, no one suffered personal injuries as a result. However, Plaintiff Luna's Class Vehicle is a total loss.  Plaintiff Luna reported this event and his claim to Defendants who have, to date, simply informed him of their intent to send out an investigator.

29.   Plaintiff Luna purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

30.   Before purchasing his Class Vehicle, Plaintiff Luna communicated with friends who told him Polaris products like his Class Vehicle were good.  Plaintiff also discussed his Class Vehicle prior to his purchase with a salesperson at Mountain Motorsports in Ontario, California.  Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Luna would have heard, seen and been aware of it.

31.     When Plaintiff Luna purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Luna suffered injury-in-fact and lost money as a result of the conduct at issue because had Defendants disclosed the existence of Engine Overheat/Fire Defect and the fact that his Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Luna believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**3.     Florida**

32.     Plaintiff Clint Halvorsrod is a citizen of Florida and is a resident of Plant City, Florida.

33.     Plaintiff Halvorsrod purchased a new 2017 Ranger 1000 Highlifter (for purposes of this paragraph, "Class Vehicle") from Sky Powersports in Lakeland, Florida in or around June 30, 2017.

34.     When Plaintiff Halvorsrod purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk. Plaintiff Halvorsrod operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

35.     In September 2017, with only 13 hours on the meter, Plaintiff Halvorsrod's Class Vehicle caught fire while operating—resulting in a total loss of the vehicle.

36.     Plaintiff Halvorsrod purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

37.   Before purchasing his Class Vehicle, Plaintiff Halvorsrod reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff Halvorsrod also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff Halvorsrod also discussed his Class Vehicle prior to their purchase with a salesperson at Sky Powersports in Lakeland, Florida. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Halvorsrod would have seen and been aware of it.

38.   When Plaintiff Halvorsrod purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Halvorsrod suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Halvorsrod's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Halvorsrod believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**4.    Georgia**

39.   Plaintiff Robert Lenz is a citizen of Georgia and is a resident of Columbus, Georgia.

40.   Plaintiff Lenz purchased a new 2017 RZR 1000 Highlifter (for purposes of this paragraph, "Class Vehicle") from Extreme Power Sports in Columbus, Georgia in 2017.

41.     When Plaintiff Lenz purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Lenz operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

42.     Plaintiff Lenz purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

43.     Before purchasing his Class Vehicle, Plaintiff Lenz reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff Lenz also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff Lenz also discussed his Class Vehicle prior to his purchase with a salesperson at Extreme Power Sports in Columbus, Georgia. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Lenz would have seen and been aware of it.

44.     When Plaintiff Lenz purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Lenz suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Lenz's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Lenz believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

5.      **Illinois**

45.      Plaintiff Michael Zeeck is a citizen of Illinois and is a resident of Rushville, Illinois.

46.      Plaintiff Zeeck purchased a new 2017 RZR XP 1000 (for purposes of this paragraph, "Class Vehicle") from Outdoor Power in Quincy, Illinois in 2017.

47.      When Plaintiff Zeeck purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Zeeck operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

48.      Plaintiff Zeeck purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

49.      Before purchasing his Class Vehicle, Plaintiff Zeeck reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff Zeeck also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff Zeeck also discussed his Class Vehicle prior to his purchase with a salesperson at Outdoor Power in Quincy, Illinois. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Zeeck would have seen and been aware of it.

50.      When Plaintiff Zeeck purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Zeeck suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Zeeck's Class Vehicle poses a

significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Zeeck believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

### 6.   Michigan

51.   Plaintiff Chad Rogers is a citizen of Michigan and a resident of Jackson, Michigan.

52.   Plaintiff Rogers purchased a new 2015 RZR 900 (for purposes of this paragraph, "Class Vehicle") from T&C Powersports in Jackson, Michigan in or around July 2015.

53.   When Plaintiff Rogers purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Rogers operated his Class Vehicle in a reasonably foreseeable manner and as it was intended to be used.

54.   Plaintiff Rogers purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

55.   Before purchasing his Class Vehicle, Plaintiff Rogers reviewed Defendants' promotional materials regarding his Class Vehicle.  Plaintiff also conducted online research on Defendants' website.  Plaintiff also discussed his Class Vehicle prior to his purchase with a salesperson at T&C Powersports.  Had Polaris disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Rogers would have seen and been aware of it.

56.    When Plaintiff Rogers purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Rogers suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Polaris disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Rogers' Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Forrest believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**7.    Minnesota**

57.    Plaintiff Richard Berens is a citizen of Minnesota and a resident of Finland, Minnesota.

58.    Plaintiff Berens purchased a new 2017 General 4 1000 (for purposes of this paragraph, "Class Vehicle") from Chopper City Sports in Fridley, Minnesota in December 2017.

59.    When Plaintiff Berens purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Berens operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

60.    Plaintiff Berens purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

61.    Before purchasing his Class Vehicle, Plaintiff Berens reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff also conducted online research

on Defendants' website and discussed his Class Vehicle prior to his purchase with a salesperson at Chopper City Sports. Had Defendants disclosed their knowledge of the Engine Overheat/Fire Defect, Plaintiff Berens would have seen and been aware of it.

62.     When Plaintiff Berens purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Berens suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Berens's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Berens believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**8.     North Carolina**

63.     Plaintiff Steve Bailey is a citizen of North Carolina and a resident of Mount Airy, North Carolina.

64.     Plaintiff Bailey purchased a new 2017 Ranger 570 (for purposes of this paragraph, "Class Vehicle") from Mount Airy Yamaha Suzuki Polaris in Mount Airy, North Carolina on or around March 23, 2017.

65.     When Plaintiff Bailey purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk. Plaintiff Bailey operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

66.    Plaintiff Bailey purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

67.    Before purchasing his Class Vehicle, Plaintiff Bailey reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff also conducted online research on Defendants' website. Plaintiff also discussed his Class Vehicle prior to his purchase with a salesperson at Mount Airy Yamaha Suzuki Polaris. Had Defendants disclosed their knowledge of the Engine Overheat/Fire Defect, Plaintiff Bailey would have seen and been aware of it.

68.    When Plaintiff Bailey purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Bailey suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Bailey's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Bailey believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**9.    Ohio**

69.    Plaintiff Michael Jacks is a citizen of Ohio and a resident of Syracuse, Ohio.

70.    Plaintiff Jacks purchased a new 2015 Ranger XP 900 (for purposes of this paragraph, "Class Vehicle") from Don Wood Polaris in Athens, Ohio in 2015.

71.     When Plaintiff Jacks purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk. Plaintiff Jacks operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

72.     Plaintiff Jacks purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

73.     Before purchasing his Class Vehicle, Plaintiff Jacks reviewed Defendants' promotional materials regarding his Class Vehicle and viewed Defendants' commercials on television. Plaintiff also discussed his Class Vehicle prior to his purchase with a salesperson at Don Woods Polaris. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Jacks would have seen and been aware of it.

74.     When Plaintiff Jacks purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Jacks suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Jacks's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Jacks believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**10.   Texas**

75.     Plaintiff Bryan Forrest is a citizen of Texas and a resident of Sour Lake, Texas.

76.     Plaintiff Forrest purchased a new 2015 Ranger 570 Full Size (for purposes of this paragraph, "Class Vehicle") from Outpost Powersports in Silsbee, Texas in or around May 2015.

77.     When Plaintiff Forrest purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk.  Plaintiff Forrest operates his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

78.     Plaintiff Forrest purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

79.     Before purchasing his Class Vehicle, Plaintiff Forrest reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff also discussed his Class Vehicle prior to his purchase with a salesperson at Outpost Powersports and a salesperson at Cowboy Powersports in Beaumont, Texas. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Forrest would have seen and been aware of it.

80.     When Plaintiff Forrest purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Forrest suffered injury-in-fact and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Forrest's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff

Forrest believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

### 11.   **Wyoming**

81.    Plaintiff Ed Beattie is a citizen of Nebraska and is a resident of Chappell, Nebraska.

82.    Plaintiff Beattie purchased a new 2016 Ranger XP 900 (for purposes of this paragraph, "Class Vehicle") from Power Toys of Riverton, in Riverton, Wyoming in 2016.

83.    When Plaintiff Beattie purchased his Class Vehicle, he reasonably expected that it would not lead to potentially deadly fires and would not pose a significant and unreasonable safety risk. Plaintiff Beattie operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used.

84.    Plaintiff Beattie purchased his Class Vehicle without knowledge of the Engine Overheat/Fire Defect.

85.    Before purchasing his Class Vehicle, Plaintiff Beattie reviewed Defendants' promotional materials regarding his Class Vehicle. Plaintiff Beattie also conducted online research on Defendants' website and viewed Defendants' commercials about his Class Vehicle on television. Plaintiff Beattie also discussed his Class Vehicle prior to his purchase with a salesperson at Power Toys of Riverton, in Riverton, Wyoming. Had Defendants disclosed its knowledge of the Engine Overheat/Fire Defect, Plaintiff Beattie would have seen and been aware of it.

86.    When Plaintiff Beattie purchased his Class Vehicle, he reasonably expected that its component parts would function properly. Plaintiff Beattie suffered injury-in-fact

and lost money as a result of the conduct at issue.  Had Defendants disclosed the existence of Engine Overheat/Fire Defect, and the fact that Plaintiff Beattie's Class Vehicle poses a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less. Indeed, as part of the purchase of his Class Vehicle, Plaintiff Beattie believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**B.     Defendants**

87.     Polaris Industries, Inc. is a Delaware corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota and Delaware.

88.     Polaris Sales Inc. is a Minnesota corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota.

89.     Polaris Sales Inc. is a wholly-owned subsidiary of Polaris Industries, Inc., and has the same offices and same chief executive officer as Polaris Industries, Inc.  On information and belief, Polaris Sales Inc. operates as an alter ego of Polaris Industries, Inc., and Polaris Industries, Inc. is liable for all actions preformed in the name of Polaris Sales Inc.

## IV.     FACTUAL BACKGROUND

**A.     Polaris's Defective Engine and Engine Configuration**

90.     Polaris first entered the off-road vehicle ("ORV") market in 1985 and produced its first Recreational Off-Road Vehicle ("ROV," also often referred to as a "side-

by-side), the six-wheeled Ranger, in 1998.[1]  In 2000, Polaris unveiled the four-wheeled Ranger.[2]

91.     Polaris introduced the Ranger RZR in 2007 (for Model Year 2008), as a smaller, more agile alternative to the utilitarian Ranger.[3]  Polaris subsequently shortened its name to RZR (hereinafter referred to as "RZR").

92.     Ranger models are utility variants often used in commercial applications on farms, land managements, and for maintenance jobs, and an inability to use them can affect livelihoods.  Class vehicles include two-person and four-person Rangers models, all with a plastic cargo bed mounted directly above the engine.

93.     RZR models are high performance vehicles with a narrow chassis, sport-tuned suspension, and a plastic engine cover instead of the Ranger's plastic cargo bed. Class Vehicles include two-person through six-person models.

94.     Polaris's 2006 patent filing for a "Side-By-Side ATV" design, which became the Ranger RZR, was designed to reduce the width from the usual 54" to 50."  (The term "ATV," or "All-Terrain Vehicle," is sometimes used interchangeably with the term "ROV.") Reducing the width was an important market advantage because the vehicles could move at an accelerated pace and could be loaded into the bed of a full-size pickup truck for transport.  However, reduced width typically increases the risk of rollover, a

---

[1] Polaris, 2014 Annual Report, Form 10-K, Dec. 31, 2014, at 4.

[2] *Id.*

[3] *Id.*

significant problem with ROVs.  Thus, Polaris's design attempted to mitigate the increased rollover risk associated with narrowing the width by lowering the engine position.  To accomplish this width reduction, the patent disclosed a behind-the-seat engine location, rather than the previous under-the-seat location.[4]

95.    The patent, which was granted in 2008, describes a narrower vehicle width and improved center of gravity.  The patent disclosed:  "In this embodiment, engine is a 760 cc engine producing about 50 horsepower.  Engine produces excellent acceleration characteristics and responsiveness.  ATV weighs about 950 pounds and has a power to weight ratio of about 0.053/1.  Any suitable engine may be used in ATV, and ATV may be constructed to any suitable weight, however the present invention contemplates ATVs having a power to weight ratio of at least 0.045/1."

