1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                    )
                                    )   File No. 18-CV-939
4     In re: Polaris Marketing,     )          (WMW/DTS)
      Sales Practices, and Products )
5     Liability Litigation          )
                                    )   St. Paul, Minnesota
6                                   )   November 28, 2018
                                    )   9:14 a.m.
7     ------------------------------------------------------------

8

9

10         BEFORE THE HONORABLE WILHELMINA M. WRIGHT
              UNITED STATES DISTRICT COURT JUDGE
11

12                    **(MOTIONS HEARING)**

13

14

15

16

17

18

19

20

21

22

23

24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.


                    LORI A. SIMPSON, RMR-CRR
                        (651) 848-1225

```
 1    APPEARANCES

 2      For the Plaintiffs:      Beasley, Allen, Crow, Methvin,
                                 Portis & Miles, P.C.
 3                               H. CLAY BARNETT, III, ESQ.
                                 218 Commerce Street
 4                               Montgomery, Alabama 36103

 5                               Chestnut Cambronne, PA
                                 BRYAN L. BLEICHNER, ESQ.
 6                               JEFFREY D. BORES, ESQ.
                                 Suite 300
 7                               17 Washington Avenue North
                                 Minneapolis, Minnesota 55401
 8
                                 DiCello, Levitt & Casey, LLC
 9                               JOHN E. TANGREN, ESQ.
                                 Eleventh Floor
10                               10 North Dearborn Street
                                 Chicago, Illinois 60602
11
                                 The Davenport Law Firm, LLC
12                               COURTNEY DAVENPORT, ESQ.
                                 18805 Porterfield Way
13                               Germantown, Maryland 20874

14                               Baron & Budd, P.C.
                                 DAVID FERNANDES, JR., ESQ.
15                               Number 8
                                 1138 12th Street
16                               Santa Monica, California 90403

17      For the Defendants:      Kirkland & Ellis, LLP
                                 ANDREW B. BLOOMER, ESQ.
18                               300 North LaSalle Street
                                 Chicago, Illinois 60654
19
                                 Faegre, Baker, Daniels, LLP
20                               WENDY J. WILDUNG, ESQ.
                                 Suite 2200
21                               90 South Seventh Street
                                 Minneapolis, Minnesota 55402
22
        Court Reporter:          LORI A. SIMPSON, RMR-CRR
23                               Suite 146
                                 316 North Robert Street
24                               St. Paul, Minnesota 55101

25
```

1                     **P R O C E E D I N G S**

2                         **IN OPEN COURT**

3              THE COURT:  Please call the case on our calendar.

4              LAW CLERK:  Case No. 18-CV-939, In Re: Polaris

5     Marketing.

6              THE COURT:  Counsel, please note your appearances.

7              MR. TANGREN:  Good morning, Your Honor.  John

8     Tangren of DiCello, Levitt & Casey on behalf of the

9     plaintiffs.

10             THE COURT:  Thank you, Mr. Tangren.

11             Are other counsel noting appearances?

12             MR. BARNETT:  Good morning, Your Honor.  Clay

13    Barnett on behalf of the plaintiffs.

14             THE COURT:  Thank you.

15             MR. FERNANDES:  Good morning, Your Honor.  David

16    Fernandes of Baron & Budd on behalf of the plaintiffs.

17             THE COURT:  Thank you.

18             MR. BLEICHNER:  Good morning, Your Honor.  Bryan

19    Bleichner from Chestnut Cambronne on behalf of the

20    plaintiffs.

21             THE COURT:  Thank you.

22             MR. BORES:  Good morning, Your Honor.  Jeffrey

23    Bores from Chestnut Cambronne on behalf of plaintiffs.

24             THE COURT:  Thank you.

25             MS. DAVENPORT:  Good morning, Your Honor.

1    Courtney Davenport from the Davenport Law Firm on behalf of

2    the plaintiffs.

3              THE COURT:  Thank you.  Very well.

4              MS. WILDUNG:  Good morning, Your Honor.  Wendy

5    Wildung from Faegre, Baker, Daniels representing the

6    Defendant Polaris Industries.  And I would like to introduce

7    Your Honor to Andrew Bloomer from Kirkland & Ellis, also

8    representing Polaris.

9              Finally, Your Honor, we have here in the courtroom

10   with us Lucy Clark Dougherty, general counsel of Polaris.  I

11   would like to introduce you to her.

12             THE COURT:  Thank you very much.  If she would

13   like to sit at counsel table, she is welcome to do so.

14             MS. WILDUNG:  Thank you, Your Honor.

15             MR. BLOOMER:  Thank you, Your Honor.

16             THE COURT:  And, Counsel, are we ready to proceed

17   on this matter, a motion to dismiss?

18             MR. BLOOMER:  We are, Your Honor.

19             MR. TANGREN:  We are.

20             THE COURT:  Very well.  And how will you be

21   dividing your arguments?  Will it be one counsel per side?

22             MR. TANGREN:  I will be speaking on plaintiffs'

23   behalf, Your Honor.

24             MR. BLOOMER:  And the same for me, Your Honor.

25             THE COURT:  Very well.  Thank you.  You may

1    proceed.

2             MR. BLOOMER:  Thank you, Your Honor.  Your Honor,

3    again, I'm Andrew Bloomer on behalf of Polaris Industries

4    and Polaris Sales, who are the defendants in this case.

5             First of all, Your Honor, let me say I hope you

6    had a happy Thanksgiving holiday.  Thank you for scheduling

7    this argument.  It's an honor to be able to appear and argue

8    to this Court.

9             Your Honor, Polaris has filed a motion to dismiss

10   the plaintiffs' consolidated Complaint.  There are eleven

11   plaintiffs from eleven states, one plaintiff per state,

12   alleging claims for breach of express and implied warranty,

13   fraudulent omission, consumer fraud, and unjust enrichment.

14            We have moved, Polaris has moved for dismissal of

15   all claims except for the breach of warranty claims, both

16   the express and implied warranty claims, asserted by

17   California Plaintiff José Luna, L-u-n-a.

18            I think in the time allotted, Your Honor, I cannot

19   address all the arguments in the briefs and Your Honor was

20   kind enough to allow the parties extra pages -- or extra

21   words for those briefs.

22            THE COURT:  Yes.

23            MR. BLOOMER:  We very much appreciate that.

24            THE COURT:  And I have read the submissions.

25            MR. BLOOMER:  Thank you, Your Honor.  I can't

1    address all the arguments.  I would refer the Court to the

2    Declaration of R. Allan Pixton that was filed with our

3    motion to dismiss.  Exhibit 1 to that declaration is a chart

4    that we thought might be helpful to the Court in terms of

5    listing each plaintiff, each claim, and then the reasons why

6    we respectfully submit each claim, again, with the exception

7    of Plaintiff Luna, the California plaintiff's warranty

8    claims, fail as a matter of law and should be dismissed.

9         I think given the time -- and, Your Honor, I'll

10   obviously take any questions Your Honor has, but given the

11   time, I'll address, I think, five reasons why the

12   plaintiffs' claims, we submit, should be dismissed.  I'll

13   focus on these five reasons.  It's a little bit like peeling

14   an onion, Your Honor, because the claims, we argue, fail for

15   more than one reason, so there's going to be some overlap,

16   but at the end of the day, the end result from Polaris's

17   perspective is that all the claims should be dismissed with

18   the exception of the California plaintiff's warranty claims.

19        Reason number one is the manifest defect rule.

20   Your Honor, that rule defeats all claims except for the

21   breach of express warranty claims in seven states.  Those

22   states are Minnesota, Alabama, Georgia, North Carolina,

23   Ohio, Texas, and Wyoming.  The plaintiffs in those states do

24   not allege that their vehicles ever overheated, let alone

25   experienced the so-called engine overheat/fire defect.  And

1    engine overheat defect is how the plaintiffs define the

2    alleged defect they claim exists in the class vehicles.