96.    The patent drawings depict the exhaust pipe exiting the engine on the right side of the engine bay and then up and toward the rear of the vehicle, away from the occupant compartment, resulting in a less obstructed air flow, as shown below:



---

[4] U.S. Patent No. 7,819,220, "Side-By-Side ATV," filed Jan. 31, 2008.

97.    When it debuted in 2007, the Ranger RZR had an engine configuration and offset placement that matched that described in this patent.  Its top speed was 55 mph, its weight was 945 lbs., and its power-to-weight ratio was .055, which was 44% higher than the competitor Yamaha Rhino.[5]  It could accelerate faster than any other ROV, and its compact size made it capable of navigating narrow trails.  As Polaris describes it: "The new Ranger RZR delivers total Side x Side domination with its monstrous 800 Twin EFI.  It's the only trail-capable Side x Side you can buy, going everywhere other Side by Sides can't.  With the fastest acceleration, the highest top speed, incredibly responsive handling, and all the utility you need, the Ranger RZR leaves all other Side x Sides in the dust."[6]

98.    Polaris claimed its handling performance attributes were the result of its low center of gravity design: "The RANGER RZR and RZR S use a patented design that positions the engine behind the seat, creating the lowest center of gravity.  It's like you're riding on rails, with razor-sharp handling and performance."[7]

99.    Below is an image of this original, patented configuration on a RZR 800.  The engine exhaust pipe is directed away from the occupant compartment and exposed to a relatively open wheel well:[8]

_____

[5] Polaris Ranger 2008 Brochure, at 6.

[6] Polaris Ranger 2008 Brochure, at 8.

[7] Polaris Ranger 2009 brochure, at 21.

[8]    Product    Review    Polaris    RZR    800,    DuneGuide.com, http://www.duneguide.com/ProductReview_Polaris_RZR800.htm, accessed Apr. 2, 2018.



100.    In 2011, Polaris unveiled its new ProStar 900 Twin EFI engine, specifically designed for the RZR XP 900.  Polaris said the ProStar 900 engine "cranks out an industry-leading 88 HP and delivers 29% faster acceleration than the closest competitor."[9]  With a vehicle weight of 1,190 lbs., the new XP 900's power-to-weight ratio was bumped to 0.0739 – significantly more than originally envisioned with the patented behind-the-seat design.  The new engine "delivers fast throttle response, groundbreaking power and revolutionary acceleration."[10]

101.    The ProStar engine was the first engine designed by Polaris engineers rather than by suppliers, as suppliers cost 20-30 percent more money and require more time to develop a custom engine.[11]  On its website, Polaris states: "A ProStar engine is an off-road vehicle engine that has been designed, engineered, and manufactured from the ground-up

---

[9] Polaris Ranger Brochure 2011, at 11.

[10] Polaris Ranger Brochure 2011, at 11.

[11] Polaris Indus., 2015 Annual Report, at 8.

by the experts at Polaris who share the same passion for off-roading as you do.  ProStar engines are purpose-built, tuned, and designed specifically for your vehicle and application.  By leveraging cutting-edge technology from automotive influences, we have emerged as a trusted leader in off-road powertrain technology.  With over one million engines produced we've created the perfect balance of engineered features to ensure you are getting the maximum performance in every vehicle."[12]

102.    The ProStar engine would eventually come in both twin-cylinder and single-cylinder and varying power outputs depending on the vehicle model.  However, all models with the ProStar engine share a common engine and exhaust configuration.

103.    Unlike the original behind-the-seat configuration with the engine exhaust ported on the right side, the ProStar engine was placed squarely behind the occupant compartment, with the exhaust pipe exiting forward toward the front of the vehicle and directly behind the occupant compartment.  The exhaust pipe quickly makes a 180-degree turn mere inches behind the passenger seating and seat belt buckles.  The photographs below show this configuration from different angles in single-cylinder and twin-cylinder versions of the ProStar engine.[13]

---

[12] Polaris Indus. Website, ProStar Overview page, https://rzr.polaris.com/en-us/prostar/, accessed Apr. 2, 2018.

[13] Long Term Report – The Polaris RZR 570, ATV & SXS Illustrated, http://atvillustrated.com/content/long-term-report-polaris-rzr-570, accessed Apr. 2, 2018.







104.    The enclosed engine and exhaust pipe configuration in the Class Vehicles prevents airflow from dissipating the heat from the exhaust and nearby combustible materials.   The enclosed design prevents passive heat evacuation, whereby heat soak occurs, particularly at low speeds and under high load conditions, frequently experienced while traversing inclines.   The excessive heat melts the plastic sheeting that covers the engine and ignites surrounding combustible materials.

105.    Compounding the problem, the ProStar engine was designed to allow easy access to components for maintenance.   This can be seen in the photos above, which show the pocket of space that provides access to the oil filter and spark plugs.   The gaps allow combustible organic debris to get caught under inadequate heat shields intended to box the

---

[14]    2015    RZR    4    XP    1000    for    sale,    Haacke    Motors, https://www.haackemotors.net/2015_Polaris_RZR%204%20XP%201000_Layton_UT_1 1324333.veh.

exhaust heat in and away from passengers.  This debris can ignite as a result of the Engine Overheat/Fire Defect.

106.   Before Polaris installed the ProStar engine behind the occupant compartment, Polaris ROVs were not plagued by engine fires.  The only Polaris recall involving fire risk in the RZR was a 2007 recall of 330 model year 2008 RZR 800 vehicles for fuel tank could leaks, which according to Polaris had not caused any fires.[15]  Likewise the only recall for fire risk in the Ranger vehicles was a 2009 recall of 3,800 model year 2009 Ranger Crew and 6x6 vehicles, concerning a risk of electrical shorting and fire in the rear tail light wiring harnesses.[16]

107.   But two years after Polaris introduced the 2011  RZR XP 900 – the first model with the ProStar engine positioned on the centerline behind the occupant compartment – Polaris recalled the model because, "the firewall behind the driver and passenger seats can overheat and melt, posing a burn hazard to consumers."[17]  Like the recalls that would follow, Polaris advised customers to stop using the vehicles and bring them in for an unspecified repair.

108.   In the recall announcement, Polaris reported there had been one report of burn injuries to a finger.[18]  However, at least one owner of a 2011 Ranger RZR XP 900

---

[15] Polaris Indus., Recall No. 08-521, Dec. 6, 2007.

[16] Polaris Indus., Recall No. 09-762, Aug. 4, 2009.

[17] Polaris Indus., Recall No. 13-740, June 19, 2013.

[18] *Id.*

notified the CPSC that in 2012, he was driving the vehicle through the woods when he and his passenger smelled a burning smell.  Moments after they exited the vehicle, they observed a flame behind the seat, which "immediately began to spread and subsequently engulfed the entire [vehicle], until all that remained was the burnt out frame of the vehicle."[19]  When he contacted the dealer and Polaris in May 2012, prior to the recall, they offered him a $5,500 credit toward another purchase.[20]  Thus, when it asserted in the recall that the firewall could melt and had only burnt a finger, Polaris concealed the fact that it was aware of at least one incident in which the entire vehicle burned in minutes.

109.  Polaris marketing shows the company was singularly focused on significantly exceeding the power output of its competitors' products, at the expense of safety.  As Polaris learned of the Engine Overheat/Fire Defect associated with its new centerline ProStar engine configuration, it continued introducing models with the defective engine configuration.  For example, in 2013, Polaris introduced the Ranger XP 900, which it touted as containing the new ProStar 900 engine that "pumps out 60 HP, with incredible class-leading torque across the power band.  All that power and torque lets you easily tow up to one ton, or haul up to 1,000 lbs."[21]  At the same time, Polaris advertised, "[i]t's also

---

[19] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.

[20] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.

[21] Polaris 2013 Off Roads Vehicles Brochure, at 5.

a quiet ride, thanks to a new engine placement behind the seat and below the box.  Ground clearance is a high, obstacle-clearing 12".[22]

110.    In 2014, Polaris debuted the RZR XP 1000, Ranger 900 and Crew 900, and Ranger 570 and Crew 570.  Each of these vehicles contained a ProStar engine with the exhaust pipe placed in the center behind the occupant space.[23]  The RZR XP 1000's engine "provides an industry-leading 107 horsepower and a true 999ccs of displacement, making it the most powerful and largest engine in the class."[24]  Thus, this RZR had more than double the horsepower originally envisioned in the RZR patent.[25]

111.    In model year 2015, Polaris debuted the RZR 900 and S 900, which featured "unequalled power from their 75 horsepower ProStar 900 engine offering improved power-to-weight ratio and faster acceleration . . . ."[26]

112.    For model year 2016, Polaris introduced the RZR XP Turbo and RZR XP 4 Turbo, stating in a press release: "The Polaris ProStar Turbo engine provides an industry-leading 144 horsepower – 30 percent more horsepower and 45 percent more torque than the RZR XP 4 1000 EPS.  The ProStar Turbo effortlessly carries a full load of thrill seekers over the most power-robbing terrain.  The new engine was developed for extreme

---

[22] *Id.*

[23] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.

[24] *Id.*

[25] *Id.*

[26] Press Release, Polaris Debuts 2015 ORV and Motorcycle Product Lines, July 29, 2014.

performance. . . . For consistent performance at all temperatures, the vehicle also includes a new liquid charged air cooler with front-mounted, dual radiators with high-capacity fan and high-flow electric pump.  To control the massive power delivered by the ProStar Turbo, the engine management system has also been updated to include knock detection, boost control and a high-flow return style fuel system ensuring that the engine delivers maximum power under all conditions, altitudes and temperatures."[27]

113.   By 2016, all RZR and all gas powered 500cc or larger Ranger models contained a ProStar engine.  Importantly, with the exception of the unique Youth RZR, all of the ROVs Polaris has recalled for fire risk since 2013 contain the ProStar engine directly behind the occupant compartment. The Youth RZR has also been recalled for an isolated fuel system issue but does not appear to contain a ProStar engine.

114.   The fire risk is severe.  For example, Plaintiff Rogers's 2015 RZR 900 caught fire the day after he purchased the vehicle, and it burned until the frame melted and the vehicle was completely destroyed.  Plaintiff Rogers had been riding with his wife, who turned around to see flames coming from the engine area.  Plaintiff Rogers and his wife were able to jump off, and they watched as flames consumed the entire vehicle.  Plaintiff Rogers' wife suffered burns on her hands and ear.   Plaintiff Luna's Class Vehicle caught fire after one hour of operation and burned completely, leaving only a charred chassis. Luckily, no one suffered personal injuries as a result. However, Plaintiff Luna's Class

---

[27] Press Release, Polaris RZR Expands 4-Seat Line-Up to Share the Off-Road Experience with Friends and Family, Oct. 6, 2015.

Vehicle is a total loss.   With only 13 hours on the meter, Plaintiff Halvorsrod's Class

Vehicle caught fire while operating—resulting in a total loss of the vehicle.

## B. Polaris's Series of Ineffective Recalls

### 1. RZR Recalls

115.   As discussed above, the first recall for the Class Vehicles was issued on June

19, 2013, recall number 13-740.  The recall involved 4,500 model year 2011 RZR XP 900

vehicles.  The specified cause: The firewall behind the driver and passenger seats could

overheat and melt.

116.   The April 2013 Technical Service Bulletin (TSB) explaining the recall to

dealers provided more detail: "Some Ranger RZR XP 900 models may experience hot air

leakage from the engine compartment that travels over the service divider panel which can

cause deformation of the panel.  This hot air leakage into the passenger area can also create

elevated air and component temperatures that could cause burns to the occupant of the

vehicle.  Polaris has developed an aluminum heat shield to deflect the hot air and prevent

it from damaging the service divider panel."[28]  The TSB noted that this safety bulletin

updates a previous TSB issued in 2011 (R-11-03) that was completed through warranty

claims, indicating that Polaris was aware of this problem two years before it issued the

recall.