3          So even though the plaintiffs from these seven

4    states purchased their vehicles as much as a year ago and in

5    some cases as many as three years ago for the Ohio and Texas

6    plaintiffs, they don't allege the so-called heat defect.

7    They don't allege that it ever manifested, it ever arose, it

8    ever occurred.

9          So if a plaintiff came into this court and said I

10   have a heat defect with my vehicle and Your Honor were to

11   ask them has the heat defect occurred and they say no and

12   then say, all right, did it occur either during the warranty

13   period or after the warranty period, no, it hasn't occurred,

14   that plaintiff would not have a claim.  They wouldn't have a

15   claim based on just the need to plead some facts under

16   *Twombly* and *Iqbal*, the Supreme Court precedent, on providing

17   factual support to make a claim plausible.

18          This situation is no different for these seven

19   plaintiffs.  There's no class certified.  These are just

20   individual claimants before the Court.  And seven of these

21   plaintiffs -- actually, eight overall, but in Illinois we

22   did not move on the manifest defect rule in that state, but

23   eight out of the eleven plaintiffs, eight, so three-quarters

24   of their plaintiffs say this alleged defect has never arisen

25   in their vehicles.  They bought a vehicle.  The vehicle has

1    performed.  If there was an allegation of a defect, it

2    should be made.

3            Under the manifest defect rule, which is the rule

4    applied by the majority of courts that have addressed this

5    issue, you cannot have an implied warranty, a consumer

6    fraud, a fraudulent omission, or an unjust enrichment claim

7    unless the defect actually occurs.

8            I'll give you an example.  The plaintiffs say we

9    lost the benefit of our bargain.  We bought a vehicle that

10   has this defect in it.  So take the example of a

11   plaintiff -- there's eight of them in this case, seven of

12   whom we have moved on -- that says I paid for the vehicle,

13   I've driven the vehicle, I haven't experienced the defect.

14   Let's say they use the vehicle for its entire usable life,

15   however many years, however many hours.  Hours is how -- not

16   so much miles, but hours is how manufacturers record usage

17   of these particular off-road vehicles.

18           So a plaintiff buys the vehicle, pays for it,

19   rides it without any alleged heat defect and, what, says

20   I've lost the benefit of my bargain?  They didn't lose the

21   benefit of their bargain.  They got the benefit of their

22   bargain.  They got a vehicle that functioned exactly the way

23   it should have.

24           Take a similar example which may be -- which could

25   be based on the facts in this case.  A plaintiff buys a

1    vehicle.  Again, the alleged heat defect never manifests,

2    never occurs.  They use the vehicle.  Polaris issues a

3    recall.  Let's say it's a heat-related recall.  They take

4    their vehicle in.  The vehicle is repaired free of charge,

5    by the way, because that's how the recall works and they go

6    on their way.

7            Again, how can that plaintiff say I lost the

8    benefit of my bargain?  Even if the Court were to agree with

9    the claim that maybe there was an alleged defect, that

10   defect got repaired with the recall repair.  They got the

11   benefit of their bargain.

12           On top of that, if a court were to award them

13   money damages based on the alleged difference between the

14   price of a vehicle without a defect and the price of a

15   vehicle with the alleged defect, they've overcompensated

16   them.  They've provided them compensation for no harm and no

17   injury.

18           THE COURT:  So let me clarify which plaintiffs,

19   and perhaps it's all plaintiffs, you're alleging this

20   argument applies to.  Is it Bruner, Lenz, Zeeck, Berens,

21   Bailey, Jacks, Forrest, and Beattie for which you are

22   arguing that they have not alleged an injury that's

23   particularized and actual?

24           MR. BLOOMER:  Right.  Bruner in Alabama, Lenz in

25   Georgia --

1          THE COURT:  Is it Zeeck, Z-e-e-c-k?

2          MR. BLOOMER:  Zeeck in Illinois, but Illinois does

3     not apply the manifest defect rule, Your Honor, so we did

4     not move on Zeeck.

5          THE COURT:  Okay.

6          MR. BLOOMER:  So Zeeck -- the seven plaintiffs are

7     from Minnesota, which is Berens, B-e-r-e-n-s; Alabama, which

8     is Bruner; Georgia, which is Lenz; North Carolina, which is

9     Bailey; Ohio, which is Jacks.  That's a plaintiff, by the

10    way, Your Honor, who bought his vehicle more than three

11    years ago.  He filed a Complaint this year and doesn't

12    allege that he ever had a heat issue with it.  Jacks in

13    Ohio, Texas is Forrest, and Wyoming is Beattie.

14         Your Honor, we have cited to the Court in our

15    papers on-point authority, either state or federal

16    authority, in the states of Minnesota, Alabama, North

17    Carolina and Texas, so four out of the seven states.

18         We admit, Polaris admits that for Georgia, Ohio,

19    and Wyoming this Court has to predict how those courts would

20    rule on the manifest defect rule because those states'

21    supreme courts have not addressed the issue.  So Your Honor

22    does have to make a prediction, as a court sitting in

23    diversity, as to how those cases -- how those supreme courts

24    in those states would rule on the issue.

25         THE COURT:  Have there been intermediate appellate

1    court decisions on that issue in Georgia?  Recognizing the

2    value of a supreme court decision, certainly, but in

3    determining my predictive acumen, it might be helpful if

4    there have been decisions by the intermediate appellate

5    court.

6              MR. BLOOMER:  Not on the precise issue in Georgia

7    of manifest defect.

8              THE COURT:  Okay.

9              MR. BLOOMER:  There is a case we cite, *Edel*,

10   E-d-e-l, *vs. Southtowne Motors of Newnan*, where the court

11   gets close to the issue where it says that the plaintiff's

12   claim should be dismissed when they have made no claim under

13   the warranty and have been denied, made no repair other than

14   that made by the defendant at no charge, nor otherwise shown

15   an actual injury suffered.

16             And in the courts that do apply the manifest

17   defect rule, they describe it variously.  They describe it

18   as an actual injury.  They describe it as lack of a legally

19   cognizable injury.  Some courts describe it as a lack of

20   legally cognizable damages.  And still other courts, and the

21   *Zoonander* [sic] case is an example of this in Minnesota, as

22   is the *Wallace vs. ConAgra* case out of the Eighth Circuit,

23   they treat the issue as one of standing, no injury in fact.

24             There's a difference, I think, under the law.

25   Standing is standing and it's jurisdictional and some courts

1    look at it and say, well, you actually haven't alleged an

2    injury that's particularized and concrete, I can't hear the

3    case.  And you get to the same result.  Courts that apply

4    the manifest defect rule -- I'm sorry, Your Honor.  I think

5    you wanted to ask a question.

6              THE COURT:  Well, I guess that's what I am trying

7    to determine.  Is there Article III standing or should I be

8    looking at whether or not, you know, there's an issue at

9    all?

10             MR. BLOOMER:  I think the Court could look at it

11   under either rubric.  And what I mean by that is standing is

12   one issue, which is jurisdictional.  Manifest defect as

13   substantive state law is a different issue because that --

14   they both get to the same result, but standing the court

15   says I just can't hear the claim.  It's Federal

16   Jurisdiction 101.  For manifest defect as a substantive

17   state law issue, the court says I can hear the claim, but

18   the claim fails on its merits.  I think the Court, even for

19   places like Georgia, could look at it the same way because

20   standing --

21             THE COURT:  Could look at what the same way?

22             MR. BLOOMER:  I'm sorry.  Could look at it from

23   either vantage point.  It could look at it and say would I

24   predict that the Georgia court based on these authorities

25   would find that the manifest defect rule is part of their

1    substantive law and would apply it or the court could say,

2    alternatively, I know what standing is, I know what a

3    concrete and particularized injury is, I deal with that

4    every day in my courtroom, that's a fairly standard

5    requirement of any action brought in federal court.