---

[28] Polaris Indus., Tech. Serv. Bulletin R-13-02, Apr. 25, 2013, at 1.

117.   On October 5, 2015, Polaris issued recall number 16-702 for 53,000 model year 2015 RZR 900 series and RZR XP 1000 series vehicles.[29]   The cause stated in the recall notice was that the fuel vent line could be misrouted, causing it to become pinched. That in turn could overpressurize the fuel tank and leak fuel.  Polaris's press release noted that it had also received reports of the driveline contacting the pressurized fuel tank, which also caused fuel leaks.[30]  Polaris said it had received four reports of fuel leaks in the RZR 900 series, including two fires and one minor burn injury, and 25 reports of fuel leaks in the RZR 1000 series, with no fire incidents.[31]

118.   What Polaris did not report in the recall was that in July 2015, 15-year-old Baylee Hoaldridge suffered burns over 65 percent of her body when the 2015 RZR 900 her family had rented tipped on its side and burst into flames.[32]   Baylee died from complications a month after the recall was issued.[33]

119.   When Polaris subsequently rolled this recall into another expanded recall, it provided more information that demonstrated the fuel vent problem was also related to the exhaust pipe's location. In addition to the kinked fuel vent line, "[a]n improperly routed

---

[29] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.

[30] Polaris Industries Recalls RZR Recreational Off-Highway Vehicles Due to Potential Fire Hazard, Oct. 5, 2015.

[31] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.

[32] Caroline Connolly, Attorney for Family of Teen Girl Severely Burned in Crash Says Polaris Should Consider Vehicle Recall, Fox 13 Salt Lake City, Aug. 27, 2015.

[33] Jeffrey Meitrodt, Polaris Recalls 133,000 Off-Road Vehicles After Reports of Fire, Minneapolis Star Tribune, Apr. 19, 2016.

fuel tank vent line may have insufficient clearance to the exhaust head pipe. A vent line with insufficient clearance to the exhaust head pipe may pose a fire hazard."[34] Higher temperatures, such as those created by the Engine Overheat/Fire Defect, can also increase fuel tank pressure, exacerbating the danger posed by a pinched fuel line.

120. The specified "fix" did not actually resolve the fire risk. On March 5, 2016, a fire started in a 2015 RZR XP4 1000 while a 19-year-old and 13-year-old were sitting in the occupant compartment.[35] The fire engulfed the vehicle and burned it down to the metal chassis before help could arrive.[36] The recall repair had been completed three months earlier.[37] The CPSC report for the incident included photos:

 

121. On December 10, 2015, in recall number 16-713, Polaris recalled 2,230 model year 2016 RZR XP Turbo and RZR XP 4 Turbo vehicles, stating that the

---

[34] Polaris Indus., Tech. Serv. Bulletin Z-16-01-AD, Apr. 19, 2016.

[35] CPSC, Epidemiologic Investigation Report, No. 160309CBB1457, Mar. 28, 2016.

[36] *Id.* at 3.

[37] *Id.* at 1.

turbocharger's oil drain line could leak, posing a fire hazard.[38]   At that time, Polaris reported two reports of oil leaks and two reports of fire with no injury.  The turbocharged vehicles were first recalled only two months after they were released into the market.

122.    This recall would be expanded to 13,000 turbocharged vehicles in September 2016, but this time the cause was connected to the Engine Overheat/Fire Defect: "The vehicle's engine can overheat and turbo system's drain tube can loosen."[39]  Polaris reported it had received 19 reports of vehicles catching fire, causing six burn injuries.  Polaris stated one of those incidents involved a young child – that is a 6-year-old girl who was burned over 40 percent of her body when the RZR Turbo caught fire in Utah's American Fork Canyon, also setting fire to 15 acres of land.[40]

123.    As depicted in the photo below, owners of vehicles repaired under this recall posted on online forums that the heat shield their dealer installed on the exhaust pipe to repair this recall had burned shortly thereafter.[41]

---

[38] Polaris Indus., Recall No. 16-713, Dec. 10, 2015.

[39] Polaris Indus., Recall No. 16-257, Sept. 1, 2016.

[40] Jed Boal, Recent ORV Explosion Raises Questions About Vehicle's Safety, KSL.com, Jul. 26, 2016, https://www.ksl.com/?sid=40821427&nid=148, accessed Apr. 2, 2018.

[41] RZR Forums.Net, 16 Turbo with Recall done heat shield allegedly burning, Sept. 24, 2016,      http://www.rzrforums.net/rzr-xp-turbo/336465-16-turbo-recall-done-heat-shield-allegedly-burning.html, accessed Apr. 2, 2018.



124. Realizing that the initial recall for the RZR 900 and 1000 series was inadequate, Polaris expanded the recall on April 19, 2016, to include a total of 133,000 vehicles: the 2013-2014 RZR XP 900 (production ended after 2014, when it became the RZR 900), 2014-2016 RZR XP 1000 (entire production to date), 2015-2016 RZR 900 (entire production to date), 2015-2016 RZR S 900 (entire production to date), 2016 RZR S 1000 (debut year). Each of these vehicles had a ProStar engine mounted on the vehicle's centerline behind the occupant compartment.

125. Polaris did not specify a root cause on the recall notice, saying only the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[42] Polaris reported it had received 160 reports of fires with just those vehicles and 19 injury reports, including some for third degree burns.[43] Inexplicably, Polaris still did not include Baylee Hoaldridge's death in the tally.

---

[42] Polaris Indus., Recall No. 160146, Apr. 19, 2016.

[43] *Id.*

126. According to the TSBs Polaris sent to dealers for this recall, the vehicles had one or more of several issues related to overheating and fire. Every recalled vehicle also had the engine configuration associated with the Engine Overheat/Fire Defect.

127. In a press release, Polaris stated it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles. Polaris also plans to include a warning on new-production vehicles instructing riders not to carry fuel and other flammable liquids in their vehicles, and cautions against carrying flammable liquids in previously produced models."[44]

128. Polaris's Chairman and CEO Scott Wine assured the public, "[w]e are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis. We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."[45]

129. However, on March 2, 2017, Polaris again expanded on previous recalls, re-recalling 13,500 model year 2016 vehicles that had already been recalled meaning that those fixed under the expansive April 2016 recall still suffered from the Engine Overheat/Fire Defect, and adding model year 2017 for certain vehicles in the RZR 900 series, RZR XP 1000, and RZR XP 4 Turbo. It also added the 2016-2017 General 1000

---

[44] Press Release, Polaris Industries Voluntarily Recalls Certain RZR 900 and 1000 Off-Road Vehicles, Apr. 16, 2016.

[45] *Id.*

and General 4 1000.[46]  Like the others, the recall for the General 1000 series encompassed its entire production run.  All recalled vehicles featured the ProStar engine behind the occupant compartment.[47]

130.   This recall stated that the engine could misfire, causing the exhaust to overheat, melting nearby components.[48]  Polaris received one report of fire and two reports of melting related to engine misfire.[49]

131.   Finally, on December 19, 2017, Polaris and CPSC issued a joint statement warning the public that fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and property damage.[50]  The warning noted that many of the vehicles were previously recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall continue to report fires, including total-loss fires."[51]  The warning also stated that some of the 2017 RZR vehicles not previously recalled have also experienced fires.[52]

---

[46] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.

[47] Polaris General 1000 EPS: Full Test, UTV Action, Apr. 8, 2016, https://utvactionmag.com/polaris-general-1000-eps-full-test/, accessed Apr. 2, 2018.

[48] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.

[49] *Id.*

[50] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-Highway Vehicles (ROVs), Dec. 19, 2017.

[51] *Id.*

[52] *Id.*

132.    The joint statement offered no solution, saying only that "[t]he CPSC and Polaris continue to work together to ensure fire risks in these vehicles are addressed. However, at this time, the CPSC and Polaris want to make the public aware of the fires involving these vehicles."[53]

133.    The RZR recalls did not stop there.  Three days after the joint CPSC and Polaris announcement, the fire hazard was associated with model year 2018 vehicles, with Polaris recalling 560 RZR XP 4 Turbo vehicles for a risk of fire.[54]  Polaris had received one report of fire related to this flaw.[55]

134.    On April 2, 2018, Polaris issued yet another recall related to the Engine Overheat/Fire Defect.  The recall applies to 107,000 model year 2014-2018 RZR XP 1000 vehicles in which the exhaust silencer fatigues and cracks and the heat shield fails to manage the heat, leading to melting of nearby components or fire.[56]  Some RZR owners have noted on a forum that the intense heat from the engine was what was causing the exhaust silencer, also known as a muffler, to crack on the side facing the engine.[57]

---

[53] *Id.*

[54] Polaris Indus., Recall No. 18-708, Dec. 21, 2017.

[55] *Id.*

[56] Polaris Indus., Recall No. not provided, Apr. 2, 2018.

[57]  RZRForums.Net, posted by JGKopp, Fuel rail causing fires?, post no. 62, Jan. 26, 2016, available at http://www.rzrforums.net/rzr-xp-4-1000/183116-fuel-rail-causing-fires-5.html.

135.    The same day, Polaris announced another voluntary field action for the 2017-2018 RZR 570, 2016-2018 RZR S 1000, 2016-2018 RZR XP/XP 4 Turbo, and 2017-2018 Ace 500, 570, and 900 models.  The Ace is a one-seat side-by-side vehicle that shares many characteristics of an ATV. The 2017-2018 Ace vehicles contained a ProStar engine with the exhaust pipe in the same configuration as the other models.  This time, Polaris said the vehicles contained a fuel pump flange assembly that could degrade when exposed to certain chemicals over time, resulting in a fuel leak that could catch fire in the presence of an ignition source.[58]  Polaris's solution is reportedly to install a cover over the fuel pump to protect it from chemical exposure, suggesting Polaris used an inadequate material for the assembly within an unforgiving environment.

136.    Although Polaris has admitted to a fire risk in its recalls, it has never disclosed to Class Members and potential consumers that all of the recalled vehicles share the underlying Engine Overheat/Fire Defect and that Polaris has not devised a viable repair to remedy this defect.  Instead, it has hidden behind a series of band-aide fixes for issues that would not be causing fires were it not for the excessive heat generated by the Engine Overheat/Fire Defect.

137.    In sum, all RZR models with the centerline-mounted ProStar engine have been recalled, several for all model years produced.  Prior to the incorporation of the centerline-mounted ProStar Engine, only 330 total RZR vehicles had been recalled.

---

[58] Polaris Indus., Polaris Issues Voluntary Field Action for Certain RZR and ACE Models, Apr. 2, 2018.

## 2. Ranger Recalls

138.    At the same time the series of RZR recalls was unfolding, the Ranger vehicles with ProStar engines in the central location were also recalled several times.

139.    In June 2016, Polaris recalled 43,000 model year 2015-2016 Ranger 570 and Crew 570 series vehicles.  The U.S. recall stated that the ROVs could overheat during heavy engine loading, slow-speed intermittent use and/or high outdoor temperatures, causing them to catch fire.[59]  However, Canada's recall statement explained that the culprit was that the excessively hot exhaust system in a confined space with little air flow could set the seat close-off panel on fire.[60]  The remedy was a new heat shield between the engine exhaust and the seat panel.[61]  Polaris had received 36 reports of fire, including three minor burns and one sprained ankle associated with escaping the burning vehicle.[62]

140.    In September 2016, Polaris recalled 42,500 model year 2014 Ranger XP 900 and Crew 900, stating it had received 36 reports of fire, including three minor injuries.[63]  The TSB for this recall specified that the fasteners for the cargo box heat shield could become loose, failing to protect the passenger seat panel from exhaust heat.[64]

---

[59] Polaris Indus., Recall No. 16-755, June 28, 2016.

[60] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.

[61] *Id.*

[62] Polaris Indus., Recall No. 16-755, June 28, 2016.

[63] Polaris Indus., Recall No. 16-264, Sept. 16, 2016.

[64] Polaris Indus., Tech. Serv. Bulletin R-16-03, Sept. 15, 2016.