6              THE COURT:  So if I take that approach, then it's

7    game, set, match, we don't go any farther, there's no

8    predictive aspect to it at all, correct?

9              MR. BLOOMER:  I would agree with that, Your Honor.

10             THE COURT:  Because standing is --

11             MR. BLOOMER:  Right.

12             THE COURT:  -- a threshold issue, correct?

13             MR. BLOOMER:  Standing is a threshold issue and

14   whether courts analyze the issue, which is -- you're

15   claiming a product defect.  The defect doesn't occur.  Can

16   you have a claim?  Some courts have said I'm going to look

17   at state law and determine whether as a matter of state law

18   it's a substantive element of the claim or I look at it as

19   standing.

20             I think it's kind of almost an accident of the way

21   courts have reviewed it, understandably so because take a

22   case -- take a situation like Texas.  Texas is interesting

23   because they have several cases that dismiss these types of

24   claims based on standing under Texas state law.  So even in

25   state court cases, the court says you don't allege an

 1    injury.  Because you don't allege an injury, you don't have

 2    standing under state law.  Forget about -- I don't need --

 3    I'm a state court.  I don't need to worry about federal

 4    standing.  You just don't have standing under Texas state

 5    law.

 6            THE COURT:  So it sounds like -- I just want to

 7    make sure I understand your argument -- you're taking a belt

 8    and suspenders approach?

 9            MR. BLOOMER:  That's exactly right.

10            THE COURT:  Two different routes, to mix

11    metaphors --

12            MR. BLOOMER:  I think you --

13            THE COURT:  -- two different routes to get to the

14    result that you are advocating?

15            MR. BLOOMER:  I think you can get to the same

16    place two different routes, exactly.

17            THE COURT:  Okay.

18            MR. BLOOMER:  Because that's how courts have done

19    it.  And recognizing that I think if the Court looks and

20    says what does the state law -- state substantive law say

21    and let's say the court concludes it's unclear, you don't

22    know, maybe you're skeptical that that state court -- say

23    Wyoming, there's very little --

24            THE COURT:  But why wouldn't I look at what does

25    the Eighth Circuit say about a problem like this, whether

1     it's a standing problem or otherwise?

2              MR. BLOOMER:  I think you should.  I think that's

3     exactly right, Your Honor.

4              THE COURT:  So what does the Eighth Circuit say?

5              MR. BLOOMER:  So the Eighth Circuit has looked at

6     this both under state law and both as a matter of standing.

7              The *Briehl* case, B-r-i-e-h-l, was a case against

8     General Motors.  The court said you don't have a claim under

9     state substantive law because you don't allege that the

10    defect actually manifested.  You don't have legally

11    cognizable injury or damages.

12             The *O'Neil vs. Simplicity* case, again, out of the

13    Eighth Circuit, relying on *Briehl*, I believe, they dealt

14    with drop-side cribs that had caused injury and maybe even

15    deaths, I think, among infants.  You had a crib that had a

16    drop side.  I have five children.  I'm used to drop-side

17    cribs.  A Minnesota plaintiff sued on behalf of a Minnesota

18    class alleging same types of claims you have here, Minnesota

19    consumer fraud, implied warranty, et cetera, but they

20    couldn't say that their drop-side crib had ever

21    malfunctioned, that it didn't work.  And the Eighth Circuit

22    says, citing *Briehl* and joining what it calls the great

23    majority of courts, says you don't have a claim, you don't

24    have a claim under state law.

25             And the way that *O'Neil* addressed it -- and,

1      again, same claims, benefit of the bargain, I should have

2      had a crib that doesn't have this defect.  The court said,

3      quote, "It is well established that purchasers of an

4      allegedly defective product have no legally cognizable claim

5      where the alleged defect has not manifested in the product

6      they own."  That's at 574 F.3d at pin cite 503.  Again,

7      quote, "It is not enough to allege that a product line

8      contains a defect or that a product is at risk for

9      manifesting this defect.  Rather, the plaintiffs must allege

10     that their product actually exhibited the alleged defect."

11             So *Briehl*, *Simplicity* both dealt with it as a

12     question of Minnesota and other state's laws.  They were

13     both class actions.

14             Interestingly enough, the *O'Neil* court, district

15     court, which was affirmed, cited a case by a Minnesota state

16     court called *Carey*, C-a-r-e-y, *vs. Select Comfort* and that

17     was a case where someone said I bought a mattress, the

18     mattress retains moisture, it causes mold, it could make me

19     ill.  And the court said -- it dismissed Minnesota consumer

20     fraud, common law fraud, breach of express and implied

21     warranty claims because, quote, "diminished value premised

22     on the possibility of future product failure is insufficient

23     to support a claim for relief."

24             And it was sweeping.  The court said plaintiff's

25     Complaint must be dismissed in its entirety because it lacks

1    an essential element.  It does not allege legally cognizable

2    damages.  And damages is obviously an element of every

3    claim, whether it's implied warranty, express warranty,

4    consumer fraud, or fraud.

5         Those are cases -- there's a wealth of cases in

6    Minnesota and in the Eighth Circuit that address it that

7    way, but there's also cases, to Your Honor's point, that

8    address it as an Article III matter and we cite the case I

9    mentioned, *Wallace vs. ConAgra Foods*, which is 747 F.3d

10   1025, out of the Eighth Circuit in 2014.

11        In that case -- it's an interesting case --

12   plaintiffs allege that they overpaid for purportedly kosher

13   hot dogs that may have contained improperly certified meat.

14   Now, in that case the court -- it actually cites these other

15   cases, but the Eighth Circuit in that case analyzed it as a

16   question of standing.  The court said that the plaintiffs

17   had not alleged a particularized actual injury in fact.  It

18   quoted *O'Neil*, but it came out a different door to the same

19   result on the basis of Article III standing.  It says you

20   haven't shown that the meat you purchased was contaminated

21   with a nonkosher ingredient and because of that, you haven't

22   alleged an injury and that injury is the entire basis of

23   your claim.

24        Another case that cites these cases that analyzes

25   the issue is the *Zurn* case, which the plaintiffs cite, and

1    it's a case -- it's 644 F.3d 604, and we embrace that case.

2    The issue there was that the plaintiffs said, well, we

3    have -- we bought pipes that can be -- that have brass

4    fittings that exhibit a defect.

5            Now, in that case the Eighth Circuit said there

6    was an injury.  I don't think it was clear whether it was

7    analyzing it under state law or Article III.  My reading of

8    the case, Your Honor, is they were looking at it as state

9    law.

10           But they distinguished *O'Neil*, but the reason they

11   distinguished *O'Neil* is because the plaintiffs had shown

12   that the defect had manifested.  The court says, quote,

13   (As read) "In contrast to the plaintiffs in *O'Neil*, the

14   homeowners do not argue that the fittings merely risk

15   developing this condition.  They allege that the condition

16   afflicts all of the fittings upon use, regardless of water

17   conditions or installation practices."  So they said -- so

18   in that case the court said it had already manifested.

19           And the plaintiffs actually had an expert, a

20   Dr. Staehle, S-t-a-e-h-l-e, who opined that the Zurn

21   fittings, the defendant's fittings, as soon as they are

22   exposed to domestic water will fail or begin to fail.

23           So in that case the court says this is different

24   from *O'Neil*.  You're not alleging a risk.  What you're

25   alleging is that there's already failure.

1          Another case, the *Zoonander* [sic] case, which is

2     from this district court, analyzes a very similar case to

3     *Zurn*, but comes out a different way on Article III grounds.

4     Same kind of claim.  The plaintiffs say we bought pipes

5     that -- I'm sorry.  They claim that the defendant sold pipes

6     that it said could be used for potable water, but, in fact,

7     it didn't and they could allow toxins into the water supply.