141.   In April 2017, Polaris expanded the 2016 recall to include model year 2015 after receiving 13 incident reports, including five fires.[65]  This expanded recall asserted that the heat shield could fall off the vehicle.  Owners report the heat shields are coming off because the metal attaching bolts are heating up to the point that they melt the plastic panel to which the shields are attached.[66]

142.   Polaris has not recalled model years 2013 or 2016 for the Ranger XP 900, which share the ProStar engine configured in the same manner as the other model years, but owners of these vehicles have warned others via user forums of the hazards.  In 2013, a firefighter posted a warning on a forum under the subject heading, "2013 polaris ranger 900 xp exhaust FIRE danger," saying after he purchased the vehicle, he and his fellow firefighters discovered that in the "new Polaris setup the muffler gets really hot."  That is a danger because of "the vehicle's exhaust and muffler placement," as well as the fact that "a majority of the muffler is open and could easily start a grass fire if not watched carefully by the operator, especially when stopping in long dry grass or brush."[67]  Unfortunately, warnings posted on forums are often read only after a current owner visits the site looking for answers to problems that are already occurring.

---

[65] Polaris Indus., Recall No. 17-132, Apr. 13, 2017.

[66] PRCForum.com, posted by Chris, 2014 900 potential fire issue, June 22, 2015, available at http://www.prcforum.com/forum/26-ranger-problems-solutions/61961-2014-900-potential-fire-issue.html

[67] PRC Ranger Club, 2013 Polaris Ranger 900 xp exhaust FIRE danger, July 26, 2013, http://www.prcforum.com/forum/154-ranger-xp-900-570-fs-discussions/50505-2013-polaris-ranger-900-xp-exhaust-fire-danger.html, accessed Apr. 2, 2018.

143.    Another consumer posted in November 2016 that his new 2016 Ranger XP 900 had caught fire only three days after he purchased it after mud and straw ignited on the engine.  The consumer reported, "I am choked.  I have used this brand new item for 1.5 working days since Nov. 9.  The dealer and Polaris see me as 'overreacting,' and I can't get Polaris to contact me."[68]

144.    Polaris tells Ranger owners that only a dealer can conduct the replacement repairs.  Many Ranger owners use their vehicles as utility vehicles on farms or other remote locations, with dealerships miles away.  For example, one forum user who has a 2015 Ranger XP 900 stated, "According to my dealership, which is 90 miles away, I need to return it there and can't do the work myself.  He also stated that if it caught fire while riding it, neither Polaris nor my insurance company would be liable.  I'd be on the hook for damages myself."[69]

145.    Thus, Ranger owners whose vehicles have been recalled are also forced to make the decision between taking time to deliver the Ranger to a dealership, possibly leaving it there for days while waiting for the repair, or use a vehicle that could catch fire while they are using it.

---

[68] Ranger Forums, XP 900 on Tracks Major Problems, by Frankie Paper Boy, Nov. 23, 2016, http://www.rangerforums.net/forum/polaris-ranger-xp900/30402-xp-900-tracks-major-problems.html, accessed Apr. 2, 2018.

[69] Ranger Forums.Net, 2015 XP900 Recall Notice, Apr. 24, 2017, http://www.rangerforums.net/forum/polaris-ranger-xp900/35433-2015-xp900-recall-notice.html, accessed on Apr. 2, 2018.

146.    Polaris's representations to owners of recalled Rangers that the vehicles have a discreet, permanent fix, i.e. new heat shields, conceals its knowledge that the vehicles will continue to possess the underlying Engine Overheat/Fire Defect, and that Polaris has attempted since 2011 to devise a heat shield effective enough to withstand the excessive temperatures, but has continually had to recall the heat shields it selects.

147.    Polaris has also concealed the Engine Overheat/Fire Defect from owners of Ranger vehicles that have not yet been recalled, giving them the false impression their vehicles are safe from fire risk.

148.    On April 2, 2018, the CPSC confirmed Polaris's duplicity, fining the company a record $27.25 million for failing to timely report defects and fire hazards in the RZR and Ranger models that it knew could result in serious injury or death.[70]  Neither the CPSC's nor Polaris's press releases announcing the fine mentioned the unsolved defect situation with the RZR vehicles.

## C.    Polaris's Meteoric Rise Causes Systemic Quality Control Problems

149.    During the timeframe the engines were designed and manufactured, Polaris underwent a meteoric rise in sales that led to dangerous cost-cutting measures, which were also imposed on its suppliers.  The rapid pace at which Polaris wanted to unveil new vehicles also meant the component design, engineering, and testing process was truncated, which, upon information and belief, resulted in inadequate component validation testing.

---

[70] CPSC, Press Release, Polaris Agrees to Pay $27.25 Million Civil Penalty for Failure to Report Defective Recreational Off-Road Vehicles, Apr. 2, 2018.

150.    These systemic quality control issues and the relentless drive to reduce costs was part of a culture that put profits above safety.  Quality control problems and lack of oversight over suppliers exacerbated the Engine Overheat/Fire Defect by subjecting subpar components to the excessive heat environment.

151.    From at least the mid-2000s until 2015, when it implemented a new cost reduction program, Polaris expected suppliers to participate in what it called the Strategies Toward Annual Reductions, or STAR, program. In a STAR Program Manual to suppliers, Polaris stated that, "[i]n order for Polaris to maintain and improve its competitive position, cost reduction efforts need to do more than offset inflation."[71]  Polaris challenged suppliers to submit cost savings proposals equal to at least 10 percent of their annual sales and to work with Polaris to actually implement cost savings of at least 2 percent of annual sales.[72]

152.    The STAR Program manual noted, "Although the emphasis of this program is to achieve bottom-line savings, suppliers are reminded that this is a cost reduction program and not simply an invoice price reduction initiative.  Suppliers are encouraged to reduce costs by focusing on any and all saving opportunities . . . ."[73]  These cost reductions could be in the form of, for instance, reductions to operating or material costs, including

---

[71] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

[72] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

[73] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

recommending cheaper alternate materials, and design changes for existing products, such as "relaxing a tolerance to reduce scrap and increase throughput."[74]

153.    If not carefully validated, cost reductions can have a significant impact on safety.  A manufacturer could, for instance, approve thinner walls for fuel tanks to save money on plastic, making them more prone to failure in high-heat conditions, or select less expensive bolts prone to shearing.

154.    Polaris credited these cost reductions as a significant factor in its massive increase in profits.  For instance, in its 2011 10-K, Polaris reported, "For 2011, gross profit dollars increased 40 percent to $740.6 million compared to 2010.  Gross profit, as a percentage of sales, increased 130 basis points to 27.9 percent compared to 26.6 percent for 2010.  The increase in gross profit dollars and the 130 basis points increase in the gross profit margin percentage in 2011 resulted primarily from continued product cost reduction efforts, production efficiencies on increased volumes, and higher selling prices, partially offset by increasing commodity costs and unfavorable product mix."[75]

155.    The cost reduction efforts were particularly important as Polaris readied itself to become the world leader in recreational vehicles.  One cost-cutting measure Polaris took in 2009 was to begin designing and manufacturing its own engines.  In its 2015 Annual Report, Polaris explained the reasons for this evolution: "Lower cost – Suppliers typically

[74] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 3, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

[75] Polaris Indus., 2011 Annual Report, SEC Form 10-K for fiscal year end Dec. 31, 2011, at 34.

charge 20 to 30 percent more to develop a custom engine than it costs to do it in-house. Faster time to market – A custom engine from a supplier typically takes four to five years to develop, an unacceptable timeline for a competitive company."[76]

156.   Polaris also explained that developing an engine in-house provides "[t]he flexibility to be more innovative – We can experiment more cost-effectively with radical ideas that help exceed customer desires."[77]

157.   In developing its own engine, "[w]e borrowed a page from our chassis playbook and developed five platforms that serve as the foundation for all our engines. While each engine has its own distinct brand variances, they share some common elements to maximize our powertrain investment."[78]

158.   Thus, Polaris appears to have begun developing the ProStar engine in 2009 and installed it in the first vehicle, the 2011 RZR XP 900, only two years later.

159.   In its 2009 Annual Report, Polaris highlighted several changes implemented that year to reduce costs: "The Operational Excellence initiatives in engineering drove two critical outcomes in 2009 – cost improvement in all areas and quality improvement in most areas.  From a cost improvement perspective, engineers implemented design changes that allowed them to use more common components and subsystems across multiple Polaris platforms.  They leveraged commonalities in drivetrains, chassis, electrical subsystems,

---

[76] Polaris Indus., 2015 Annual Report, at 8

[77] Polaris Indus., 2015 Annual Report, at 8

[78] Polaris Indus., 2015 Annual Report, at 9.

body frames and controls to drive significant savings across the portfolio of products. Polaris engineering teams reduced cycle time for product design by nearly 50 percent and discovered new ways to reduce the weight of most vehicles.  And they found ways to make manufacturing processes faster and less labor-intensive, which also had a strong impact on costs and margins."[79]

160.    The 2009 recession prompted Polaris to declare 2010 the year of "Making Growth Happen," which it planned to accomplish by "leveraging our industry-leading innovation, speed to market and burgeoning international presence."[80]  That year, Polaris experienced a 27 percent sales increase, requiring ramped up production, a new assembly line in Mexico, and enhanced U.S. facilities to lower production costs and manufacturing lead times.[81]    The company set a goal of reaching $5 billion in worldwide sales by 2019.[82]  Products that used to take six months to manufacture were now produced in as little as two weeks because representatives were meeting with dealers frequently to discuss sales and demand, rather than requiring that

---

[79] Polaris Indus., 2009 Annual Report, at 9.

[80] Polaris Indus., 2010 Annual Report, at 1.

[81] *Id.* at 2.

[82] *Id.*

dealers guess what to stock.[83]  In its first year of operation, the Monterrey, Mexico facility alone produced 22,000 vehicles.[84]

161.   By 2011, Polaris was making 24 models of ORVs, including Sportsman ATVs (themselves the subject of a fire-hazard class action lawsuit).[85]  The goal to reach $5 billion in sales was shortened from 2019 to 2018.[86]

162.   The rapid growth continued in 2012, with Polaris emphasizing the thirst for growth at a rapid pace in its Annual Report: "Regardless of the challenges, the success of Polaris ultimately depends on leadership and teamwork.  We have a deep and talented team that is the best in powersports, and we rely on their experience and ability as we expand into new markets.  Our ability to innovate and execute faster and better than the competition provides Polaris with an advantage that plays anywhere; couple that with the global reach of our strong brands and the potential of our business is practically unlimited.  This Polaris team has aggressively and consistently executed our Strategic Objectives to create both value for shareholders and significant opportunities for additional growth."[87]  In a 2012

---

[83] *Id.* at 4.

[84] Polaris Indus., 2011 Annual Report, at 10.

[85] Polaris Indus., 2011 Annual Report, Securities Form 10-K Filing, at 16.

[86] *Id.* at 1.

[87] Polaris Indus., 2012 Annual Report, at 4.

presentation to investors, Polaris projected a 120 percent sales growth for the RZR brand between 2009 and the end of 2012.[88]

163.    In its 2013 report, Polaris proclaimed that its sales had risen so much it had expanded its sales goal to $8 billion by 2020.[89]   In that year alone, it launched 26 new models, bringing the total ORV models to 49 (double the number of models in 2011).[90] Polaris credited its margin reductions, stating, "However, one simple number – 10.1 percent – best represents the progress we've made over the past five years.  In 2009, we set a goal to expand net income margin from 6 percent to 10 percent by 2018.  With typical Polaris vigor, our teams relentlessly pursued margin opportunities: they moved plants and lowered product costs, improved productivity and leveraged overhead, value engineered vehicles, and captured price."[91]

164.    But there were signs that Polaris knew the pace might be affecting design and quality, as Polaris stated in its Annual Report: "Achieving our net margin goal five years early, in conjunction with our accelerated revenue growth, coincides nicely with the exponential expansion our market capitalization has undergone.  While we're certainly pleased with our progress, there are clear justifications for our intense motivation to be better: we must improve project execution, quality and speed; lower inventories and

---

[88]  Polaris Indus., Analyst & Investor Meeting, July 31, 2012, at 60.

[89] Polaris Indus., 2013 Annual Report, at 3.

[90] *Id.*; *see also* Polaris Indus., 2014 Annual Report, Securities Form 10-K Filing, at 30.