8     And the court said you haven't injured -- you haven't

9     alleged an injury in fact and because you haven't alleged an

10    injury in fact, it got rid of the -- it dismissed the

11    Minnesota Consumer Fraud Act claims, breach of express

12    warranties, and they also had a tort claim in that case for

13    negligence and negligent failure to warn.

14          Again, *Zoo -- Thunander*, which is spelled

15    T-h-u-n-a-n-d-e-r, 887 F.Supp.2d at 850, it cited both

16    *Briehl* and *O'Neil*, but it came out the door of Article III

17    standing.  It just said you haven't alleged a particularized

18    injury -- a particularized or concrete injury, it affects

19    all your claims, and it dismissed the case on that basis.

20          So courts in the Eighth Circuit, there's really a

21    wealth of authority on this issue and they've analyzed it

22    under both rubrics, but in either case the key question is

23    did the defect manifest.

24          And in this case the plaintiffs say, well, the

25    defect is heat.  They say we put these ProStar engines into

1      our vehicles.  We do.  And they allege that we have ProStar

2      engines in vehicles that have not been recalled.  There's a

3      lot more vehicles that the ProStar engine is in that are not

4      the subject of this case.  But the plaintiffs say, well, the

5      engine creates heat.  Well, that's the defect.  If we put a

6      ProStar engine into every vehicle and it doesn't overheat,

7      then you can't possibly say there's a heat defect, but

8      that's what the Court is confronted with in this case and in

9      this case --

10                THE COURT:  Why isn't that a factual issue that

11     needs to be addressed later in the proceeding, whether the

12     heat is the defect or it is the effect of the heat on

13     something else that is the defect?

14                MR. BLOOMER:  Because I think it's a threshold

15     issue.  The question is what is the defect.  In this case

16     heat is inseparable from the claimed defect.  I think

17     plaintiffs would concede under their theory if there's no

18     heat, there's no defect.  They need heat.

19                And so what courts say is if you're claiming a

20     product defect, you have to plead and prove the existence of

21     the defect.  Take my example of the person who comes in as

22     an individual plaintiff and says, I have a heat defect.

23     Your Honor asks them, Did your vehicle overheat?  No, it

24     never has.  That wouldn't pass *Iqbal*.  It wouldn't pass

25     *Twombly*.

1          So what courts say, whether it's implied warranty,

2     express warranty, fraudulent omission, at the end of the day

3     you still have to say it's a question of is there a defect.

4     What is -- I'm sorry.  Go ahead.

5          THE COURT:  What defines the defect here?

6          MR. BLOOMER:  They define the defect as excessive

7     heat.  They call it the engine overheat/fire defect.  Their

8     defect isn't -- it can't be separated from heat because if

9     all they did is allege we put ProStar engines into vehicles

10    and they didn't overheat, I think they would concede they

11    don't have a claim.

12         THE COURT:  And I'm certainly going to ask the

13    plaintiffs this question too, but do the plaintiffs allege

14    that there is overheating or there's the risk of

15    overheating?

16         MR. BLOOMER:  They allege, Your Honor, that there

17    is a risk of overheating.

18         I mean, first of all, let's take them at their

19    word.  And what I mean by that is they've got eleven

20    plaintiffs and eight of those people do not allege a single

21    instance of overheating at any time despite owning a vehicle

22    from anywhere for a year to three years or more.

23         And the plaintiffs in their opposition brief, I

24    think, try to address this, but they can't -- I don't think

25    they can avoid the fact that they allege that it's a risk of

1    overheating because they've got most of their --

2            THE COURT:  An unreasonable propensity; is that

3    correct?  Isn't that one of the allegations?  So if there's

4    a propensity, that means that there is the overheating,

5    correct, as opposed to a risk of overheating?  Why isn't, if

6    I look at the language, it an unreasonable propensity?

7            MR. BLOOMER:  It's the same as risk.  They allege

8    risk 45 times in their Complaint.  They allege propensity, I

9    think, more than 28 times.

10           And the courts that have addressed manifest defect

11   either as a question of substantive state law or Article III

12   say the risk of something happening is not sufficient.  Take

13   the *Farsian* case in Alabama.  This is probably the starkest

14   example.

15           THE COURT:  So it's an unreasonable propensity to

16   do what, then?  I want to make sure that we're looking at

17   the language of the allegations to discern whether or not

18   there's standing.

19           MR. BLOOMER:  The answer, Your Honor --

20           THE COURT:  Because it --

21           MR. BLOOMER:  I'm sorry.

22           THE COURT:  It seems to me you can't have a

23   propensity to do something unless it has occurred and it

24   hasn't occurred in an isolated manner, it's occurred in a

25   manner in which, you know, under certain conditions it's

1    almost predictive that it's going to occur.

2            MR. BLOOMER:  Right.  And the propensity or the

3    risk in either case has to be to overheat.  We're talking

4    about vehicles that have a gas combustion engine in them,

5    like a car.

6            THE COURT:  But you said risk of overheating is

7    not enough; is that correct?

8            MR. BLOOMER:  Correct, because courts say--

9            THE COURT:  So propensity -- that's why I am

10   trying to understand from you how you distinguish.  And I

11   certainly will ask plaintiffs this too, whether or not it's

12   sufficient to hang one's hat in the legal analysis on

13   propensity and what the basis for propensity would be.

14           MR. BLOOMER:  Courts have treated the two issues

15   as indistinguishable, meaning whether it's risk or

16   propensity, it's still no injury and --

17           THE COURT:  I just want to make sure.  If a

18   person -- I'm not going to indict myself here.  If a person

19   has a propensity to lie, doesn't that mean they lie a lot

20   and in this circumstance they're probably lying too versus

21   there's a risk of lying, which occurs anytime someone makes

22   a statement?

23           MR. BLOOMER:  But one party cannot come in and

24   allege an injury that happened to someone else.  So in the

25   example you give, a person may have a propensity to lie.

1    Whether you can charge them with perjury in a specific

2    situation will depend.  Even if they may be a liar

3    generally, the one instance that might be at issue you have

4    to look at.

5             And so the courts that have looked at this do

6    address propensity.  The *Carey* case out of the Minnesota

7    state court, which was a 2006 case -- that's the case that

8    was cited by the *O'Neil* district court and the *O'Neil*

9    district court was affirmed by the Eighth Circuit -- the

10   court says, "This court agrees with those cases that find

11   that an allegation of diminished value due to a propensity

12   to fail is too remote, conjectural, and speculative."

13   That's at 2006 Westlaw 871619, pin cite Star 4.

14            So courts have said propensity is not enough

15   because it wouldn't satisfy -- Your Honor, I don't think

16   that would satisfy -- come close to satisfying Article III.

17            In *Thunander*, the case where -- the district court

18   case out of this court where Minnesota claims were alleged

19   and the parties said I bought a house, it has this piping,

20   supposed to be rated to handle potable water, but it

21   doesn't, the court said:  Have you tested it?  Do you have

22   toxins in your water?  Well, they had never tested it, but

23   it had happened elsewhere.  The company had documents that

24   show it happened.  And the court said that doesn't get you

25   to first base, you don't have an injury.

1        I mentioned the *Farsian* case.  This is an

2   interesting case.  I'll admit it's sobering.  That's a case

3   out of the Supreme Court of Alabama that involved a heart

4   valve, a heart valve that had allegedly caused like 200

5   deaths.  A person comes in and says, I have this heart

6   valve.  It has a propensity to fail.  I don't have to -- you

7   know, do I have to wait for it to fail in my chest to have a

8   claim?  And the Supreme Court said you don't have a claim

9   because what you have is a risk or a propensity that that

10  thing could fail, but until you do, under our law you don't

11  have a claim.