[91] Polaris Indus., 2013 Annual Report, at 6.

warranty costs; and generate significant returns on numerous investments that have, in some cases, diluted our margins over the past few years."[92]  The report also stated that the "financial results were arguably better than our operational performance" and "less-than-stellar execution."[93]

165.    To address some of those concerns, in 2014, Polaris created the division for Operations, Engineering and Lean [Management].  The executive vice president of this division, Ken Pucel, said he was brought in to "make sure we not only drive industry-leading innovation, but that we also drive continuous improvement and efficiency and quality and safety and keep up with product demand."[94]  To improve operations, Polaris was "better integrating engineering and manufacturing.  We're involving manufacturing experts earlier in the development process and involving engineering experts further into manufacturing and supply chain."[95]  CEO Scott Wine said in the report that in its drive to reach $8 billion in sales by 2020, Polaris planned to reduce supplier costs, rework (i.e. correcting defective products), and inventory.[96]

166.    Sales in ORVs declined in 2015, Polaris proclaimed an "all-out assault on costs."  As part of this renewed focus on cost reduction, Polaris replaced the STAR program

---

[92] Polaris Indus., 2013 Annual Report, at 2.

[93] *Id.* at 4.

[94] Polaris Indus., 2014 Annual Report, at 18.

[95] *Id.*

[96] Polaris Indus., 2014 Annual Report, at 8

with the Value Improvement Project (VIP) system.  The company implemented this system because, according to a presentation to suppliers by Tony Wixo, then Senior Director of Global Procurement and Supplier Development, "traditional cost-down approaches won't meet the goals we have for margin expansion coupled with business growth."[97]  Wixo said VIP was a standardized tool with a "common prioritization across groups driven by financials."[98]  Polaris wanted to use VIP to reduce material costs, which account for 78% of the company's costs through Value Analysis/Value Engineering (VA/VE), which is a method for determining the highest costs and eliminating them; focused optimization and in-sourcing; and strategic sourcing with "should cost" modeling.[99]

167.    Under the VIP program, Polaris still insisted on a 2 percent or better annual net cost reduction, but only suppliers who achieved a 6 percent or greater cost reduction would be given the highest grade for cost reductions, which counted for 30 percent of the overall grade.[100]

168.    Polaris's 2015 Annual Report hints at its recognition that quality was suffering: "Quality and Delivery must also improve as we progress along our Lean journey.

---

[97] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing & Supplier Management, Feb. 2016, at 9.

[98] *Id.*

[99] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing & Supplier Management, Feb. 2016, at 10.

[100] Polaris, Supplier Business Practice Manual, 2018, at 19, available at https://www.polarissuppliers.com/polcy_procedure/Business_Practices/BP001.asp.

While an important commitment will always be to build the best vehicles, we know that winning in the future will require more than horsepower and suspension travel. With our multi-year global investment in assembly plants in its final stages – from Spirit Lake and Opole all the way to Jaipur and Shanghai – we are prepared to deliver higher-quality vehicles and shorter lead times to customers all over the world."[101]

169.    After recalling more than 200,000 RZR and Ranger vehicles for fire hazards in 2016, Polaris, in its Annual Report, promised that the company was improving its engineering and quality: "As Polaris has always done, we attacked our problems head-on and learned a great deal as we addressed them. We are putting that knowledge to use as we continue to strengthen our Global Safety and Quality function. Safety and quality have been, and remain, our top priorities, but we know we still have much work to do. We will continue to closely monitor our vehicles' performance. When an issue arises, we will act swiftly to keep our customers safe."[102]

170.    Polaris also asserted it was "increasing our R&D investment significantly, adding engineering resources to ensure that our armada is stronger than ever before. With stronger leadership, increased investments, more resources, improved dealer service and support, and of course, great vehicles, we are well-prepared to deliver better performance in a competitive ORV market."[103]

---

[101] Polaris Indus., 2015 Annual Report, at 2.

[102] Polaris Indus., 2016 Annual Report, at 3.

[103] *Id.* at 4.

171.   The Annual Report included a description of the goals of the Global Safety and Quality Organization: "enhanced and monitor quality systems across the entire product lifecycle – from product and supplier development through manufacturing and end of life. Enhanced and monitor safety training for all employees.  Conduct post-sale surveillance, tracking warranty data and social media to identify and address safety trends sooner."[104]

172.   Polaris's assertions of a renewed focus on quality are belied by its requirements of its suppliers, which are significantly less stringent than most manufacturers.

173.   Polaris states in its Supplier Quality Assurance Manual (SQAM) that suppliers must "strive to create a 'zero-defect' environment in which ongoing data review shall drive proactive process improvements."  The latest SQAM version seems mindful that its oversight was previously lacking: "We shall transform our mindset regarding quality from 'as received' at the factory to zero defects 'as delivered' to the end customer. The focus shall be on customer-perceived quality with metrics linked to leading product quality and reliability." [105]

174.   However, in its Supplier Business Practices Manual, Polaris describes its monthly grading system for suppliers, which is based on delivery and flexibility, quality,

---

[104] *Id.* at 11.

[105] Polaris, Supplier Quality Assurance Manual, March 2018, Rev. 4, at 6; Captured 06/08/18 at:
https://www.polarissuppliers.com/Files/Polcy_Procedure/Documents/Supplier_Exchange/SQAM%20Rev4.pdf.

and cost reductions.   Quality, which accounts for 30 percent of the grade, is judged primarily by a supplier's Parts Per Million (PPM) performance basis, which is a measure of how many defective parts were produced within one million parts.[106]   Polaris's minimum quality expectation is that suppliers will attain a PPM below 300, although a PPM under 500 will not prompt a quality alert.[107]   In a 2017 supplier conference webinar, Wixo noted that Polaris's goal was less than 225 PPM.[108]   This translates to an acceptance rate of 225 defective parts out of one million parts produced.

175.   Polaris's acceptable PPM is significantly higher than the rate considered acceptable in manufacturing.   Many manufacturers follow Six Sigma quality practices, which allows only 3.4 defects per million parts produced.[109]   In fact, Polaris specifically requires in its SQAM that suppliers adhere to Six Sigma.[110]   Yet, it is willing to accept 221.6 defective products over that limit.

---

[106]  Polaris, Supplier Business Practices Manual, 2018, at 16, available at https://www.polarissuppliers.com/Polcy_Procedure/Documents/Supplier_Exchange/SupplierBusinessPracticeManual.pdf.

[107] *Id.* at 17.

[108] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing & Supplier Management, Feb. 2016, at 14, available at https://www.polarissuppliers.com/files/Conference/Tony%20Wixo%20General%20Session%20Presenation.pdf.

[109] Roger G. Schroeder et al., Six Sigma: Definition and Underlying Theory, 26 Journal of Operations Management 536 (2008), at 537.

[110] Polaris, Supplier Quality Assurance Manual, March 2018, Rev. 4, at 6; Captured 06/08/18 at: https://www.polarissuppliers.com/Files/Polcy_Procedure/Documents/Supplier_Exchange/SQAM%20Rev4.pdf

176.    By way of illustration, the high-profile 2001 recall of Bridgestone/Firestone Wilderness AT tires on Ford vehicles had an average tread separation claims rate of 9 PPM.[111]  The lesser known 2010 recall of Garmin International portable GPS units for fire risk was issued after a defect rate of only 6.67 PPM.[112]

177.    Thus, despite years of recalls, Polaris continues to violate both its internal quality standards and accepted industry quality practices, exacerbating the effects of the undisclosed Engine Overheat/Fire Defect to the detriment of Class Members.

## V.    TOLLING OF THE STATUTES OF LIMITATION

### A.    Discovery Rule Tolling

178.    Neither Plaintiffs nor the other Class members could have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation.

179.    Among other things, neither Plaintiffs nor the other Class members knew or could have known that the Class Vehicles contain the Engine Overheat/Fire Defect.

### B.    Fraudulent Concealment Tolling

180.    Throughout the time period relevant to this action, Polaris concealed from and failed to disclose to Plaintiffs and the other Class members vital information concerning the Engine Overheat/Fire Defect described herein.

---

[111] *See* Joint Hearing, Subcommittees on Commerce, Trade, and Consumer Protection, Ford Motor Company's Recall of Certain Firestone Tires, June 19, 2001, at 95.

[112] Nat'l Highway Traffic Safety Admin., Recall No. 10E039, Garmin International, Aug. 10, 2010, at 2.

181.   Indeed, Polaris kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

182.   Specifically, throughout the Class Period, Polaris was aware that the Class Vehicles were susceptible to catching fire, and that they contained the Engine Overheat/Fire Defect.

183.   Despite its knowledge of the defect, Polaris failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.  Indeed, Polaris affirmatively concealed the Engine Overheat/Fire Defect through its series of ineffective and misleading recalls, described above.

184.   Plaintiffs and the other Class members justifiably relied on Polaris to disclose the Engine Overheat/Fire Defect in the Class Vehicles that they purchased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class members.

185.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

**C.      Estoppel**

186.    Polaris was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles

187.    Polaris knowingly concealed the true nature, quality, and character of the Class Vehicles.

188.    Based on the foregoing, Polaris is estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ACTION ALLEGATIONS

189.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

190.    Plaintiffs seek to represent a class ("the Nationwide Class") defined as:

> All current and former owner or lessees of a Class Vehicle (as defined herein) that was purchased in the United States.

191.    Plaintiffs also respectively seek to represent the following statewide classes ("the Statewide Classes") defined as follows:

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama ("the Alabama Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of California ("the California Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Florida ("the Florida Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Georgia ("the Georgia Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Illinois ("the Illinois Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Michigan ("the Michigan Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Minnesota ("the Minnesota Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of North Carolina ("the North Carolina Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Ohio ("the Ohio Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Texas ("the Texas Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Wyoming ("the Wyoming Class").

192.   Excluded from both the Nationwide and Statewide Class are Defendants Polaris Industries, Inc. and Polaris Sales, Inc. and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff

assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend these Nationwide and Statewide Class definitions, as appropriate, during the course of this litigation.

193.    The Classes expressly disclaim any recovery in this action for personal injury resulting from the Engine Overheat/Fire Defect, without waiving or dismissing any such claims.

194.    This action has been brought and may properly be maintained on behalf of the Nationwide and Statewide Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

195.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Nationwide and Statewide Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiffs are informed and believe that there are not less than 300,000 members of the Nationwide and Statewide Classes, the precise number of Nationwide and Statewide Classes is unknown to Plaintiffs but may be ascertained from Polaris's books and records. Nationwide and Statewide Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

196.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

a.      whether Polaris engaged in the conduct alleged herein;

b.      whether Polaris's alleged conduct violates applicable law;

c.      whether Polaris designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.      whether Polaris misled Nationwide and Statewide Class members about the safety of the Class Vehicles;

e.      whether the Class Vehicles contain the Engine Overheat/Fire Defect alleged herein;

f.      whether Polaris had actual or imputed knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other Nationwide and Statewide Class members;

g.      whether Polaris's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive Statewide Class members in violation of the state consumer protection statute alleged herein;

h.      whether Polaris breached its express warranties to the Nationwide and Statewide Class members with respect to the Class Vehicles;

i.      whether Polaris breached its implied warranties to the Nationwide and Statewide Class members with respect to the Class Vehicles;

j.      whether Nationwide and Statewide Class members overpaid for their Class Vehicles as a result of the defect alleged herein;

k.      whether Nationwide and Statewide Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.      the amount and nature of relief to be awarded to Plaintiffs and the other Nationwide and Statewide Class members.

197.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims are typical of the other Nationwide and Statewide Class members' claims because Plaintiffs and the Nationwide and Statewide Class members purchased or leased Class Vehicles that suffer from the Engine Overheat/Fire Defect.  Neither Plaintiffs nor the other Nationwide and Statewide Class Members would have purchased the Class Vehicles, or, alternatively, would have paid less for the Class Vehicles, had they known of the Engine Overheat/Fire Defect.  Plaintiffs and the other Nationwide and Statewide Class members suffered damages as a direct proximate result of the same wrongful practices in which Polaris engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Nationwide and Statewide Class members.