12        So I think to answer your question, Your Honor,

13  propensity, risk, it's the same thing because at the end of

14  the day there needs to be -- you need to show actual injury

15  or damage under state law and you need to show a

16  particularized and concrete injury under federal Article III

17  law.

18        THE COURT:  Thank you, Counsel.  Your time has

19  expired.

20        MR. BLOOMER:  Okay.  Thank you for your time, Your

21  Honor.

22        MR. TANGREN:  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        MR. TANGREN:  Your Honor is, I think, rightly

25  focused on exactly what the defect is here that plaintiffs

1    have alleged, so I will address that one first if you would

2    like to take the opportunity to ask me the question you

3    indicated you would like to ask about exactly what it is we

4    allege.

5              I'll direct the Court's attention to our

6    Complaint, specifically paragraph 7, where we lay out

7    exactly what it is about these off-road vehicles that we

8    believe poses a defect and an unacceptable risk of fire.

9              What happens here is that the piping that takes

10   the exhaust away from the ProStar engine, which, as you

11   know, we've alleged is too powerful to be housed within the

12   chassis in which it is housed, this piping lacks proper

13   ventilation and heat shielding and is positioned within

14   inches of combustible plastic body panels.  Thus, the

15   hottest area of this engine is located inches behind the

16   occupants in an area of the vehicle that is enclosed with

17   little room for air flow to dissipate the high heat.

18             These extremely high temperatures, combined with

19   inadequate cooling and heat shielding, result in melting of

20   plastic body panels and the ignition of any combustible

21   material that is surrounding the engine, which can lead to

22   potentially deadly fires.

23             What we're alleging here is not a risk of

24   overheating.  It's not a propensity of overheating.  It is

25   actual overheating due to a condition that is immediately

1   and easily apparent to someone who opens up the engine and

2   knows where to look.

3          Again, at paragraphs 103 to 105 of the Complaint

4   this theory of defect is laid out in a little more detail,

5   along with pictures where the Court can see exactly where

6   the pipe goes and why it creates the overheating condition

7   inside of the vehicle.

8          To be clear, this is not a case like *O'Neil*, for

9   example, or *ConAgra* where it is unclear whether the

10  plaintiff's specific product actually has the defect.  One

11  can take any of plaintiffs' vehicles and just turn them on

12  and within just a few minutes you can tell.  You can put

13  your hand on the seat, you can put your hand on the side of

14  the vehicle and you can feel the excessively high

15  temperatures.  This is an overheating defect that is

16  manifested in every single one of these class vehicles.  So

17  for that reason --

18         THE COURT:  So what makes it -- as opposed to

19  heated, what makes it overheated?

20         MR. TANGREN:  Well, it is --

21         THE COURT:  Is there supposed to be no heating

22  whatsoever?

23         MR. TANGREN:  It is overheated in the sense that

24  it creates an unacceptable risk of fire and it also results

25  in degrading of the vehicle over time, which poses problems

1        in and of itself in terms of structural integrity.

2                No responsibly designed vehicle would have these

3        kinds of temperatures that expose the vehicle to structural

4        damage, expose the passengers to the possibility of burning,

5        and last, but not least, creates an unacceptably high risk

6        of vehicle fires, which has already occurred in, you know,

7        several of the plaintiffs' vehicles despite the limited

8        amount of time in which they've been operated since they've

9        been purchased.

10               THE COURT:  So you have actual overheating and

11       fires in all or certain --

12               MR. TANGREN:  We have fires in three of them and

13       we have significant overheating in all of them, Your Honor.

14               THE COURT:  And the overheating is measured by?

15               MR. TANGREN:  Overheating is measured by the

16       engineering standards that would apply to the way that these

17       vehicles have been designed.  A vehicle that has this level

18       of heat that creates this kind of risk of fire is just

19       excessive in overheating.  So --

20               THE COURT:  So there's no standard, is there?

21               MR. TANGREN:  There's a standard at common law

22       that these vehicles be designed in a way that presents a

23       risk of fire that is acceptable to consumers as a matter of

24       reasonableness, as a matter of materiality.

25               The risk of fire in these vehicles has reached a

1     point, Your Honor, we allege, that Polaris breached its

2     warranties, that the risk of fire renders them

3     unmerchantable, it renders them defective insofar as it

4     breaches Polaris's express warranties to repair any defects

5     in these vehicles, and it also creates a breach of Polaris's

6     duty to disclose any material defects in the vehicle to

7     these consumers.

8            These are common law standards and they depend on

9     standards of reasonableness, standards of duty of reasonable

10    care and they've been breached in this case, Your Honor, and

11    they've been breached in every vehicle, not simply those

12    vehicles that happen to catch on fire.

13           And one helpful way to think about this is to

14    compare this case with the Eighth Circuit cases that

15    Mr. Bloomer discussed a few minutes ago and which Your Honor

16    is correctly focused on.

17           In the *O'Neil* case, for example, that case

18    featured defects in the drop side of a crib.  The cribs at

19    issue, prior to the drop side separating from the crib and

20    creating a gap where a child could become trapped and get

21    injured or possibly even killed, the cribs to anyone just

22    looking at it appear to be working just fine and apparently

23    in many cases the cribs did work just fine.

24           By contrast, in the *Zurn Pex Plumbing* case, a case

25    with which this case is on all fours, in that case the

1    corrosion of the pipes at issue happened in all of the

2    pipes, beginning with when the pipes were first exposed to

3    moisture, when the pipes were first installed and when they

4    first began to convey water.  That was something that the

5    plaintiffs were able to demonstrate.

6         And similarly here, this defect involves

7    overheating that affects all of the vehicles.  It's

8    overheating that can be easily demonstrated both by a

9    physical inspection of the vehicle and by touching the

10   vehicle while it's in operation to feel that excessive heat.

11        The parties engaged -- and it's an interesting

12   exchange and it's one that we believe Your Honor needs to

13   look at for purposes of other state law outside of Minnesota

14   on whether even if we had not alleged a defect that had

15   manifested, whether we could still raise a claim for a

16   latent defect in the same way that the *GM Ignition* and

17   *Takata* courts, for example, have allowed plaintiffs in many

18   states to do.

19        But for purposes of applying Minnesota law -- and

20   also Your Honor may also -- can also reach the same result

21   in these other states by simply noting that here the

22   manifest defect rule is satisfied because we have alleged a

23   defect that is exhibited in each one of these vehicles.

24        THE COURT:  And the defect is?  Just identify the

25   defect, to be clear.

1              MR. TANGREN:  Sure.  The defect is an engine and

2      exhaust piping from the engine that have been installed in

3      the vehicle in such a way as to create overheating every

4      time the vehicle is in operation.

5              And as I mentioned just a little while ago, it may

6      be helpful to take a step back and look at how the manifest

7      defect rule has evolved over time.  There are a number of

8      cases --

9              THE COURT:  And let me just -- creates overheating

10     every time.  The overheating is manifest how?  How do we

11     know this?  What's our governor?

12             MR. TANGREN:  We can look at, for example --

13     unlike a crib where if the drop side has not separated from

14     the body of the crib, the crib appears to be perfectly fine,

15     can hold a child, there's no gap where a child can get

16     trapped, here if you take any of these class vehicles and

17     open them up, you can see that the exhaust piping runs right

18     underneath where the passengers occupy the vehicle when it's

19     in operation, you can see that there's inadequate space for

20     the engine to dissipate that heat, and most importantly,

21     when you turn the vehicle on, you can feel on the seat, you

22     can feel on the side of the vehicle there is heat that is

23     excessive, that when it is allowed to build up creates an

24     unacceptably high risk of fire.

25             If you were to take dry leaves, for example, and

1    stuff it into that engine compartment, which can happen

2    frequently when the vehicle is out and riding around, then

3    you would fairly easily create a situation where a fire

4    would result inside of that vehicle.