198.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**.  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Nationwide and Statewide Classes that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Nationwide and Statewide Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

199.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**.  Polaris has acted or refused to act on grounds generally applicable to Plaintiffs and the other Nationwide and Statewide Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

200.    **Superiority – Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Nationwide and Statewide Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Polaris, so it would be impracticable for the Nationwide and Statewide Class members to individually seek redress for Polaris's wrongful conduct.  Even if the Nationwide and Statewide Class members could afford litigation the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS FOR RELIEF

**A.   Claims Brought on Behalf of the Nationwide Class**

### COUNT 1
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*

201.   Plaintiffs repeat and reallege paragraphs 1-200 as if fully set forth herein.

202.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

203.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

204.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

205.   Polaris is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

206.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

207.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

208.   In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

[Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

209.   Polaris's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

210.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of Polaris's written warranty and implied warranty became part of the basis of the bargain between Polaris, on the one hand, and Plaintiff and each of the other Class members, on the other.

211.   Polaris breached these warranties as described in more detail above.  Without limitation, the Class Vehicles have an unreasonable propensity to catch fire, as described above.

212.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

213.   At the time of sale or lease of each Class Vehicle, Polaris knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff and the other Class members resort to an informal dispute resolution procedure and/or afford Polaris a

reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

214.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

215.    As a direct and proximate result of Polaris's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class members have sustained damages in an amount to be determined at trial.

216.    Plaintiffs, individually and on behalf of all the other Class members, seeks all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**B.      Claims Brought on Behalf of the Alabama Class**

**COUNT 2**
**VIOLATIONS OF ALABAMA'S**
**DECEPTIVE TRADE PRACTICES ACT**
**Ala. Code. §§ 8-19-1, *et seq.***

217.    Plaintiff James Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

218.    Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

219.    The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

220.    By the conduct described in detail above and incorporated herein, Polaris engaged in deceptive trade practices.

221.    Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

222.    Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

223.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

224.    Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

225.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

226.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members' Class Vehicles with that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

227.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq*.

**COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**Ala. Code. §§ 7-2-313 and 7-2A-210**

228.    Plaintiff James Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

229.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

230.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

231.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

232.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

233.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

234.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

235.   The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

236.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

237.   Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

238.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

239.    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 4
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ala. Code §§ 7-2-314 and 7-2A-212

240.    Plaintiff James Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

241.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

242.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under Ala. Code §§ 7-2-104 and 7-2A-103.

243.    Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

244.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

245.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

246.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

247.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 5
## FRAUDULENT OMISSION

248.    Plaintiff James Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

249.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

250.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

251.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

252.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

253.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

254.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

255.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

256.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

257.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 6
## UNJUST ENRICHMENT

258.    Plaintiff James Bruner ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

259.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

260.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

261.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

262.    It is inequitable and unconscionable for Polaris to retain these benefits.

263.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

264.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

265.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

C.    **Claims Brought on Behalf of the California Class**

## COUNT 7
## VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code. §§ 1750, *et seq.*

266.    Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims)

repeat and reallege Paragraphs 1-200 as if fully set forth herein.

267.    Plaintiff brings this Count individually and on behalf of the other members

of the California Class (the "Class," for purposes of this Count).

268.    Plaintiff and the other Class members were deceived by Polaris's failure to

disclose that the Class Vehicles share a common design defect in that they contain the

Engine Overheat/Fire Defect, which results in the Class Vehicles having an unreasonable

propensity to catch fire.

269.    Polaris engaged in unfair or deceptive acts or practices when, in the course

of its business, it knowingly omitted material facts as to the characteristics and qualities of

the Class Vehicles.

270.    Polaris failed to disclose material information concerning the Class Vehicles

that it had a duty to disclose.  Polaris had a duty to disclose the Engine Overheat/Fire Defect

because, as detailed above: (a) Polaris knew about the Engine Overheat/Fire Defect, (b)

Polaris had exclusive knowledge regarding the Engine Overheat/Fire Defect not known to

the general public, Plaintiff, or the other Class members; and (c) Polaris actively concealed

material facts concerning the Engine Overheat/Fire Defect from the general public,

Plaintiff, and the other Class members.  As detailed above, the information concerning the

defect was known to Polaris at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

271.   Polaris intended for Plaintiff and the other Class members to rely on it to provide adequately designed and adequately manufactured vehicles, and to honestly and accurately reveal the problems described throughout this Complaint.

272.   Polaris intentionally failed or refused to disclose the Engine Overheat/Fire Defect to consumers.

273.   Polaris's deceptive omissions were intended to induce Plaintiff and the other Class members to believe that the Class Vehicles were adequately designed and manufactured.

274.   Polaris's conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act.

275.   Plaintiff and the other Class members have suffered injury in fact and actual damages resulting from Polaris's material omissions because they paid inflated purchase prices for the Class Vehicles.  Plaintiff and the other Class members are entitled to recover actual damages, punitive damages, costs and attorneys' fees, and all other relief that the Court deems proper under California Civil Code § 1780.

276.   In accordance with California Civil Code Section 1782, Plaintiff's counsel sent a certified letter to Polaris on April 5, 2018, notifying Polaris of its § 1770 violations. Polaris received the certified letter on April 9, 2018. Pursuant to § 1782 of the Act, Polaris is hereby on notice of its particular § 1770 violations, and Plaintiff's demands that Polaris

rectify the problems associated with the actions detailed above and give notice to all affected consumers of Polaris's intent to so act.

277.    Polaris did not commit to provide any remedy for the Engine Overheat/Fire Defect within Plaintiff Luna's Class Vehicle, did not state that it has taken or will take any actions to identify or notify consumers similarly situated to Plaintiff Luna, and did not commit to ceasing from engaging in the conduct complained of in Plaintiff's letter.

278.    Pursuant to California Civil Code § 1780(d), attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

## COUNT 8
## VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT
## FOR BREACH OF EXPRESS WARRANTY
## Cal. Civ. Code §§ 1790, *et seq.*

279.    Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims) repeat and reallege Paragraphs 1-200 as if fully set forth herein.

280.    Plaintiff brings this Count individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

281.    Plaintiff and the other Class members are "buyers" within the meaning of Cal. Civ. Code. § 1791.

282.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

283.    Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

284.    Plaintiff and the other Class members bought or leased Class Vehicles manufactured by Polaris.

285.   Polaris made an express warranty to Plaintiff and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

286.   The Class Vehicles share a common design defect, in that they contain the Engine Overheat/Fire Defect, which results in the Class Vehicles having an unreasonable propensity to catch fire.

287.   The Class Vehicles are covered by Polaris's express warranty.  The defect described herein substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and the other Class members.

288.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

289.   Polaris has had the opportunity to cure the defect in the Class Vehicles, but it has chosen not to do so.  Giving Polaris a chance to cure the defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

290.   As a result of Polaris's breach of its express warranty, Plaintiff and the other Class members received goods with substantially impaired value.  Plaintiff and the other Class members have been damaged as a result of the diminished value of the Class Vehicles resulting from the Engine Overheat/Fire Defect.

291.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their Class Vehicles.

292.    Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other Class members are entitled to costs and attorneys' fees.

**COUNT 9**
**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**FOR BREACH OF IMPLIED WARRANTY**
**Cal. Civ. Code §§ 1790, *et seq.***

293.    Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims) repeats and realleges Paragraphs 1-200 as if fully set forth herein.

294.    Plaintiff brings this Count individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

295.    Plaintiff and the other Class members who purchased their Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code. § 1791.

296.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

297.    Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

298.    Polaris impliedly warranted to Plaintiff and the other members of the Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

299.    Cal. Civ. Code § 1791.1(a) states that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description;

(2)      Are fit for the ordinary purposes for which such goods are used;

(3)      Are adequately contained, packaged, and labeled; and

(4)      Conform to the promises or affirmations of fact made on the container or label.

300.    The Class Vehicles would not pass without objection in the off-road vehicle trade because they share a common design defect in that they contain the Engine Overheat/Fire Defect, resulting in the Class Vehicles having an unreasonable propensity to catch fire.

301.    Because of the Engine Overheat/Fire Defect, the Class Vehicles are not fit for their ordinary purposes.

302.    The Class Vehicles were not adequately labeled because the labeling failed to disclose the defects described herein.

303.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

304.    Polaris has had the opportunity to cure the defect in the Class Vehicles, but it has chosen not to do so.  Giving Polaris a chance to cure the defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

305.    As a result of Polaris's breach of its implied warranty, Plaintiff and the other Class members received goods with substantially impaired value.  Plaintiff and the other

Class members have been damaged as a result of the diminished value of the Class Vehicles.

306.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

307.    Under Cal. Civ. Code § 1794, Plaintiff and the other Class members are entitled to costs and attorneys' fees.

## COUNT 10
## FRAUDULENT OMISSION

308.    Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims) repeat and reallege Paragraphs 1-200 as if fully set forth herein.

309.    Plaintiff brings this Count individually and on behalf of the other members of the California Class ("Class," for purposes of this Count).

310.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

311.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

312.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

313.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

314.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

315.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

316.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

317.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 11
## UNJUST ENRICHMENT

318.   Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

319.   Plaintiff brings this Count individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

320.   Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

321.   Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

322.   It is inequitable and unconscionable for Polaris to retain these benefits.

323.   Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

324.   Polaris knowingly accepted the unjust benefits of its wrongful conduct.

325.   As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## COUNT 12
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

326.   Plaintiff Jose Luna ("Plaintiff," for purposes of the California Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

327.   Plaintiff brings this Count individually and on behalf of the other members of the California Class ("Class," for purposes of this Count).

328.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

329.   Polaris's conduct violated multiple statutes and the common law, as alleged herein.

330.   Polaris has violated § 17200 by knowingly selling Class Vehicles that include the Engine Overheat/Fire Defect and omitting mention of this defect to consumers.

331.   Polaris's conduct was unscrupulous, offended established public policy, and was fraudulent.

332.   The harm caused by Polaris's conduct greatly outweighs any benefit to consumers.

333.   Plaintiff relied on the omissions of Polaris with respect to the quality and reliability of the Class Vehicles.  Plaintiff and the other Class members would not have purchased or leased their Class Vehicles, and/or paid as much for them, but for Polaris's omissions.

334.   Polaris concealed and failed to disclose material information about the Class Vehicles in a manner that is likely to, and in fact did, deceive consumers and the public.

335.    All of the wrongful conduct alleged herein occurred in the conduct of Polaris's business.

336.    Plaintiff, individually and on behalf of the other Class members, requests that this Court restore to Plaintiff and the other Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement.

**D.    Claims Brought on Behalf of the Florida Class**

**COUNT 13**
**VIOLATIONS OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 502.201,** *et seq.*

337.    Plaintiff Clint Halvorsrod ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

338.    Plaintiff brings this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

339.    The Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201, *et seq.*, states that, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

340.    By the conduct described in detail above and incorporated herein, Polaris engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

341.    Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

342.    Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

343.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

344.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

345.    Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

346.    In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members Class Vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.   Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

347.    As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.   Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, *et seq.*

### COUNT 14
### BREACH OF EXPRESS WARRANTY
### Fla. Stat. §§ 672.313 and 680.21

348.    Plaintiff Clint Halvorsrod ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

349.    Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

350.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

351.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

[Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

352.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

353.    Polaris breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

354.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

355.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

356.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

357.    Also, and as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding

its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

358.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

359.   As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 15
## FRAUDULENT OMISSION

360.   Plaintiff Clint Halvorsrod ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

361.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

362.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

363.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not

have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

364.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

365.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

366.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

367.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

368.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

369.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 16
## UNJUST ENRICHMENT

370.     Plaintiff Clint Halvorsrod ("Plaintiff," for purposes of the Florida Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

371.     Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

372.     Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

373.     Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

374.     It is inequitable and unconscionable for Polaris to retain these benefits.

375.     Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

376.     Polaris knowingly accepted the unjust benefits of its wrongful conduct.

377.     As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

E.     **Claims Brought on Behalf of the Georgia Class**

<u>**COUNT 17**</u>
**VIOLATIONS OF GEORGIA'S**
**FAIR BUSINESS PRACTICES ACT**
**Ga. Stat. Ann. §§ 10-1-390, *et seq.***

378.   Plaintiff Robert Lenz ("Plaintiff," for purposes of the Georgia Class's claims)

repeats and realleges paragraphs 1-200 as if fully set forth herein.