5          And so that is the major and critical distinction

6    between the case we have here on one side, along with cases

7    like *Zurn Pex*, and in cases on the other side, like *O'Neil*,

8    like the *ConAgra* case counsel referred to a short wile ago

9    where plaintiffs could not demonstrate that the hot dogs

10   they had purchased were kosher or not kosher.  In fact, it

11   seemed likely that the hot dogs were kosher and that the

12   situation that they were suing under was a situation that

13   impacted other plaintiffs, but not them.

14         THE COURT:  Okay.  And so we're measuring or

15   defining the term "overheating" based on what you can feel

16   with your hands?  And where is it alleged that it occurs

17   every time?

18         MR. TANGREN:  It's alleged in our Complaint at

19   paragraphs 6 to 7 and also paragraphs 103 to 105.  We

20   explain how this overheating occurs.  We explain how it

21   results from an engine design that is present in each one of

22   these vehicles.

23         And as Your Honor asked before, is this an issue

24   of fact that precludes a ruling on a 12(b)(6) motion in

25   favor of defendants?  We absolutely believe that it does.

1    We look forward to doing further expert work on exactly how

2    high the temperature would be before it trips over that

3    threshold to be overheating.  We believe that --

4              THE COURT:  Why shouldn't that have been done

5    before the allegation was made as to overheating?  You're

6    saying it overheats every time, but we're going to have

7    somebody tell us that it overheats.

8              MR. TANGREN:  We have the evidence now that shows

9    that these vehicles have exhibited overheating, which

10   resulted in multiple fires.  We have multiple recalls from

11   the company, which is essentially an admission that at least

12   for some of these vehicles in the class they have recognized

13   that there is an overheating problem.

14             We don't believe that there's a requirement that

15   you have an expert report prior to filing suit in any case

16   and we believe that the evidence here is more than

17   sufficient to support an inference under *Twombly* and *Iqbal*

18   that this overheating does occur.

19             And if Your Honor has no other questions on that

20   issue, I will turn next to the manifest defect rule and how

21   it has evolved over time.

22             We have a few cases from over 20 years ago where

23   courts that were presented with cases where it didn't even

24   appear that there was a defect at all sometimes would

25   dismiss those cases, speaking of them in terms of, well, the

1    defect hasn't exhibited or hasn't manifested in the

2    plaintiffs' vehicles.

3            In the last few years the manifest defect rule has

4    been used quite frequently.  The *GM Ignition* case, which is

5    cited frequently throughout the parties' briefs, is one of

6    them.  Polaris's counsel here today has been instrumental in

7    pushing that issue forward in that case.

8            The *Takata* airbag case is another example where

9    simply because of the size of those cases Judge Moreno in

10   Florida and Judge Furman in New York have thought through

11   these issues very, very thoroughly and have both come to the

12   conclusion that, in fact, if you look at what the benefit of

13   the bargain rule was designed to do, in most of these states

14   plaintiffs should, in fact, be allowed to pursue a claim for

15   economic harm due to a product defect even if that product

16   defect is latent, even if that product defect isn't clear or

17   isn't manifest or hasn't been exhibited in each of the

18   plaintiffs' vehicles simply because of the dangerous

19   condition that those defects pose, in the *Takata* case the

20   fact that an airbag can go off and kill the occupants inside

21   or in *GM Ignition* that the key in the ignition can flip

22   back, turn the car off just before it crashes, and the

23   airbag won't inflate.

24           To be clear, as I said a minute ago, we think this

25   case is different from that because there is a clear

1   manifest defect, but if Your Honor has remaining doubts

2   about whether we've pled that clearly enough in the

3   Complaint, at the very least we believe that for the reasons

4   discussed in those cases and for the reasons discussed in

5   the state courts as well in most of these states, even a

6   latent defect, even a defect that does not manifest until

7   something catches on fire or until someone is killed is

8   sufficient to allow plaintiffs to recover on a theory of

9   economic harm.

10          I'll briefly walk through the states at issue.

11  We've already discussed Minnesota.

12          The *GM Ignition* court allowed plaintiffs to

13  proceed on a latent defect theory based on its reading of

14  the *Zurn Pex* case.

15          In Alabama, the *Takata* court has recognized that a

16  plaintiff can proceed under the Alabama consumer protection

17  statute for a latent defect.

18          And in California, in *Benkle v. Ford Motor Company*

19  the court there also allowed Alabama warranty claims to

20  proceed for a latent throttle body defect.

21          The case that Polaris relies on mainly, *Ford Motor*

22  *Company vs. Rice*, was a case decided 20 years ago and it was

23  a case where plaintiff's vehicle had operated free of

24  incident for 15 years, so there was some healthy skepticism

25  there about whether there was actually a defect in the

1    vehicle at all.

2            In North Carolina, the *Coley v. Champion Home*

3    *Builders* case at 590 S.E.2d 20 establishes Plaintiff

4    Bailey's right to recover for his defective vehicle.  In

5    that case the plaintiff's allegation that their mobile home

6    tie-down systems could possibly malfunction during high

7    winds was sufficient to allow them to proceed.

8            The cases that Polaris relies on are inapplicable

9    because in each of those cases the court found that the

10   plaintiffs had failed to prove an actual defect.

11           In Texas, the controlling decision on this issue

12   is *DaimlerChrysler Corp. vs. Inman*, which was decided by the

13   Texas Supreme Court in 2008.  In that case the Texas Supreme

14   Court affirmed the Fifth Circuit's holding in *Cole vs.*

15   *General Motors Corporation* that allowed the plaintiffs to

16   proceed on an economic damages theory for a latent airbag

17   defect theory that had not exhibited in their vehicles.

18           Most of the authorities cited by Polaris predates

19   *Inman* and, we would submit, has been implicitly overruled by

20   *Inman* to the extent that they are irreconcilable.  While we

21   recognize that the *GM Ignition* court reached a different

22   result, we would submit that it's the Texas Supreme Court's

23   thinking on this issue that rules, not the *GM Ignition*

24   court's, not an out-of-state federal New York court.

25           Polaris concedes that there's no clear authority

1    in Georgia, Ohio, or Wyoming on these issues.  The

2    *GM Ignition* court went ahead and did hold that under Georgia

3    law you can proceed under a fraudulent omission theory for a

4    latent defect.  This was also true under Ohio law for the

5    implied warranty and tort claim and for the Ohio consumer

6    protection statute.  And then we also have the *Whirlpool*

7    litigation that went up to the Sixth Circuit where

8    plaintiffs were allowed to proceed, again, on a latent

9    defect theory.

10           And for the same reason that plaintiffs have

11   alleged harm for the product defect that exhibits in each of

12   their vehicles, we also allege Article III standing, which

13   permits us to proceed in federal court.

14           THE COURT:  Okay.  I want to get to the unjust

15   enrichment claims and particularly focusing on Florida.  How

16   do those claims survive in this instance?

17           MR. TANGREN:  Certainly.  In Florida plaintiffs

18   cited the *Solidda Group, S.A. vs. Sharp Electronics Corp.*

19   Case, which is 2014 Westlaw 12513613.

20           THE COURT:  So it's unpublished?

21           MR. TANGREN:  Right, right.  In that case the

22   court recognized that a direct benefit for purposes of

23   establishing an unjust enrichment claim may be conferred

24   without traveling through any third-party intermediary.

25           Polaris relies heavily on an earlier case,

1     *Extraordinary Title Services*, but *Solidda* came after that

2     case and we would submit is more consistent with what

3     appears to be the majority, if not unanimous, rule when it

4     comes to determining whether a benefit has been conferred

5     for unjust enrichment purposes, which is is there a

6     sufficient nexus, is there some relationship between the

7     plaintiff and defendant, short of the two parties having

8     engaged in a direct transaction with each other, that would

9     permit a court to find that a benefit has been conferred.