379.   Plaintiff brings this claim individually and on behalf of the other members of

the Georgia Class (the "Class," for purposes of this Count).

380.   The Georgia Fair Business Practices Act, Ga. Stat. Ann. § 10-1-393, states

that, "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and

consumer acts or practices in trade or commerce are declared unlawful."

381.   By the conduct described in detail above and incorporated herein, Polaris

engaged in unfair and deceptive trade practices.

382.   Polaris's omissions regarding the Engine Overheat/Fire Defect, described

above, that results in the Class Vehicles having an unreasonable propensity to catch fire,

are material facts that a reasonable person would have considered in deciding whether or

not to purchase (or to pay the same price for) the Class Vehicles.

383.   Polaris intended for Plaintiff and the other Class members to rely on Polaris's

omissions regarding the Engine Overheat/Fire Defect.

384.   Plaintiff and the other Class members justifiably acted or relied to their

detriment upon Polaris's omissions of fact concerning the above-described Engine

Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity

to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

385.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

386.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

387.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members Class Vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

388.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed.

Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ga. Stat. Ann. § 10-1-399.

**COUNT 18**
**BREACH OF EXPRESS WARRANTY**
**Ga. Stat. Ann. §§ 11-2-313 and 11-2a-210**

389.   Plaintiff Robert Lenz ("Plaintiff," for the purposes of the Georgia Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

390.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

391.   Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

392.   In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

393.   Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

394.    Polaris breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

395.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

396.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

397.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

398.    Also, and as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

399.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein,

and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

400.   As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 19
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ga. Stat. Ann. 84-2-314 and 84-2A-212

401.   Plaintiff Robert Lenz ("Plaintiff," for purposes of the Georgia Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

402.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

403.   Polaris is and was at all relevant times a merchant with respect to motor vehicles under Ga. Stat. Ann. §§ 11-2-104 and 11-2A-103.

404.   Pursuant to Ga. Stat. Ann. §§ 11-2-314 and 84-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

405.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.   Specifically, the Class

Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

406.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

407.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

408.   As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 20
## FRAUDULENT OMISSION

409.   Plaintiff Robert Lenz ("Plaintiff," for purposes of the Georgia Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

410.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

411.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

412.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a

duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

413.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

414.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

415.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

416.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

417.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

418.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 21
## UNJUST ENRICHMENT

419.    Plaintiff Robert Lenz ("Plaintiff," for purposes of the Georgia Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

420.    Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

421.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

422.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

423.    It is inequitable and unconscionable for Polaris to retain these benefits.

424.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

425.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

426.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**F.     Claims Brought on Behalf of the Illinois Class**

<u>COUNT 22</u>
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 Ill. Comp. Stat. 505/1, *et seq.***

427.   Plaintiff Michael Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

428.   Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

429.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

430.   By the conduct described in detail above and incorporated herein, Polaris engaged in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

431.   Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

432.   Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

433.   Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine

Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

434.    Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

435.    Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

436.    In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members' Class Vehicles with that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

437.    As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would

have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill. Comp. Stat. 505/1, *et seq*.

**COUNT 23**
**BREACH OF EXPRESS WARRANTY**
**810 Ill. Comp. Stat. 5/2-313 and 5/2A-210**

438.    Plaintiff Michael Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

439.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

440.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

441.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

442.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

443.   Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

444.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

445.   The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

446.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

447.   Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

448.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein,

and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

449.   As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 24
## FRAUDULENT OMISSION

450.   Plaintiff Michael Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

451.   Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

452.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

453.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

454.   Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

455.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

456.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

457.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

458.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

459.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 25**
**UNJUST ENRICHMENT**

460.    Plaintiff Michael Zeeck ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

461. Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

462. Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

463. Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

464. It is inequitable and unconscionable for Polari to retain these benefits.

465. Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

466. Polaris knowingly accepted the unjust benefits of its wrongful conduct.

467. As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## G. Claims Brought on Behalf of the Michigan Class

### COUNT 26
### VIOLATIONS OF THE MICHIGAN
### CONSUMER PROTECTION ACT
### Mich. Comp. Laws §§ 445.901-445.922

468. Plaintiff Chad Rogers ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

469.     Plaintiff brings this claim individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

470.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903.

471.     By the conduct described in detail above and incorporated herein, Polaris engaged in unfair or deceptive acts in violation of the Michigan CPA.  Polaris knew or should have known that its conduct violated the Michigan CPA.

472.     Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

473.     Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

474.     Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

475.     Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class

members would not have purchased or leased Class Vehicles or would have paid less to do so.

476.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

477.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members' Class Vehicles with that are essentially unusable for the purposes for which they were sold.   The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.   Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

478.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed.   Plaintiff and the other Class members also suffered diminished value of their vehicles.

479.   Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the other Class members seek an order enjoining Polaris's unfair and/or deceptive acts or practices and

awarding damages, including trebled and punitive damages, as well as attorneys' fees, costs, and any other just and proper relief available under the Michigan CPA.

**COUNT 27**
**BREACH OF EXPRESS WARRANTY**
**Mich. Comp. Laws § 440.2313**

480.    Plaintiff Chad Rogers ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

481.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

482.    Polaris is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2314 and 440.2862, and a "seller" of motor vehicles under §§ 440.2314 and 440.2313.

483.    With respect to leases, Polaris is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws §§ 440.2862.

484.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2314, 440.2862, and 440.2313.

485.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components
> of the POLARIS RANGER against defects in material and workmanship…
> This warranty covers the parts and labor charges for repair or replacement of

defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

486.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

487.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

488.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

489.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

490.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

491.    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

492.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

493.    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 28**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Mich. Comp. Laws §§ 440.2314 and 440.2862**

494.    Plaintiff Chad Rogers ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

495.    Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

496.    Polaris is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2314 and 440.2862, and a "seller" of motor vehicles under § 440.2314.

497.    With respect to leases, Polaris is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws §§ 440.2862.

498.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2314 and 440.2862.

499.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which

500.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

501.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

502.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

503.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 29
## FRAUDULENT OMISSION

504.    Plaintiff Chad Rogers ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

505.    Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

506.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

507.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

508.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

509.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

510.    Polaris's non-disclosure of the Engine Overheat/Fire Defect gave Plaintiff and the other members of the Class a false impression that the Class Vehicles were safe.

511.    Polaris knew that by not disclosing the Engine Overheat/Fire Defect, it was giving Plaintiff and the other members of the Class a false impression that the Class Vehicles were safe.  Polaris intended for Plaintiff and the other members of the Class to rely on this impression.

512.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

513.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

514.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

515.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 30
## UNJUST ENRICHMENT

516.    Plaintiff Chad Rogers ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

517.    Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

518.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

519.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

520.    It is inequitable and unconscionable for Polaris to retain these benefits.

521.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

522.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

523.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**H.      Claims Brought on Behalf of the Minnesota Class**

**COUNT 31**
**VIOLATIONS OF THE MINNESOTA PREVENTION**
**OF CONSUMER FRAUD ACT**
**Minn. Stat. §§ 325F.68,** *et seq.*

524.    Plaintiff Richard Berens ("Plaintiff," for purposes of the Minnesota Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

525.    Plaintiff brings this Count individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

526.    The Minnesota Prevention of Consumer Fraud Act prohibits "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice." Minn. Stat. § 325F.69.

527.   By the conduct described in detail above and incorporated herein, Polaris engaged in unfair or deceptive acts in violation of Minn. Stat. § 325F.69.

528.   Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

529.   Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions of fact regarding the Engine Overheat/Fire Defect.

530.   Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

531.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

532.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other Class members.

533.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members Class Vehicles that

are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

534.     As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Minn. Stat. § 8.31, subd. 3a.

**COUNT 32**
**BREACH OF EXPRESS WARRANTY**
**Minn. Stat. §§ 325G.19, 336.2-313**

535.     Plaintiff Richard Berens ("Plaintiff," for purposes of the Minnesota Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

536.     Plaintiff brings this Count individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

537.     Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

538.   In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

539.   Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

540.   Polaris breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

541.   Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

542.   The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

543.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and

Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

544.   Also, and as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.   Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

545.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

546.   As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 33
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Minn. Stat. § 336.2-314

547.   Plaintiff Richard Berens ("Plaintiff," for purposes of the Minnesota Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

548.    Plaintiff brings this Count individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

549.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under Minn. Stat. § 336.2-314.

550.    Pursuant to Minn. Stat. § 336.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

551.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Overheat Engine/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

552.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

553.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

554.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 34
## FRAUDULENT OMISSION

555.    Plaintiff Richard Berens ("Plaintiff," for purposes of the Minnesota Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

556.    Plaintiff brings this Count individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

557.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

558.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

559.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

560.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

561.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

562.   Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

563.   Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

564.   As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 35
## UNJUST ENRICHMENT

565.   Plaintiff Richard Berens ("Plaintiff," for purposes of the Minnesota Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

566.   Plaintiff brings this Count individually and on behalf of the other members of the Minnesota Class (the "Class," for purposes of this Count).

567.   Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

568.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

569.    It is inequitable and unconscionable for Polaris to retain these benefits.

570.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

571.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

572.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**I.    Claims Brought on Behalf of the North Carolina Class**

**COUNT 36**
**VIOLATIONS OF THE NORTH CAROLINA**
**UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***

573.    Plaintiff Steve Bailey ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

574.    Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

575.    Polaris engaged in unlawful, unfair, and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by advertising, selling, and warranting the defective Class Vehicles.

576.   Polaris knew that the Class Vehicles suffered from the Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire.

577.   In advertising, selling, and warranting the Class Vehicles, Polaris omitted material facts concerning the Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire.  Polaris failed to give Plaintiff and the other Class members sufficient notice or warning regarding this defect.

578.   Polaris intended that Plaintiff and the other Class members rely upon Polaris's omissions when purchasing the Class Vehicles.

579.   Plaintiff and the other Class members were deceived by Polaris's concealment of the defect.

580.   Polaris's conduct was in commerce and affected commerce.

581.   As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, Plaintiff and the other Class members have been damaged and are entitled to recover actual and treble damages, as well as attorneys' fees and costs, and all other relief allowed under N.C. Gen. Stat §§ 75-16 and 75-16.1.

**COUNT 37**
**BREACH OF EXPRESS WARRANTY**
**N.C. Gen. Stat. §§ 25-2-313 and 25-2A-210**

582.   Plaintiff Steve Bailey ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

583.   Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

584.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

585.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

586.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

587.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

588.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

589.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

590.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

591.    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

592.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

593.    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 38
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212

594.    Plaintiff Steve Bailey ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

595.    Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

596.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under N.C. Gen Stat. § 25-2-314 and 25-2A-212.

597.    Pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

598.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

599.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

600.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

601.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 39
## FRAUDULENT OMISSION

602. Plaintiff Steve Bailey ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

603. Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

604. Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

605. Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose these defects to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

606. Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

607. For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale of the Class Vehicles.

608. In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

609.    Had Plaintiff and the other members of the Class known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

610.    Through its omission regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

611.    As a direct and proximate result of Polaris's omission, Plaintiff and the other members of the Class either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Engine Overheat/Fire Defect had been disclosed to them, and therefore have incurred damages in an amount to be determined at trial.

**COUNT 40**
**UNJUST ENRICHMENT**

612.    Plaintiff Steve Bailey ("Plaintiff," for purposes of the North Carolina Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

613.    Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

614.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

615.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

616.    It is inequitable and unconscionable for Polaris to retain these benefits.

617.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

618.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

619.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**J.      Claims Brought on Behalf of the Ohio Class**

<u>**COUNT 41**</u>
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code Ann. §§ 1345.01, *et seq.***

620.    Plaintiff Michael Jacks ("Plaintiff," for purposes of the Ohio Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

621.    Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

622.    Polaris, Plaintiff, and the other Class members are "persons" within the meaning of Ohio Rev. Code Ann. § 145.01(B).  Polaris is a "supplier" as defined by Ohio Rev. Code Ann. § 1345.01(c).

623.    Plaintiff and the other Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase and lease of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

624.    Ohio Rev. Code Ann. § 1345.02 prohibits unfair or deceptive acts or practices in connection with consumer transactions.

625.    In the course of Polaris's business, Polaris violated the Ohio Consumer Sales Practices Act ("CSPA") by selling Class Vehicles with the Engine Overheat/Fire Defect, or by negligently concealing or suppressing material facts concerning the Engine Overheat/Fire Defect in the Class Vehicles.