10            And we believe here, and this is generally the

11    result that courts reach, when you're dealing with a vehicle

12    manufacturer that has warranted a vehicle, that has provided

13    a warranty to a consumer that that consumer can rely upon,

14    that in that case, even if there is a dealership that acts

15    as an intermediary, the fact that there's that warranty and

16    also the fact that that dealership is authorized by the

17    manufacturer explicitly to sell its products is sufficient

18    to create a nexus that allows a direct benefit for unjust

19    enrichment purposes to be conveyed.

20            THE COURT:  I guess I'm still puzzled because it

21    seems that Florida requires plaintiffs to purchase the

22    vehicle directly from the defendant's manufacturer or

23    dealership to state a claim for unjust enrichment.

24            MR. TANGREN:  If I recall the cases under Florida

25    law, and this is true for many of the cases in the other

1    states as well, what we have there are cases where -- the

2    one that comes to mind most readily is the *Whirlpool* case

3    where the court held that there wasn't a sufficient

4    transactional nexus.

5            In that case we were dealing with Whirlpool

6    washers that were sold by third-party stores like Best Buy

7    and H.H. Gregg.  You didn't show -- there weren't the same

8    kind of dealerships in the way there are for Polaris or for

9    auto manufacturers.

10           In fact, if I recall, I don't believe there have

11   been any cases cited in the papers on this unjust enrichment

12   direct benefit issue involving an automobile or other

13   vehicle manufacturer selling a vehicle through its

14   dealership to a consumer where the court did not find that

15   that conveyed a sufficient transactional nexus to find that

16   a direct benefit had been conferred.

17           THE COURT:  Okay.

18           MR. TANGREN:  And possibly, you know, since

19   Michigan law is helpful on these vehicle issues, I'll note

20   that under Michigan law the cases that plaintiffs cite,

21   including the *Auto Parts Antitrust Litigation*, established

22   that a direct benefit can be conveyed in the same way.

23           And the case that Polaris relies on, *Storey*, was a

24   case that did not involve a vehicle sale and there was no

25   allegation that the parties had interacted in any way,

1    unlike the interaction that happens here where Polaris

2    warrants that these vehicles are free of defect, the

3    warranty that is at issue now that plaintiffs have brought

4    claims for breach of express and implied warranty.

5             THE COURT:  So as I look at the *Whirlpool*

6    *Corporation* case from the Eastern District of Michigan in

7    2017, it indicates that Michigan law requires a direct

8    benefit or some sort of direct interaction --

9             MR. TANGREN:  Right.

10            THE COURT:  -- between plaintiffs and defendants.

11   That's what -- you're relying on some sort of direct

12   interaction?

13            MR. TANGREN:  We're relying on the fact that a

14   warranty is conveyed to the consumer and also the

15   relationship between a vehicle manufacturer and its

16   dealerships, we would submit, is tighter than the

17   relationship between, say, an appliance manufacturer and the

18   department stores that sell those appliances.

19            THE COURT:  How so?

20            MR. TANGREN:  Each of the purchases made here were

21   made at Polaris authorized dealerships.

22            So, for example, if I go and I want to buy a car

23   and I go to -- when my wife and I bought our Toyota Camry,

24   we went to the local Toyota dealership.  The Toyota logo was

25   displayed prominently on the side of the building.  The

1    people who sold us the car wore uniforms that had the Toyota

2    logo on them.  When we signed our paperwork, the paperwork

3    had Toyota's logo on it and Toyota's name featured

4    prominently throughout.

5            Similarly here, when you go to purchase a Polaris

6    vehicle, the Polaris logo is featured.  The dealership can

7    rely on the good name and credit of Polaris to back up that

8    the vehicles are good vehicles, and that's exactly what

9    Polaris intends to do when it provides a warranty to the

10   consumers.

11           A vehicle is a different sort of product than an

12   appliance where people understand that, you know, Best Buy

13   doesn't necessarily stand behind the nondefective nature of

14   the appliances it sells.  You're on your own in terms of

15   what you want to do to -- if your DVD player breaks down or

16   you washer breaks down, you need to go directly -- you don't

17   go back to Best Buy.  But here the entanglement between the

18   dealership and the manufacturer is much tighter, and this is

19   what courts routinely hold in cases involving vehicle

20   defects.

21           THE COURT:  Anything further at this time?

22           MR. TANGREN:  If Your Honor has nothing further on

23   the unjust enrichment claim, then our arguments on the other

24   issues that were raised by defense counsel on fraudulent

25   omission and on warranty are laid out in our papers.  If the

1    Court has no questions on those, we're happy to conclude our

2    presentation.

3              THE COURT:  Thank you.

4              Rebuttal.

5              MR. BLOOMER:  Thank you, Your Honor.  Very, very

6    briefly.

7              My friend across the bar said that plaintiffs have

8    alleged significant overheating in all vehicles.  That's not

9    the case.  Their Complaint does not say that heating is

10   inevitable.  It doesn't say it will occur in every vehicle.

11   It does not say that it occurs the first time the vehicle is

12   used.  They can't make those allegations.  They've got eight

13   plaintiffs who don't allege any heat whatsoever who have

14   owned their vehicles for a year or more.  That's a problem.

15   What they do allege repeatedly is a risk or a propensity,

16   and the courts say that isn't enough under state law, that's

17   not enough under Article III.

18             Your Honor makes a good point about the governor.

19   There is no governor here.  There's no standard that they've

20   alleged.  They say the defect is overheating.  In *Zurn* the

21   reason the plaintiffs were able to sustain their claim in

22   that Eighth Circuit case is because they had an expert who

23   came in and said the second water goes through these pipes,

24   they fail.  They said -- the court explicitly says the pipes

25   had exhibited the defect.

1        We have eight plaintiffs here who don't say that.

2   They've been driving their vehicles.  They've got other

3   plaintiffs who do, so they can make the allegations if the

4   allegations exist.

5        THE COURT:  And let me make sure.  *Zurn* was at the

6   same stage of the proceedings as this case is?

7        MR. BLOOMER:  I believe it was, Your Honor.  I

8   believe it was a -- I can check very briefly.

9        THE COURT:  I'll take a look at it.  We've got the

10  case too.  I don't want you to spend your time in that way.

11       MR. BLOOMER:  Thank you, Your Honor.

12       The interesting thing about the *GM* case and

13  obviously Your Honor -- I have nothing but the utmost

14  respect for Judge Furman in the Southern District of

15  New York.  I have spent significant time with that court

16  over the last four years.  He's a wonderful judge.  I don't

17  agree with him on everything.  Obviously Your Honor is not

18  bound by his rulings.

19       The plaintiffs like to cite Judge Furman when it

20  helps them.  They don't like to cite him on things like

21  Texas where he poured out the plaintiffs' claims, like the

22  plaintiffs' claims here, on the manifest defect rule, but he

23  did that as well.

24       I would say that -- plaintiffs say that the *Rice*

25  and the *Farsian* cases in Alabama are older cases.  We cite

1    *Hinton* in 2001, *Southern Bakeries* in 2002.  And if the Court

2    looks at cases like *Zoonander* [sic] in this district, other

3    cases, the manifest defect rule comes up in these cases.

4    It's not some old relic of the past.  It is very much a

5    principle whether analyzed under substantive state law or

6    Article III standing.

7          For Florida on unjust enrichment, I think Your

8    Honor is right.  *Extraordinary Title* is the case we cite,

9    2009 from the Florida Court of Appeals.  It's a state court

10   appellate court, a decision which the Eighth Circuit under

11   the *Rucci* case, R-u-c-c-i, says is entitled to great

12   deference.  That case, *Extraordinary Title*, has been

13   repeatedly cited by Florida and state courts since it was

14   decided.  The single case cited by plaintiffs, *Solidda*, in

15   four years since it's been decided hasn't been cited by

16   another court.