626.    Further, as a result of placing a defective product into the stream of commerce, Polaris has breached its implied warranty in tort, which is an unfair and deceptive act, as defined in Ohio Rev. Code Ann. § 1345.09(B).

627.    Polaris has committed unfair and deceptive acts in violation of the Ohio CSPA by knowingly placing into the stream of commerce the Class Vehicles with the Engine Overheat/Fire Defect.

628.    Moreover, Polaris has committed an unfair and deceptive act by knowingly concealing the Engine Overheat/Fire Defect in the Class Vehicles and failing to inform Plaintiff and the other Class members of this defect.

629.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Polaris as detailed in this Complaint, including, but not limited to, the failure to honor both its implied and express warranties; and the concealment and/or non-disclosure of a substantial defect,

constitute deceptive sales practices in violation of the CSPA.  These cases include, but are

not limited to, the following:

     a.  *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

     b.  *State ex rel. Betty D. Montgomery v. Ford Motor co.* (OPIF #10002123);

     c.  *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

     d.  *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

     e.  *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

     f.  *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

     g.  *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

     h.  *Brown v. Spears* (OPIF #10000403);

     i.  *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

     j.  *Mosley v. Performance Mitsubishi AKA Automanage* (OPIF #10001326); and

     k.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

630.    Polaris's unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff and the other Class members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles.

631.    Plaintiff and the other Class members suffered ascertainable loss and actual damages as a direct result of Polaris's concealment of and failure to disclose material

information, namely, the Engine Overheat/Fire Defect.   Plaintiff and the other Class

members who purchased or leased the Class Vehicles would not have done so, or would

have paid significantly less, if the true nature of the Class Vehicles had been disclosed.

Plaintiff and the other Class members also suffered diminished value of their vehicles.

632.    Polaris is liable to Plaintiff and the other Class members for compensatory

damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code Ann.

§ 1345.09.

**COUNT 42**
**BREACH OF EXPRESS WARRANTY**
**Ohio Rev. Code Ann. §§ 1302.26 and 1310.17**

633.    Plaintiff Michael Jacks ("Plaintiff," for purposes of the Ohio Class's claims)

repeat and reallege paragraphs 1-200 as if fully set forth herein.

634.    Plaintiff brings this Count individually and on behalf of the other members

of the Ohio Class (the "Class," for purposes of this Count).

635.    Polaris is and was at all relevant times a merchant with respect to the Class

Vehicles.

636.    In its Limited Warranty, Polaris expressly warranted that it would repair or

replace defects in material or workmanship free of charge if they became apparent during

the warranty period. Polaris provides the following language in its Ranger XP 900 Owner's

Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components
> of the POLARIS RANGER against defects in material and workmanship….
> This warranty covers the parts and labor charges for repair or replacement of
> defective parts which are covered by this warranty.  This warranty begins on
> the date or purchase.

637.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

638.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles. Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

639.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

640.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

641.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

642.    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

643.     Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

644.     As a direct and proximate result of Polaris's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 43
## BREACH OF IMPLIED WARRANTY IN TORT

645.     Plaintiff Michael Jacks ("Plaintiff," for purposes of the Ohio Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

646.     Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

647.     Polaris manufactured and sold the defective Class Vehicles to Plaintiff and the other Class members.

648.     The Class Vehicles are defective because they have the Engine Overheat/Fire Defect, resulting in the Class Vehicles having an unreasonable propensity to catch fire.

649.     These defects existed at the time the Class Vehicles left the control of Polaris.

650.     Based upon these defects, Polaris has failed to meet the expectations of a reasonable consumer.  The Class Vehicles have failed in their ordinary, intended use,

because they suffer from the Engine Overheat/Fire Defect, resulting in the Class Vehicles having an unreasonable propensity to catch fire.

651.   The above-described defects in the Class Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class members.

## COUNT 44
## FRAUDULENT OMISSION

652.   Plaintiff Michael Jacks ("Plaintiff," for purposes of the Ohio Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

653.   Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

654.   Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

655.   Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

656.   Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

657.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

658.    In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

659.    Had Plaintiff and the other Class members known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

660.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

661.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 45
### UNJUST ENRICHMENT

662.    Plaintiff Michael Jacks ("Plaintiff," for purposes of the Ohio Class's claims) repeat and reallege paragraphs 1-200 as if fully set forth herein.

663.    Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class ("Class," for purposes of this Count).

664.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

665.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

666.    It is inequitable and unconscionable for Polaris to retain these benefits.

667.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

668.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

669.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**K.    Claims Brought on Behalf of the Texas Class**

**COUNT 46**
**VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES –**
**CONSUMER PROTECTION ACT**
**Tex. Bus. & Com. Code §§ 17.01,** *et seq.*

670.    Plaintiff Bryan Forrest ("Plaintiff," for purposes of the Texas Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

671.    Plaintiff brings this Count individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

672.    The Texas Deceptive Trade Practices—Consumer Protection Act ("TDTPA") states that it is unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

673.    By the conduct described in detail above and incorporated herein, Polaris engaged in false, misleading and deceptive trade practices.

674.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

675.    Polaris's omissions regarding the Engine Overheat/Fire Defect, described above, that results in the Class Vehicles having an unreasonable propensity to catch fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

676.    Polaris intended for Plaintiff and the other Class members to rely on Polaris's omissions regarding the Engine Overheat/Fire Defect.

677.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Polaris's omissions of fact concerning the above-described Engine Overheat/Fire Defect that results in the Class Vehicles having an unreasonable propensity to catch fire, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

678.   Had Polaris disclosed all material information regarding the Engine Overheat/Fire Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

679.   Polaris's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

680.   In addition to being deceptive, the business practices of Polaris were unfair because Polaris knowingly sold Plaintiff and the other Class members Class Vehicles that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances.  Moreover, in light of Polaris's exclusive knowledge of the Engine Overheat/Fire Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

681.   As a direct and proximate result of Polaris's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Engine Overheat/Fire Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles.

Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the TDTPA.

## COUNT 47
## BREACH OF EXPRESS WARRANTY
### Tex. Bus. & Com. Code §§ 2.313 and 2A.210

682.    Plaintiff Bryan Forrest ("Plaintiff" for purposes of the Texas Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

683.    Plaintiff brings this Count individually and on behalf of the Texas Class (the "Class," for purposes of this Count).

684.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

685.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship.... This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty. This warranty begins on the date or purchase.

686.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

687.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles. Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

688.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

689.    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

690.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

691.    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

692.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

693.    As a direct and proximate result of Polaris's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 48
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Tex. Bus. & Com. Code §§ 2.314 and 2A.212

694.    Plaintiff Bryan Forrest ("Plaintiff," for purposes of the Texas Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

695.    Plaintiff brings this Count individually and on behalf of the Texas Class (the "Class," for purposes of this Count).

696.    Polaris is and was at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104 and 2A.103.

697.    Pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

698.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

699.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

700.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

701.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 49
## FRAUDULENT OMISSION

702.    Plaintiff Bryan Forrest ("Plaintiff," for purposes of the Texas Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

703.    Plaintiff brings this Count individually and on behalf of the other members of the Texas Class (the "Class," for purposes of this Count).

704.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

705.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

706.    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

707.    For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

708.    In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

709.    Had Plaintiff and the other Class members known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

710.    Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

711.    As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 50**
**UNJUST ENRICHMENT**

712.    Plaintiff Bryan Forrest ("Plaintiff," for purposes of the Texas Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

713.    Plaintiff brings this Count individually and on behalf of the other members of the Texas (the "Class," for purposes of this Count).

714.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

715.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

716.    It is inequitable and unconscionable for Polaris to retain these benefits.

717.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

718.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

719.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

L.      **Claims Brought on Behalf of the Wyoming Class**

## COUNT 51
## BREACH OF EXPRESS WARRANTY
### Wy. Stat. §§ 34.1-213 and 34.1-2.a-210

720.    Plaintiff Ed Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

721.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

722.    Polaris is and was at all relevant times a merchant with respect to the Class Vehicles.

723.    In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in its Ranger XP 900 Owner's Manual, which upon information and belief, is substantially identical for all models:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship… This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

724.    Polaris's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

725.    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

CASE 0:18-cv-00939-WMW-DTS   Document 35   Filed 06/15/18   Page 147 of 155

726.     Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

727.     The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

728.     Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

729.     Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Polaris improperly concealed material facts regarding its Class Vehicles.   Plaintiff and the other Class members were therefore induced to purchase or lease the Polaris Vehicles under false pretenses.

730.     Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make them whole.

731.     As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 52
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Wy. Stat. §§ 34.1-2-314 and 34.1-2.a-212

732.     Plaintiff Ed Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

733.     Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

734.     Polaris is and was at all relevant times a merchant with respect to motor vehicles under Wy. Stat. §§ 34.1-2-104 and 34.1-2.a-103.

735.     Pursuant to Wy. Stat. §§ 34.1-2-314 and 34.1-2.a-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

736.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Engine Overheat/Fire Defect which causes the Class Vehicles to have an unreasonable propensity to catch fire.

737.    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

738.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Polaris's breach of the warranty of merchantability.

739.    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 53
## FRAUDULENT OMISSION

740.    Plaintiff Ed Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

741.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

742.    Polaris was aware of the Engine Overheat/Fire Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

743.    Having been aware of the Engine Overheat/Fire Defect within the Class Vehicles and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

149

744. Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

745. For the reasons set forth above, the Engine Overheat/Fire Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

746. In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

747. Had Plaintiff and the other Class members known of the Engine Overheat/Fire Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

748. Through its omissions regarding the Engine Overheat/Fire Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

749. As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Engine Overheat/Fire Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 54**
**UNJUST ENRICHMENT**

750.    Plaintiff Ed Beattie ("Plaintiff," for purposes of the Wyoming Class's claims) repeats and realleges paragraphs 1-200 as if fully set forth herein.

751.    Plaintiff brings this Count individually and on behalf of the other members of the Wyoming Class (the "Class," for purposes of this Count).

752.    Polaris has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

753.    Polaris has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

754.    It is inequitable and unconscionable for Polari to retain these benefits.

755.    Because Polaris concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's misconduct.

756.    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

757.    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the Statewide Classes, respectfully requests that the Court enter judgment in their favor and against Defendants Polaris Industries, Inc. and Polaris Sales, Inc. as follows:

a.      Declaring that this action is a proper class action, certifying the Nationwide and Statewide Classes as requested herein, designating Plaintiffs as Nationwide and Statewide Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.      Enjoining Polaris Industries, Inc. and Polaris Sales, Inc. from continuing the unfair business practices alleged in this Complaint;

c.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Nationwide and Statewide Class members, as allowable by law;

d.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay both pre- and post-judgment interest on any amounts awarded;

e.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay attorneys' fees and costs of suit; and

f.      Ordering such other and further relief as may be just and proper.

## IX.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

**DATED:**  June 15, 2018

/s/ Karl L. Cambronne
Karl L. Cambronne
Bryan L. Bleichner
Jeffrey D. Bores
**CHESTNUT CAMBRONNE, PA**
17 Washington Avenue North, Suite 300
Minneapolis, Minnesota  55401
Telephone:  612-339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com

*Plaintiffs' Liaison Counsel*

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT & CASEY LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com
dferri@dlcfirm.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com

Roland K. Tellis
David Fernandes
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, #1600
Encino, California  91436
Telephone: 818-839-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com
*Plaintiffs' Interim Co-Lead Counsel*

Roger A. Dreyer
Christopher W. Wood,
Robert Bale
Dreyer Babich Buccola Wood
Campora, LLP
20 Bicentennial Circle
Sacramento, California 95826
Telephone: 916-379-3500
rdreyer@dbbwclaw.com;
cwood@dbbwclaw.com

Kirk J. Wolden
Clifford L. Carter
CARTER WOLDEN CURTIS, LLP
1111 Exposition Boulevard, Suite 602
Sacramento, California 95815
Telephone: (916) 567-1111
cliff@cwclawfirm.com,
kirk@cwclawfirm.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way

Germantown, Maryland  20874
Telephone:  703-901-1660
courtney@thedavenportlawfirm.com

*Additional Counsel for Plaintiffs and the*
*Proposed Classes*