17         I would also point out, and we argue this in our

18   brief and I'm sure Your Honor knows that, that Your Honor

19   doesn't even need to reach the direct benefit point.  You've

20   got -- every plaintiff alleges a written contract, the

21   warranty that they say was the basis of their bargain, and

22   they allege adequate remedies of law in the form of money

23   damages under their implied warranty, consumer fraud, and

24   fraudulent omission claims.

25         They can't have -- you can't have an unjust

1    enrichment claim when you are alleging, affirming, and

2    trying to enforce a contract to begin with and you can't

3    have unjust enrichment, which is an equitable claim, when

4    you have an adequate remedy at law, which they allege.

5              THE COURT:  Why can't you plead in the

6    alternative?

7              MR. BLOOMER:  Because they didn't plead in the

8    alternative.  What they did here is they actually alleged

9    the existence of a contract in every count of their

10   Complaint, including the unjust enrichment count.

11             So courts have said if you want to plead in the

12   alternative, if you're not certain that there was a contract

13   and you want to say if there was a contract, it's a breach

14   of contract and if there wasn't a contract, then it's unjust

15   enrichment, you can do that.  But they didn't do that.  They

16   didn't plead in the alternative.

17             What they did was to affirm and seek to enforce

18   and sue over a breach of a written contract and they

19   incorporated those allegations expressly into all their

20   claims, including the unjust enrichment claims, which I

21   think is fatal.

22             THE COURT:  Well, why shouldn't I be reading that

23   pleading liberally and giving it a liberal construction such

24   that I read it as an alternative?  Is there no legal grounds

25   to read it in the alternative?

1          MR. BLOOMER:  I think the plaintiffs are masters

2     of their Complaint and I think that they need to put the

3     defendant on notice of what their claim is.  If they think

4     there is no written warranty or they're not sure they got a

5     written warranty, I understand that and they have to plead

6     it.

7          But when they plead there is a contract and on top

8     of that they plead claims that give rise to adequate

9     remedies at law in the form of money damages, I just don't

10    see how even under Rule 8 or a liberal construction of the

11    pleading standards there's not a fatal conflict or a fatal

12    problem with that type of a pleading, but Your Honor is the

13    judge and you will decide.

14         THE COURT:  Well, I am going to look for the law

15    that says that you can't plead in the alternative or that

16    the manner in which this is pled is not in the alternative

17    as recognized by courts.

18         MR. BLOOMER:  Fair enough.

19         Two more points, if I may, Your Honor, briefly.

20    The plaintiffs cite the *Inman* case out of the Supreme Court

21    of Texas.  Texas has -- the law is chock-full of cases

22    tossing claims on manifest defect and Judge Furman cites a

23    number of those cases when he tossed the plaintiffs' claims

24    in the GM MDL.

25         But what was interesting and was curious to me is

1    that the plaintiffs -- I was scratching my head as to why

2    they would cite the *Inman* case.  In that case the plaintiffs

3    allege that a buckle was defective and that the buckle

4    had -- the defect, just like they do here, they say it was

5    manifested the moment it was sold until the present.  And

6    the court tossed it out saying they hadn't -- they dismissed

7    the claim saying that the plaintiffs had not suffered a

8    concrete and legally compensable injury and thus lack

9    standing under Texas law.  They said, (As read) "We do not

10   rule out the possibility that somewhere there may be owners

11   or lessees of vehicles with Gen-3 seat belt buckles that can

12   allege concrete injury.  Our focus is on Plaintiffs Inman,

13   Castro, Wilkins and they have not shown they can.  We simply

14   think that the rights of 10 million vehicle owners and

15   lessees across the United States should not be adjudicated

16   in an action brought by three plaintiffs who cannot show

17   more than the merest possibility of injury to themselves."

18   That is what you have in this case with respect to the eight

19   plaintiffs, seven of whom on which we have moved on manifest

20   defect.

21            One more point, Your Honor, that I'm compelled to

22   make.  I was reviewing the materials over the last couple of

23   days and in our briefs we argued that the Michigan

24   plaintiff, whose name I believe is Berens, that he failed to

25   allege an issue within the warranty time period both for his

1    express and implied warranty claims.  I was re-reading the

2    Complaint and in paragraph 114 they do allege that he had an

3    issue.  Michigan is not a claim we're moving on for purposes

4    of manifest defect because he did allege overheating.

5    Someone who had it alleged it.  But we did move on that

6    ground.  We should not have moved on that ground because,

7    looking at the Complaint, they did allege on the face of it

8    that he had an issue within the warranty period.

9           The plaintiffs, I don't know if they noticed it or

10   didn't notice it.  They didn't argue it.  But I have a duty

11   of candor to the Court, which I take very seriously, and so

12   I wanted to make the Court aware of that, that we withdraw

13   our motion with respect to the Michigan plaintiff.

14          I will say we withdraw it on the basis that he

15   didn't allege within the time period of the warranty.  His

16   warranty claims still fail because he alleges UCC warranty

17   claims and he didn't give pre-suit notice.  So under our

18   theory we get to the same result, but only on the one leg of

19   the stool, not the other leg of the stool, but I wanted to

20   bring that to the Court's attention.

21          THE COURT:  I appreciate your candor, Counsel.

22   That is very helpful to the Court --

23          MR. BLOOMER:  All right.

24          THE COURT:  -- and also very much reflects well on

25   you and, frankly, the members of the bar.

1          MR. BLOOMER:  Thank you, Your Honor.

2          THE COURT:  That being said, this matter is taken

3     under advisement.  I will stop there because I see that

4     there is counsel who wishes to speak.

5          MR. TANGREN:  I have nothing further on the

6     motion, Your Honor.  I just wanted to let you know that

7     there is a minor housekeeping matter we should probably

8     discuss while we're all here.

9          THE COURT:  Okay.  So the motion is taken under

10    advisement and we can address the other matter that needs to

11    be addressed.

12         MR. TANGREN:  The parties have been discussing

13    while the motion to dismiss has been pending -- the parties

14    differ on the extent to which discovery should be allowed,

15    but it seems that we are close to agreement that there will

16    be some preliminary production by Polaris.  We're currently

17    negotiating the confidentiality and electronic discovery

18    protocol orders that would allow that to happen.  We don't

19    anticipate that there will be any issues, but if it does

20    appear that there is something that we need to bring to the

21    Court's attention, we just need Your Honor's guidance on the

22    best way to do that.

23         THE COURT:  What do you mean, something that needs

24    to be brought to my attention that bears on this motion

25    before me --

1           MR. TANGREN:  Not on the --

2           THE COURT:  -- or other matters relating to

3   discovery and how the case proceeds, which typically would

4   go to a magistrate judge?

5           MR. TANGREN:  That was what we had anticipated

6   might happen, is that it would be a magistrate judge that

7   would hear those.

8           THE COURT:  Okay.

9           MR. TANGREN:  So we wanted to make sure that is

10  what Your Honor intended and that we will bring that to the

11  magistrate judge's attention if we're unable to agree.

12          THE COURT:  That is my expectation.  I will be

13  addressing the motion to dismiss.  If something occurs

14  during the course of your discussions with the magistrate

15  judge to resolve other issues that affects this motion to

16  dismiss, then that would -- I would want to know that.

17          MR. TANGREN:  I don't anticipate that there will

18  be any relationship between the two.

19          THE COURT:  Okay.  Very well.  Thank you.

20  Anything further at this time?

21          I want to thank counsel for being extremely well

22  prepared and providing well-reasoned and strong arguments

23  for both of your parties, which is of great assistance to

24  the Court, both written and orally.  Thank you.

25          COUNSEL:  Thank you, Your Honor.

1          (Court adjourned at 10:23 a.m.)

2                              *        *        *

3

4

5          I, Lori A. Simpson, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9                    Certified by:   *s/ Lori A. Simpson*

10                                   Lori A. Simpson, RMR-CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25