# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Polaris Marketing, Sales Practices, and Products Liability Litigation | Case No. 0:18-cv-00939-WMW-DTS |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 3

STATEMENT OF FACTS ................................................................................. 3

ARGUMENT....................................................................................................... 5

I.     PLAINTIFFS HAVE CONSTITUTIONAL STANDING TO BRING THEIR CLAIMS. ............................................................................................... 5

        A.     Plaintiffs Have Standing Because All Class Vehicles Actually Exhibit Excessive Heat in Their Engine Compartments. .............................. 6

        B.     The Excessive Heat Necessarily Causes Thermal Degradation. .................. 10

        C.     Polaris's Cited Cases Are Distinguishable. ................................................ 11

II.    PLAINTIFFS BERENS, BRUNER, LENZ, JACKS, FORREST, AND BEATTIE HAVE SUFFICIENTLY ALLEGED A DEFECT UNDER THE LAWS OF THEIR STATES................................................................................................. 14

III.   PLAINTIFFS SUFFICIENTLY PLEADED THEIR WARRANTY AND MAGNUSON-MOSS CLAIMS............................................................................ 18

        A.     Polaris Was on Notice of a Breach Under State Law. ................................ 19

        B.     The Warranty Limitation Is Invalid Because It Causes the Warranty to Fail in Its Essential Purpose. .................................................................. 21

        C.     Even If the Limitation on the Express Warranty Is Valid, the Alleged Defect Manifests from the Beginning, Well Within the Warranty's Stated Time Limitation................................................................................. 23

        D.     From the Moment of Sale, Class Vehicles Contain a Defect That Renders Them Unmerchantable, in Breach of the Implied Warranty......... 25

        E.     Plaintiffs Have Viable Claims under the Magnuson-Moss Warranty Act. ................................................................................................................. 26

IV.   PLAINTIFFS PLEAD VIABLE UNJUST ENRICHMENT CLAIMS. ................ 26

V.    PLAINTIFFS PROPERLY PLEAD THEIR FRAUD-BASED CLAIMS ............ 30

i

A.  The Economic Loss Doctrine Does Not Bar Plaintiffs' Consumer
and Common Law Fraud Claims under Pennsylvania and Texas
Law. ..................................................................................................... 30

B.  Polaris Had a Duty to Disclose the Excessive Heat Defect to
Plaintiffs Forrest, Rodriguez, Elkin, and Turgeon under Their
Respective State Laws. .......................................................................... 33

C.  Plaintiff Luna Has Successfully Pled His Consumer and Common
Law Fraud Claims. ............................................................................... 37

D.  Plaintiff Guthrie Can Bring a Claim under the LPLA Alongside His
Redhibition Claim. ............................................................................... 39

CONCLUSION ............................................................................................ 39

## INTRODUCTION

This Court has already endorsed the essential allegations underlying Plaintiffs' claims: "that Defendants knew about a potentially dangerous defect in its vehicles and continued to sell the vehicles in multiple states without warning of the defect." (*See* Dkt. 60 at 16 (holding that Plaintiffs' allegations satisfied the particularity requirements of Rule 9(b).) In their First Amended Consolidated Class Action Complaint (Dkt. 70) ("Compl." or "Complaint"), Plaintiffs further expand on these allegations, particularly with respect to the nature of the undisclosed defect that causes every Class Vehicle to give off excessive heat (*see id.* ¶¶ 141-157), the testing that confirms this excessive heat (*see id.* ¶¶ 158-161), and the degradation and corrosion this heat causes in the Class Vehicles (*see id.* ¶¶ 162-180). These updated allegations establish each Plaintiff's Article III standing, even if their Class Vehicle did not catch fire. Furthermore, for the reasons stated herein, Polaris's other arguments are groundless, and Plaintiffs' Complaint should be sustained.

## STATEMENT OF FACTS

Polaris is the industry leader in designing and manufacturing recreational off-road vehicles, amassing $6.08 billion in net sales in 2018. (Compl. ¶ 2.) However, Polaris's growth has come at the expense of consumer safety. Specifically, the Class Vehicles suffer from a common design defect (the "Excessive Heat Defect") which Polaris has failed to cure since 2013. (*Id.* ¶¶ 2-8.)

In 2011, after only two years of development, Polaris unveiled its new ProStar 900 Twin EI engine ("ProStar"), with the promise of "groundbreaking power." (*Id.* ¶ 120.) In the Class Vehicles, Polaris positioned the ProStar engine only inches behind the occupant

compartment, along the chassis centerline, with the exhaust manifold and header pipe routing frontward toward the occupants, turning 180 degrees creating a U-shape, and then connecting to piping that exits from the rear of the vehicle. (*Id.* ¶¶ 123, 127.) The engine and exhaust pipe configuration prevents ambient airflow from dissipating exhaust component heat, thus creating excessive heat within the engine compartment. (*Id.* ¶ 124.) Compounding the problem, the engine and exhaust pipe configuration is located in a tight compartment that is too close to plastic body components, as well as to critical fuel hoses, wiring and brake lines—all of which are damaged by high temperature exposure. (*Id.*) Further, the layout invites the collection of organic debris which can ignite from contact with hot components associated with the Excessive Heat Defect. (*Id.* ¶ 125.)

The exhaust system is the primary source of heat in the engine compartment. (*Id.* ¶ 164.) In the vehicle industry, it is well known that excessive engine compartment heat, particularly in tight spaces with little passive airflow, reduces component service life and causes unseen degradation of nearby components. (*Id.*) This is known as "thermal degradation," which is defined as "molecular deterioration as a result of overheating." (*Id.*) Excessive heat accumulation causes premature failure of components and materials. (*Id.* ¶ 165). For example, the Excessive Heat Defect can degrade the plastic fuel vent line to the point of sagging, putting it perilously close to the hot exhaust pipe. (*Id.* ¶ 175.) Additionally, if the line becomes kinked, the plastic fuel tank can over-pressurize and expand, contacting adjacent spinning components. (*Id.* ¶ 176.) Polaris's insufficient 2016 recall for misrouted fuel lines bears this out. (*Id.* ¶ 175.) This softening and deformation of plastic components is *always* occurring, even if it does not result in fire. (*Id.* ¶ 177.)

All Class Vehicles share a common engine and exhaust configuration—a tight compartment with defectively inadequate heat evacuation characteristics. (*Id*. ¶ 122.) As a result, all Class Vehicles inherently suffer from excessive heat and resultant thermal degradation. (*Id*. ¶¶ 141-80.) Polaris has yet to disclose the true nature of this defect to Plaintiffs and the public, instead issuing ineffective recalls to fix various components within a systemic defect that is largely related to a vehicle design and layout. (*See, e.g.*, *id*. ¶¶ 8-9, 15, 204.) By its actions, Polaris has opted for profits over safety (*id*. ¶ 218), concealing the Excessive Heat Defect and subjecting consumers to the risk of serious harm.

## ARGUMENT

### I. PLAINTIFFS HAVE CONSTITUTIONAL STANDING TO BRING THEIR CLAIMS.

To have standing under Article III, Plaintiffs need to show that they have suffered an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The injury need not be significant, but rather serves "to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973). Economic loss constitutes an injury in fact. *See Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). More specifically, when plaintiffs bargain "for safe, defect-free vehicles, but instead receive[] unsafe, defective vehicles. . . [t]he overpayment for the defective, unsafe vehicle constitutes an economic-loss injury that is sufficient to confer standing." *In re Toyota Motor Corp. Unintended*

*Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, 790 F. Supp. 2d 1152, 1167 (C.D. Cal. 2011).[1]

Here, each Plaintiff suffered economic injury when they purchased a defective Class Vehicle that they would not have purchased, or for which they would have paid significantly less, had the Excessive Heat Defect been disclosed.  (Compl. ¶ 17.)

**A.     Plaintiffs Have Standing Because All Class Vehicles Actually Exhibit Excessive Heat in Their Engine Compartments.**

Previously, the Court held that eight Plaintiffs did not allege an injury in fact because, although they alleged that their Class Vehicles had an undue *propensity* to catch fire, they did not allege that the Class Vehicles *necessarily* overheat, catch fire, or otherwise malfunction.  (Dkt. 60 at 8.)  The Complaint resolves this issue by clarifying that the Class Vehicles actually exhibit excessive heat in their engine compartments.[2]  This excessive

---

[1] In *Toyota*, the plaintiffs alleged that various model vehicles suffered from an unintended acceleration defect.  790 F. Supp. 2d at 1157.  Nineteen of the thirty-four plaintiffs alleged they had experienced the unintended acceleration.  *Id.* at 1163.  Finding that the defect had been sufficiently alleged to exist in all vehicles, the Court rejected the defendant's standing challenge.  *Id.* at 1163-65.  The court stated: "Once the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much."  *Id.* at 1163.

[2] The Consolidated Class Action Complaint explained, but did not emphasize, the reason the Class Vehicles necessarily suffer from excessive heat.  (Dkt. 35 ¶¶ 90-114.)  In part, it explained: "The enclosed engine and exhaust pipe configuration in the Class Vehicles prevents airflow from dissipating the heat from the exhaust and nearby combustible materials.  The enclosed design prevents passive heat evacuation, whereby heat soak occurs, particularly at low speeds and under high load conditions, frequently experienced while traveling inclines." (*Id.* ¶ 104.)

heat, which damages components and gives rise to a constant risk of fire, is an inherent defect present in all Class Vehicles.[3]

The defect's presence in all Class Vehicles is evidenced by: (1) comparative testing performed on Class Vehicles and competitor non-Class Vehicles (Compl. ¶¶ 158-61); (2) the availability of third-party aftermarket products designed to mitigate heat in the Class Vehicles (*id.* ¶¶ 142-48); (3) fires across the various models of Class Vehicles containing the ProStar engines (*id.* ¶¶ 7, 30, 36, 54, 60, 78, 84, 96); (4) consumers' post-purchase recognition of excessive heat across the various models of Class Vehicles containing the ProStar engines (*id.* ¶¶ 90, 96, 103); (5) the common engine/exhaust design in the Class Vehicles (*id.* ¶¶ 3-6, 110-40); and (6) the differences in the design of the exhausts in the Class Vehicles and those in competitor vehicles, which are configured to allow for airflow and heat dissipation (*id.* ¶¶ 149-57).

Polaris fails to successfully rebut Plaintiffs' allegations that the excessive heat in the Class Vehicles is indeed dangerous and abnormal. Specifically, they fail to account for the testing, which proved that the Class Vehicles generate an abnormal amount of heat compared to competitor vehicles (*id.* ¶¶ 158-61); the repeated spontaneous vehicle fires indicative of excessive heat (*id.* ¶¶ 7, 30, 36, 54, 60, 78, 84, 96); the third-party marketplace that has sprung up to address the heat issues in the Class Vehicles (*id.* ¶¶ 142-48); and Plaintiffs' detailed explanation of why the engine/exhaust configuration will necessarily

---

[3] The engine/exhaust configuration that causes the excessive heat is also accurately described as a "defect" and is also present in all Class Vehicles.

lead to excessive heat buildup (*id.* ¶¶ 3-6, 110-40).  This is not a case like those cited by Polaris, where allegations of excessive force or excessive fees were found conclusory.[4] Rather, the Complaint includes specific facts (including an objective comparison with competitor vehicles and an explanation of the causes and effects of the necessary heat buildup in the Class Vehicles' engine compartments) that lift Plaintiffs' allegations of excessive heat high above the "plausibility" bar.[5]

Polaris attacks Plaintiffs' comparative testing by pointing out that Plaintiff did not test their own Class Vehicles, but, instead, conducted heat testing on exemplary Class Vehicles.  Polaris, however, fails to cite any authority that suggests Plaintiffs were obligated to do any testing to overcome a motion to dismiss, much less test their own vehicles.  In fact, in *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 609, 614-17 (8th Cir. 2011), the court rejected defendant's standing argument where plaintiff's expert showed a defect through testing on exemplary pipe fittings, as opposed to the plaintiffs' own pipe fittings.  Polaris, moreover, fails to provide any reason to believe that the results of the testing performed on exemplary Class Vehicles would be different for

---

[4] *See Bourne v. Stewart Title Guar. Co.*, 2011 WL 635304, at *5 (D.N.H. Feb. 16, 2011) (where plaintiff provided no "supporting facts explaining the basis" for his allegation of excessive interest rates); *Alas v. AT&T Inc.*, 2018 WL 6133648, at *5 (C.D. Cal. Oct. 29, 2018) ("bare allegation" that transaction fees were excessive); *Acevedo v. Ross*, 2019 WL 343246, at *3 (E.D.N.Y. Jan. 28, 2019) (dismissing excessive force claim where plaintiff did "not make allegations showing that arresting officers used any significant force whatsoever"); *McCauley v. Shaw*, 2017 WL 769908, at *2 n.2 (E.D. Mo. Feb. 28, 2017) (where plaintiff "seem[ed] to generally claim excessive force against" defendants).

[5] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs' Class Vehicles. Indeed, this would be highly implausible, considering that all of the Class Vehicles share the same exhaust/engine configuration that causes the excessive heat. (*Id.* ¶¶ 3-6, 110-40.)

The Class Vehicles generate an abnormal, unintended, unsatisfactory, and dangerous amount of heat in their engine compartment. This is evidenced by the third-party aftermarket that exists to mitigate heat in the Class Vehicles' engine compartments (*id.* ¶¶ 142-48), the emphasis that other manufacturers have placed on exhaust flow and engine cooling (*id.* ¶¶ 149-57), the fires in the Class Vehicles (*id.* ¶¶ 7, 30, 36, 54, 60, 78, 84, 96), and Plaintiffs' allegations that they reasonably expected that the Class Vehicles would not generate excessive heat (*id.* ¶¶ 24, 27, 30, 33, 36, 39, 42, 45, 48, 51, 54, 57, 60, 63, 66, 69, 72, 75, 78, 81, 84, 87, 90, 93, 96, 100, 103, 106). While Polaris will have the opportunity to prove that the heat in the Class Vehicles is not excessive, and provide some other explanation for the plague of fires and the emergence of a heat mitigation aftermarket, it must do so on the merits, and not at the dismissal motion stage of this litigation. *See City of Clarkson Valley v. Mineta*, 504 F.2d 156, 168 (8th Cir. 1974) ("We have stated numerous times that standing is a threshold inquiry that eschews evaluation on the merits.") (internal quotation marks omitted). The allegations more than suffice for the purpose of standing.

Indeed, the Eighth Circuit's opinion in *Zurn Pex* is dispositive. In *Zurn Pex*, the plaintiffs alleged that defendants sold pipe fittings that were highly likely to leak due to stress corrosion cracking. 644 F.3d at 608-10. The defendants argued that those plaintiffs whose pipe fittings had not yet leaked lacked standing. *Id.* at 616. The Eighth Circuit rejected that argument because the stress corrosion cracking, which could cause the leaks,

occurred upon use.  *Id.*  So it is here.  While the most significant harm (*i.e.*, fire) has not occurred in every Plaintiff's Class Vehicle, all of the Class Vehicles actually exhibit the defect (*i.e.*, the excessive heat) that causes this harm.

## B.    The Excessive Heat Necessarily Causes Thermal Degradation.

Not only are the Class Vehicles inherently defective because they necessarily generate excessive heat, they are also inherently defective because this excess heat results in the accelerated degradation of the Class Vehicles' plastic components.  (Compl. ¶¶ 162-80.)  The Complaint provides a detailed explanation of this thermal degradation and its consequences.  (*Id.*)  Again, the situation is similar to that in *Zurn Pex*, in which the defendant's pipe fittings began to experience stress corrosion cracking immediately upon their exposure to water, although they did not immediately start leaking.  644 F.3d at 616-17.  Just as the stress corrosion cracking in *Zurn Pex* "afflict[ed] all of the fittings upon use," *id.* at 617, so does the excessive heat accelerate the degradation of Class Vehicles engine components upon use.  (Compl. ¶¶ 162-80.)

Polaris argues that it cannot be liable for "normal wear and tear" and that "all materials are expected to experience some level of thermal degradation."  (Dkt. 88 ("Defs.' Mem.") at 10-11.)  Whether these contentions are true or not, they fail to address the point made in the Complaint: that thermal degradation in Class Vehicle components is accelerated by the excessive heat buildup in the engine compartments.  (Compl. ¶¶ 166-69.)  Again, Polaris is free to try to prove on the merits that the accelerated thermal degradation in the Class Vehicles is insufficient to give rise to a breach of warranty claim, or that it need not have been disclosed under a fraudulent omission analysis.  But, along

with the excessive heat, this thermal degradation is a manifest defect, and thus, injury in fact, for purposes of standing.

### C.    Polaris's Cited Cases Are Distinguishable.

In *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014), the plaintiffs were unable to allege that there was anything wrong with the hot dogs they actually purchased.  In that case, the defendant marketed its Hebrew National hot dogs as "100% Kosher Beef."  747 F.3d at 1028.  Plaintiffs, seeking to represent a class of all Hebrew National buyers, alleged the kosher inspection process in defendant's slaughterhouses was unreliable, so that "meat from cows that should not qualify for kosher certification ends up being marked kosher."  *Id.*  The court held that the plaintiffs did not have standing because their "allegations fail[ed] to show that any of the particular packages of Hebrew National beef they personally purchased contained non-kosher beef."  *Id.* at 1030.  In other words, the fact that *some* packages of Hebrew National hot dogs likely were not 100% kosher did not give the plaintiffs standing, when it was "possible, maybe probable, that the packages of beef they personally purchased and consumed met the 'strict' standards advertised by [Defendant]."  *Id.*  Here, there is no allegation that only a certain percentage of the Class Vehicles are defective.  Rather, Plaintiffs have alleged that *all* Class Vehicles exhibit excessive heat in the engine compartment, and further alleged that *all* Class Vehicles exhibit accelerated thermal degradation.[6]

---

[6] *See In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *2–3 (D. Minn. July 12, 2017) (rejecting defendant's standing argument where Plaintiffs alleged that "all Nature Valley Products contain glyphosate" because the case was  "not like *Wallace*, in which the plaintiffs' allegations did not establish that all or even most of the products at issue

In *Thunander v. Uponor*, 887 F. Supp. 2d 850 (D. Minn. 2012), the plaintiffs failed to allege any factual support for their claim that the product at issue was defective. The plaintiffs alleged the AlumiPex piping in their home, installed in 2002, failed to comply with National Sanitation Foundation toxicity standards. 887 F. Supp. 2d at 857-58. As evidence of this, plaintiffs pointed to a 2003 internal memorandum from one of the defendant's employees that admitted to the use of a catalyst *in 2003* that resulted in the non-compliance with NSF standards. *Id.* The court found that this memorandum did not provide a basis for concluding that the 2002 piping in the plaintiff's home was also non-compliant. *Id.* at 862. ("[The Schuell Memo refers to events occurring in 2003, but it does not provide sufficient factual support from which Plaintiffs may extrapolate that *all* of the AlumiPex and Multicor pipe sold by Defendants, at any point in time, was defective."). The court distinguished the case from *Zurn Pex*, in which expert testing revealed a defect in the specific product type installed in the plaintiff's home. *Id.* at 865 ("This distinguishes this case from *Zurn Pex,* where the plaintiffs' expert opined that his testing revealed the defect in both the new and used pipe in question."). The problem in *Thunander*, therefore, was that plaintiffs provided no "factual support for their claims." *Id.*; *see also George v. Uponor, Inc.*, 988 F. Supp. 2d 1056, 1068 (D. Minn. 2013) (stating that plaintiffs in *Thunander* "offered no plausible facts suggesting the defect actually existed in their

---

contained the relevant defect and, so, it was 'pure speculation' to conclude that the particular packages purchased by the plaintiffs were defective.").

home"). Here, on the other hand, there is considerable evidence pointing to excessive heat (and the resultant thermal degradation) in the Class Vehicles, including Class Vehicle testing, the existence of an aftermarket for heat mitigation in the Class Vehicles, the common occurrence of fires in the Class Vehicles, and the inherently problematic design of the Class Vehicles' exhaust/engine configuration.

Likewise, in *George*, the court also found that the plaintiffs had failed to allege facts suggesting the existence of a defect. In that case, the plaintiffs alleged that plumbing components installed in their homes, made of "yellow brass," were vulnerable to dezincification, a process by which zinc leaches out of the alloy. 988 F. Supp. 2d at 1060-61. The defendants argued that the plaintiffs "failed to allege plausible facts showing a defect" in the brass plumbing components because plaintiffs only "broadly" allege the components are "vulnerable to dezincification." *Id.* at 1068. The court agreed, finding that "Plaintiffs have not alleged that *all* Components made by Defendants inevitably manifest defects upon any normal use." *Id.* at 1070 (emphasis in original). The court distinguished the case from *Zurn Pex*, in which "[t]he plaintiffs alleged—and later introduced evidence demonstrating—that *all* pipe fittings in the product line developed stress corrosion cracking ("SCC") upon exposure to water." *Id.* at 1068. Here, as in *Zurn Pex*, Plaintiffs allege that all Class Vehicles are inherently defective. Unlike in *George,* Polaris does not dispute that Plaintiffs, here, have alleged facts pointing to the existence of excessive heat in the Class Vehicles.

In *Browe v. Evenflo Co., Inc.*, 2015 WL 3915868 (D. Minn. June 25, 2015), the court did not address standing.  Rather, the court held that the plaintiff's allegations did not support a claim that the products were unmerchantable.  *Id.* at *3.

Finally, *U.S. Hotel and Resort Management, Inc. v. Onity, Inc.*, 2014 WL 3748629 (D. Minn. July 30, 2014), involved products that only failed to function as intended if a third party willfully interfered with them.  In that case, the plaintiffs alleged that defendants sold electronic locks suffering from a defect that allowed a hacker to easily breach and open the locks.  *Id.* at *1-2.  The court held that the plaintiffs lacked standing because there was no dispute that the locks were operational, and the only potential injury, the unauthorized opening of the locks, was not actual or imminent, but contingent upon a third party exercising criminal intent.  *Id.* at *4 ("[T]he fact remains that no such unauthorized entry could occur unless and until that third-party acted with criminal intent to gain entry. But where the future injury is contingent upon the actions of another, the Supreme Court has declined 'to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors' not before the court.") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).  Here, Plaintiffs do not allege that the engines are susceptible to sabotage by a third party.  Rather, the engines are inherently defective.

## II.   PLAINTIFFS BERENS, BRUNER, LENZ, JACKS, FORREST, AND BEATTIE HAVE SUFFICIENTLY ALLEGED A DEFECT UNDER THE LAWS OF THEIR STATES.

Polaris argues, separate from Constitutional standing, that the state laws governing certain Plaintiffs' claims require a manifest defect for purposes of damages or injury.

14

(Defs.' Mem. at 15.)  This argument was comprehensively addressed in the previous round of motion to dismiss briefing (Dkt. 50 at 3-33) and fails for two reasons.  First, as discussed above, Plaintiffs have alleged a manifest defect in all Class Vehicles.  Second, the relevant laws of Minnesota, Alabama, Georgia, Ohio, Texas, and Wyoming do not require allegations of a *manifest* defect.

As discussed above, Plaintiffs allege, with considerable supporting evidence, that all Class Vehicles necessarily manifest excessive heat buildup.  Plaintiffs further allege the excessive heat necessarily results in the accelerated degradation of engine compartment components.  This case is thus distinguishable from those cited by Polaris in which the alleged defect was latent and not exhibited, in any form, prior to product failure.[7]

---

[7] *See O'Neil v. Simplicity, Inc.*, 574 F.3d 501 (8th Cir. 2009) (where a baby crib's allegedly unsafe drop-side never malfunctioned in any way, and the court stated that plaintiffs "purchased a crib with a functioning drop-side and that crib continues to have a functioning drop-side"); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) (court found allegedly defective brakes to "have functioned satisfactorily and at no time have the brakes exhibited a defect."); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (not addressing any purported manifest defect requirement, but referencing a situation where "products function properly"); *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 289 (4th Cir. 1989) (where plaintiffs did not allege "that *their* diesel vehicles were defective, but instead only that the "poor reputation" of GM's diesel products resulted in compensable losses of 'resale value.'"); *Miller v. GM LLC*, 2018 WL 2740240 (E.D. Mich. June 7, 2018) (court found alleged liftgate defect to be purely latent and certain plaintiffs' liftgates to have not "malfunctioned in any way."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997) ("product perform[ed] satisfactorily and never exhibit[ed] the alleged defect."); *Hubbard v. GM Corp.*, 1996 WL 274018, at *4 (S.D.N.Y. May 22, 1996) (addressing "product that performs satisfactorily and never exhibits" the alleged defect); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 602 (S.D.N.Y. 1982) (where tires "performed to their entire satisfaction"); *Brooks v. Remington Arms Co.*, 2010 WL 6971894, at *4 (W.D. Ark. Oct. 27, 2010) (finding, under Arkansas laws, that plaintiffs did not need to allege that allegedly defective rifles actually misfired to state a claim, but had to at least allege that rifles accumulated the dirt and debris leading to misfire).

Further, Polaris' cited cases are all irrelevant insofar as they do not specifically address the issue of whether there is any manifest defect requirement under Plaintiffs Berens, Bruner, Lenz, Jacks, Forrest, or Beattie's respective state law claims.   While Polaris admits, as it must, that a "manifest defect" requirement is a matter of state law,[8] it fails to analyze whether this requirement is an element of any of the asserted claims.   This is a significant failing, as such a requirement is not recognized by the majority of states. As recently explained by Judge Furman of the Southern District of New York:

> Having now engaged in . . . an analysis of the law in twenty-seven states, covering three different kinds of claims (statutory consumer protection, common-law fraud, and implied warranty), the Court can no longer say with confidence that, across the states, the "majority view" is that manifestation is required to state claims for fraud, violations of consumer protection statutes, and breaches of warranty. ***Indeed, for every disputed claim in every disputed state, the Court concludes that manifestation is not a requirement.*** This is due in part to the Court's determination that, in the absence of state law to the contrary, there is no legal or logical ground to bar Plaintiffs' recovery if they can prove that they suffered economic loss.  If Plaintiffs paid *x* for their cars and can prove that their cars are now worth *x* minus *y* as the result of the alleged defects, it is arbitrary to prevent them from recovering the difference between *x* and *y* simply because the defect did not manifest itself in property damage or personal injury.

*In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 276 (S.D.N.Y. Sept. 12, 2018) (emphasis added).   In analyzing various state laws to determine whether they incorporated a manifest defect rule, Judge Furman held that such a rule was presumptively incompatible with both the benefit-of-the-bargain measure of damages for actions

---

[8] *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010) ("*Erie* mandates that a federal court sitting in diversity apply the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary") (quoting *Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991)).

sounding in fraud and the measure of damages for breach of implied warranty provided within the Uniform Commercial Code ("UCC").  *Id.* at 276-307.

In Plaintiffs' Opposition to Polaris's original Motion to Dismiss, Plaintiffs spent thirty pages exhaustively addressing why each of the relevant Plaintiffs' asserted claims did not contain an explicit or implicit manifest defect requirement.  (Dkt. No. 50 at 3-33.) In their renewed Motion to Dismiss, Polaris relies on a single string citation to cases which fails to show that ***any*** of these claims, much less ***all***, include such a requirement.[9]

---

[9](**Minn.**) In *Carey v. Select Comfort Corp.*, 2006 WL 871619, at *2-3 (Minn. Dist. Ct. Jan. 30, 2006), the plaintiff alleged that he had purchased a mattress with the *propensity* to develop mold, but not that his mattress had actually exhibited any defect.  Moreover, as a Minnesota trial court opinion, *Carey* is entitled to only minimal weight in this Court's determination as to how the Minnesota Supreme Court would rule on the issue of whether Plaintiff Berens must wait until his vehicle catches on fire to state a claim for relief.  *See King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 160-61 (1948) (holding that federal court of appeals was justified in not following state trial court decision, and noting that "it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court").  (**Ala.**) The Alabama cases cited by Polaris only involved fraudulent concealment claims.  In *Ford Motor Co. v. Rice*, 726 So. 2d 626 (Ala. 1998), the plaintiffs did not allege that their vehicles exhibited any defect and did not allege that they did not receive the benefit of the bargain.  In *Pfizer, Inc. v. Farsian*, 682 So. 2d 405 (Ala. 1996), the plaintiff's heart-valve defect allegations relied solely on the fact that other heart valves, of the same model, had experienced failures.  The plaintiff did not point to an inherent design defect in his own heart valve.  *Id.* at 406-07. (**Ga.**)  In *Tiisman v. Linda Martin Homes Corp.*, 610 S.E.2d 68, 70 (Ga. 2005), the court only addressed a claim under the Fair Business Practices Act, did not address the existence of a manifest defect requirement, and did not prove a narrow interpretation of "actual damages."  In *Wiedman v. Ford Motor Co.*, 2019 WL 3003693, at *4-5 (E.D. Mich. July 10, 2019), which addressed an implied warranty claim, the court found that the defect had not manifested in any way, and further did not recognize that Georgia law holds that hidden defects "are the very evil that the implied warranty of merchantability  was designed to remedy."  *Willis Mining, Inc. v. Noggle*, 509 S.E.2d 731, 733 (Ga. App. 1998).  (**Ohio**) *Felix v. Ganley Chevrolet, Inc.*, 49 N.E.23d 12124, 1231 (Ohio 2015), addressed only a claim under the Ohio CSPA, and did not address a manifest defect requirement.  As Judge Furman recognized, "*Felix* did not involve a product defect and did not once mention manifestation; the court discussed 'actual damages' only to distinguish them from '[t]reble

### III.   PLAINTIFFS SUFFICIENTLY PLEADED THEIR WARRANTY AND MAGNUSON-MOSS CLAIMS.

Breach of warranty claims are fact-intensive and generally not appropriate for resolution on a motion to dismiss, particularly where there are allegations of an undiscoverable defect. *Northern States Power Co. v. ITT Meyer Indus., a Div. of ITT Grinnell Corp.*, 777 F.2d 405, 408 (8th Cir. 1985); *In re Rust-Oleum Restore Mktg., Sales Practices and Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 789-90 (N.D. Ill. 2016) (allowing breach of warranty claims to proceed for plaintiffs in all 50 states). Here, Plaintiffs have sufficiently pleaded their allegations and should be given a chance to further develop their case through discovery.

---

and statutory damages.'" *GM Ignition*, 339 F. Supp. 3d at 288-89. In *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 2005 WL 6778678, at *11 (N.D. Ohio Feb. 22, 2005) the court did not analyze any Ohio case law imposing a manifest defect requirement. **(Tex.)** In *DaimlerChysler Corp. v. Inman*, 252 S.W.3d 299, 303-07 (Tex. 2008), the Supreme Court of Texas recognized that a manifest defect was not required under Texas law. In that case, the court looked to the Fifth Circuit's decision in *Cole v. General Motors Corp.*, 484 F.3d 717 (5th Cir. 2007), in which plaintiffs had alleged that their side airbags *could* inflate unexpectedly and that "each plaintiff suffered economic injury at the moment she purchased a DeVille because each DeVille was defective." 484 F.3d at 723. The Fifth Circuit agreed with the plaintiffs, holding that "it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered." *Id.* In *Inman*, the Supreme Court of Texas stated that it "agree[d] that the allegations in *Cole* gave the plaintiff standing." *Inman*, 252 S.W.3d at 307. The court focused on the facts showing that the plaintiffs in *Cole* had indeed alleged a plausible defect in their vehicles; namely the facts that the defendant in *Cole* had issued a recall for the vehicles and that the airbags at issue in *Cole* "might deploy improperly regardless of what [the plaintiff] did." *Id.* at 306-07. **(Wyo.)** Polaris's citation to Wyo. Stat. Ann. § 40-12-108 is irrelevant because Plaintiff Beattie has not asserted a claim under the Wyoming Consumer Protection Act. Similarly, *Broderick v. Daiyland Ins. Co.*, 270 P.3d 684, 692 (Wyo. 2012) did not address warranty or fraud claims, and did not address a manifest defect requirement.

At the outset, we note that Plaintiffs' Amended Complaint mistakenly referred to Pennsylvania statutes in the South Dakota breach of warranty allegations. Plaintiffs request allowance to amend the complaint to allege breach of express warranty under South Dakota Codified Law 57A-2-313 and breach of implied warranty of merchantability under South Dakota Codified Law 57A-2-314.

### A.     Polaris Was on Notice of a Breach Under State Law.

The UCC's requirement that sellers be given notice of claims "is designed to defeat commercial bad faith, not to deprive a good faith customer of his remedy," and "is not intended to 'operate as a technical procedural barrier to deny claimants the opportunity to litigate the case on the merits." *Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 5 (Minn. 1992).

Polaris claims that all states require pre-suit notice under the UCC. However, states have varied interpretations for what suffices as "notice." For example, courts in California, Florida, Georgia, Michigan, Pennsylvania, and Ohio have allowed filing suit as sufficient notice to a remote manufacturer.[10] "While Polaris refers to § 2-607(3)(a) as establishing a

---

[10] *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, slip op. *13 (D.N.J. May 8, 2017); *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90 (M.D. Pa. 1988); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010); *Hudson v. Gaines*, 403 S.E.2d 852, 854 (Ga. App. 1991); *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989); and *Fed. Ins. Co. v. Lazzara Yachts of N. Am.*, No. 8:09-cv-607, 2010 WL 1223126, *5 (M.D. Fla. Mar. 25, 2010) ("The parties have not cited to any Florida case extending section 672.607(3)(a)'s notice requirements to a manufacturer."). The court in *In re MyFord Touch Cons. Litig.*, 46 F. Supp. 3d 936, 975-979 (N.D. Cal. 2014) found *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331 (S.D. Fla. 2011) of limited support because it gave no rationale for ignoring the language of the statute.

'pre-litigation notice' requirement, the plain language of the statute does not require that notice be given prior to filing suit, only that notice be given within a reasonable time." *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001) (interpreting Michigan law).  The purposes of the requirement, such as allowing the seller to investigate the claim and cure the defect, are accomplished by the filing of a lawsuit, as "indeed, the normal rules of civil procedure are designed to accomplish exactly these tasks within the litigation process." *In re: FCA US LLC Monostable Electronic Gearshift Litig.*, 280 F. Supp. 3d 975 (E.D. Mich. 2017), *quoting Mid Island LP v. Hess Corp.*, 983 N.Y.S. 2d 204 (N.Y. Sup. 2013).

Further, multiple states, including Minnesota, Illinois, and Ohio, have found the notice requirement to be satisfied when plaintiffs alleged the defendant had actual knowledge of the defect because "the defendant will already have investigated the possible causes and therefore cannot argue that it is prejudiced by any delay in receiving notice of the specific complaint." *Church of the Nativity*, 491 N.W.2d at 5.[11]  When the alleged defect necessarily applies to each and every class product sold, the defendant has actual knowledge there is a warranty breach for each class member.  *In re Rust-Oleum*, 155 F.

---

[11] *See e.g., In re Rust-Oleum*, 155 F. Supp. 3d at 799-800; *Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160 at *13 (citing these cases in allowing breach of warranty claims filed by Illinois, Minnesota, and Indiana plaintiffs who had not alleged they notified either the seller or the manufacturer). Although Polaris does not dispute plaintiff Guthrie's redhibition claim, it is worth noting that Louisiana too has an exception to the notice requirement when the seller had actual knowledge of the defect. La. Civ. Code. Art. 2522.

Supp. 3d at 799-800; *see also Hedges v. Earth, Inc.*, 2015 WL 1843029, at *3 (N.D. Ill. Apr. 21, 2015).

Additionally, Minnesota has allowed notice to a manufacturer by one class member to act as notice on behalf of the class.  *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 884 (N.D. Cal. 2018) (citing *City of Wyoming v. Procter*, 210 F. Supp. 3d 1137, 1158 (D. Minn. 2016)).

The goals of the notice requirement have been satisfied here.  Polaris was aware that each sale of a Class Vehicle was troublesome and needed to be watched, as it had issued recalls that covered all Class Vehicles.  The recalls make clear Polaris was aware there had been hundreds of fires and melting incidents in the Class Vehicles, resulting in several deaths and multiple injuries. (Compl. ¶ 7.)  Polaris is aware it does not have an adequate, permanent fix for the vehicles, as replacing one component does not cure the Excessive Heat Defect. (Compl. ¶¶ 7, 199-200.)  Further, Plaintiff Luna informed Polaris prior to the filing of the consolidated complaint that all of the Class Vehicles, which Plaintiffs allege share a common defect regardless of model, are defective and "have and continue to pose a significant and immediate threat to all occupants of such vehicles," and Polaris did not attempt to cure the defect or initiate settlement discussions.  (Compl. ¶¶ 276-277 & Ex. A.) Polaris was given ample notice that Plaintiffs would claim it breached its warranties.

**B.    The Warranty Limitation Is Invalid Because It Causes the Warranty to Fail in Its Essential Purpose.**

A limitation on a warranty is invalid if it causes the warranty to fail of its essential purpose by depriving one party of the substantial value of its bargain.  *Luckey v. Alside,*

*Inc.*, 245 F. Supp. 3d 1080, 1090 (D. Minn. Mar. 29, 2017) (noting the exception applies in cases where a repair or replace warranty covering a defective part will not compensate the buyer for costs dealing with the defect).  Polaris claims failure of essential purpose requires repeated efforts to repair the vehicle.  However, several courts have held that a "purchaser can be deprived of the value of its bargain where the goods purchased under the contract contain latent defects, which are defects that are 'not detectable until it is impractical to effectuate the exclusive remedy.'"  *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 613-614 (N.D. Ohio Jan. 27, 2016) (holding a "repair or replace" warranty is meaningless when the product is inherently defective, in a suit by consumers in Michigan, Ohio, Pennsylvania, and California, among others).[12]  "The idea behind this 'failure of essential purpose' doctrine is that a seller cannot limit the buyer to certain specified remedies, then conduct itself in a manner negating the efficacy of those remedies."  *McCollough Enters., LLC v. Marvin Windows & Doors*, 2010 WL 5014670, at *8 (S.D. Ala. Dec. 2, 2010).

---

[12] *See also Luckey*, at 1091-92*; Viking Yacht Co., Inc. v. Composite One LLC*, 385 Fed. Appx. 195, 207-08 (3rd Cir. 2010) (citing several cases in which failure of essential purpose was found when a defect is undiscoverable on reasonable inspection); *Holbrook v. Louisiana-Pacific Corp.*, 2015 WL 1291534, *6-7 (N.D. Ohio Mar. 23, 2015) (applying the exception where an undiscoverable defect results in damages greater than a repair and replace warranty can cover); *Ross Neely Sys., Inc. v. Navistar, Inc.*, 2015 WL 12939110, at *1 (N.D. Tex. May 28, 2015) (quoting *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 830 F. Supp. 2d 235, 271 (S.D. Tex. 2011); and *Highmark, Inc. v. Nw. Pipe Co.*, No. 10-5089, at 2 (D.S.D. Aug. 15, 2016) (holding whether a limited warranty failed its essential purpose is a question for the jury).

Similarly, a brief time limitation may be manifestly unreasonable and invalid under the UCC where a defect was "not only latent but was not discoverable by ordinary inspection and testing." *Neville Chem. Co. v. Union Carbide Corp.*, 294 F. Supp. 649, 655 (W.D. Pa. Dec. 31, 1968), *vacated on other grounds*, 422 F. 2d 1205 (3rd Cir. 1970).

Polaris was aware when it sold the vehicles that they each contained a systemic Excessive Heat Defect not cured by replacing one component.  (Compl. ¶¶ 3-5, 123-125, 162-177.)  The defect and resulting degradation are not discoverable at the time of the sale or, often, within the brief six-month warranty period because the components are out of sight and the degradation is most obvious when the vehicle is running.  (Compl. ¶ 177.)

Plaintiffs allege Polaris has long been aware of the Excessive Heat Defect but failed to disclose it even as it rolled out the ineffective recalls to fix various components or aspects within the systemic defect that is largely related to a vehicle design and layout.  (*Id.* ¶¶ 8-9, 15.)  Had Plaintiffs submitted their vehicles for repair, Polaris would not have been able to effectively cure them, leaving them unprotected by the warranty and with a vehicle worth substantially less than they paid.  That is the quintessential circumstance the exception was designed to mitigate.

**C.     Even If the Limitation on the Express Warranty Is Valid, the Alleged Defect Manifests from the Beginning, Well Within the Warranty's Stated Time Limitation.**

As discussed above in Section I.A., *supra*, Plaintiffs have alleged that class members experience the Excessive Heat Defect as soon as they operate their Class Vehicles because they have an inherent design flaw that necessarily results in thermal degradation.  (Compl. ¶¶ 6-7, 104.)  Polaris is aware of the defect and resulting harm; indeed, several

recalls can be traced directly to thermal degradation. (Compl. ¶¶ 175-180.) Multiple courts have declined to dismiss warranty claims where plaintiffs have sufficiently alleged the product had an inherent defect from the outset, regardless of lack of external damage. *See Zurn Pex*, 644 F.3d at 617.[13]

Polaris did not cite a single case holding that Louisiana requires a malfunction during the warranty period for a breach of express warranty claim under the Louisiana Product Liability Act (LPLA). Indeed, the act does not impose such a requirement. La. R.S. § 9:2800.58. Further, in Louisiana, for a limited warranty to be effective, it must be clear and unambiguous, contained in sales documents, and brought to the attention of the buyer. *Southwest Louisiana Hospital Association d/b/a/ Lake Charles Memorial Hospital v. BASF Construction Chemicals, L.L.C.*, No. 2:10-cv-00902, at 11 (W.D. La. Sept. 29, 2014), *citing Prince v. Paretti Pontiac Company*, 281 So. 2d 112, 117 (La. 1973). Polaris did not assert, or include in Exhibit 2, proof the warranty was included in the sales

---

[13] *See also Bridgestone/Firestone*, 155 F. Supp. 2d 1069, 1101 (S.D. Ind. 2001); *Benkle*, 2017 WL 9486154, at *9-10; *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal. App. 4th 908, 918 (Cal. App. 2001); *GM Ignition*, 2018 WL 4351892, at *3, 26 (evaluating Ohio law); *Dakota Style Foods, Inc. v. Sunopta Grains & Foods, Inc.*, 329 F. Supp. 3d 794, 803-04 (N.D.S.D. 2018) (holding in South Dakota, "[p]laintiffs are not required to offer direct evidence of a defect," and noting that in *O'Neil*, the court incorrectly failed to acknowledge "the unique evidentiary aspects of a product recall."); *Burnside v. Peterbilt Motors Co.*, No. 3:17-cv-02121 (M.D. Pa. Mar. 29, 2019) ("[I]t is not necessary for Plaintiffs to commit to a particular, detailed theory of the nature of the defect at the pleading stage, as any such theory can and will be refined upon factual and expert discovery."); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) (affirming certification where some class members had not yet experienced the alleged mold problem because "all Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed…").

documents and brought to Plaintiff Guthrie's attention. Thus, Guthrie is not subject to the limited warranty.[14]

### D. From the Moment of Sale, Class Vehicles Contain a Defect That Renders Them Unmerchantable, in Breach of the Implied Warranty.

Likewise, all Plaintiffs have viable implied warranty claims, because their vehicles were defective from the moment of purchase.

The UCC "expressly provides" a claim "accrues when the breach occurs" and that "there is no requirement that [p]laintiffs demonstrate any injury to their person or property as a result of the breach, but only that they purchased an unmerchantable product." *Bridgestone/Firestone*, 155 F. Supp. 2d at 1099. Indeed, undisclosed defects "are the very evil that the implied warranty of merchantability was designed to remedy." *Mexia v. Rinker Boat Co., Inc.*, 95 Cal. Rptr. 3d 285, 291 (Cal. Ct. App. 2009) (quoting *Willis Mining*, 509 S.E.2d at 733).

To be merchantable, goods must pass without objection in the trade and be fit for the ordinary purpose for which the product is used, among other things. *Indep. Sch. Dist. No. 197 v. WR Grace & Co.*, 752 F. Supp. 286, 302 (D. Minn. 1990). Where a plaintiff sufficiently alleges a product is unreasonably dangerous, a jury could reasonably find it is not fit for the ordinary purposes for its use. *Id.*; *see also Fed. Reserve Bank of Minneapolis*, 1988 WL 220489, at *4-5 (whether a "product is merchantable and free from defects in the

---

[14] If the limited warranty is applicable to Guthrie, Louisiana courts have allowed claims for breach of implied warranty to proceed simultaneously with redhibition and LPLA claims. *Cassidy v. Ford Motor Co.*, No. 15-2483, at 6-7 (E.D. La. Feb. 19, 2016).

form of a safety hazard" is a question of fact).  A vehicle is not merchantable if it cannot provide "safe, reliable transportation."  *MyFord Touch*, 46 F. Supp. 3d at 980; *see also Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1242-1244 (concluding that "[v]ehicles subject to engine failure cannot be said to be merchantable.").  The safety risk "need not be gross or certain."  *In re MyFord Touch*, 46 F. Supp. 3d at 980.

Here, the Class Vehicles were not fit for their ordinary purposes from the moment they were sold.  The excessive heat generated by the defect immediately began degrading vital components and putting them at deadly risk of sudden fire, rendering the Class Vehicles unsafe and unreliable.

### E.   Plaintiffs Have Viable Claims under the Magnuson-Moss Warranty Act.

Plaintiffs have alleged viable express and implied warranty claims under state law. Therefore, Plaintiffs' claims under the Magnuson-Moss Warranty Act are also viable. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1003 (E.D. Mich. 2017) (denying motion to dismiss Magnuson-Moss claims where plaintiffs had adequately alleged breaches of warranty under state law).

## IV.   PLAINTIFFS PLEAD VIABLE UNJUST ENRICHMENT CLAIMS.

Polaris argues that several Plaintiffs' unjust enrichment claims fail because Ohio, Florida, Texas, Michigan, and Pennsylvania law require a *direct* benefit.  (Defs.' Mem. at 26.)  However, Polaris's argument is based on a misunderstanding of the law.  Unjust enrichment was historically available precisely when there was no privity of contract between two parties.  *See* Daniel Karon, *Undoing the Otherwise Perfect Crime—Applying*

*Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev 395, 418 (2005). And there is no direct benefit requirement under the laws of the relevant states.

First, in Ohio there is no *direct* benefit requirement. *See Randleman v. Fidelity Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 824-25 (N.D. Ohio 2006) (surveying Ohio case law and sustaining an unjust enrichment claim with no *direct* benefit, but a sufficient "transactional nexus.") (emphasis added).   Rather, Ohio law requires only a "tie of causation [] between the plaintiff's loss and the defendant's benefit." *See Paikai v. Gen. Motors Corp.*, 2009 WL 275761, at *5-6 (E.D. Cal. 2009) (applying Ohio law) (sustaining an unjust enrichment claim against GM when a ***car was purchased through its authorized dealer***) (emphasis added).

Second, Florida law "***does not require direct interaction*** between the plaintiff and defendant." *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 928 (E.D. Pa. 2012) (applying Florida law) (emphasis added).   "Just because the benefit conferred by [a plaintiff] on [a defendant] did not pass directly . . . but instead passed through a third party—***does not preclude an unjust enrichment claim***." *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4368980, at *9 (S.D. Fla Sept. 19, 2011) (emphasis added).

Third, "Texas law [] reveals that ***unjust enrichment can touch 'passively received' benefits***, where the nexus is some related third party's acts against the plaintiff, when it would be 'unconscionable for the receiving party to retain' them." *In re Okedokun*, 2018 WL 4737271, at *76 (Bankr. S.D. Tex. Sept. 28, 2018) (emphasis added).[15]

---

[15] Polaris relies on *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2011 WL 601279 (D.N.J. 2011) (New Jersey court applying Texas law).  However, the *In re Ford*

Fourth, in Michigan, the "critical inquiry [i]s *not whether the benefit is conferred directly* on the defendant, but whether the plaintiff can establish the relationship between his detriment and the defendant's benefit 'flow from the challenged conduct.'" *In re Automotive Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 897 (E.D. Mich. 2014) (emphasis added). Simply, "[a] claim for unjust enrichment under Michigan law *does not require that the plaintiff confer a direct benefit on the defendant*." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *7 (N.D. Cal. Dec. 8, 2010) (applying Michigan law) (citing *Kammer Asphalt Paving Co., Inc. v. East China Township Schools*, 504 N.W. 2d 635 (1993) (emphasis added); *see also In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1021 (E.D. Mich. 2014).[16]

Finally, "*to sustain a claim of unjust enrichment* [in Pennsylvania], the claimant must show that the party against whom recovery is sought either wrongfully secured or *passively received a benefit* that would be unconscionable for the party to retain without compensating the provider." *Bridgestone/Firestone, Inc. v. Carr's Tire Serv., Inc.*, 1992 WL 365512, at *15 (E.D. Pa. Nov. 30, 1992) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir. 1987)) (emphasis added). "The claim of unjust enrichment

---

court did not cite any Texas case law in support of its conclusion. The court merely "predicted" how Texas may resolve the matter. *Id.*

[16] The Michigan case that Polaris cites is distinguishable. In *Storey v. Attends Healthcare Prods., Inc.*, 2016 WL 3125210 (E.D. Mich. June 3, 2016), a disposable consumer good was sold through retailers with no express warranties. In this case, Polaris sold the Class Vehicles through its authorized dealerships and extended an express warranty to its purchasers.

simply requires that plaintiff 'confer' benefits on a defendant; ***it does not require that plaintiff 'directly confer' those benefits***." *Global Ground Support, LLC v. Glazer Enter., Inc.,* 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008) (emphasis added).[17]

Furthermore, Plaintiffs allege Polaris benefited from the sale of the Class Vehicles, even if through an independent dealership. Specifically, Plaintiffs allege Polaris "benefitted . . . at an unjust profit [by selling and leasing Class Vehicles] that had artificially inflated prices due to Polaris' concealment of the Excessive Heat Defect, and Plaintiff[s] . . . overpaid for these vehicles." (Compl. ¶¶ 328, 388, 440, 489, 530, 587, 643, 692, 742, 793, 844, 894, 932.) The fact that some Plaintiffs purchased their Class Vehicles from an independent dealer is immaterial, because unjust enrichment claims are used to prevent a defendant from "profit[ing] by his own wrong." Restatement (Third) of Restitution & Unjust Enrichment § 3. Here, Polaris concealed the Excessive Heat Defect, (*id.* ¶¶ 9, 15), and, as a result, profited from the sale of Class Vehicles at the expense of Plaintiffs and Class members (*id.* ¶¶ 16-18). *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 448 (E.D. Pa. 2010) (noting defendant's actions causing plaintiffs to pay higher prices unjustly benefits defendant.).[18]

---

[17] The Pennsylvania case that Polaris cites is distinguishable. In *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712 (E.D. PA. 2013), the plaintiffs vaguely alleged that they were incorrectly informed their vehicles were not covered under warranty for defects. The court dismissed the count because nothing placed the defendants on notice of the precise misconduct. In this case, Polaris knew of and concealed the Excessive Heat Defect. *See In re AZEK Bldg. Prod., Inc., Mktg. & Sales Practices Litig.*, 82 F. Supp. 3d 608, 620 (D.N.J. 2015).

[18] Polaris's nondisclosure of the Excessive Heat Defect is analogous to GM's nondisclosure of the defeat device in the Chevrolet Cruze, in which the Court stated, "GM's false

As a result of Polaris's unfair, deceptive, and/or fraudulent conduct, Plaintiffs and Class members purchased vehicles they would not have otherwise purchased had they known about the Excessive Heat Defect or paid more than they would have had they known about the defect.  (*Id.* ¶¶ 27, 33, 39, 45, 51, 57, 63, 69, 75, 81, 87, 93, 100, 106.)  This is true even if a Class member bought the vehicle used or from a dealer as the Class Member paid the inflated price.  Therefore, Plaintiffs have conferred a benefit on Polaris, and Polaris has been unjustly enriched.

## V.   PLAINTIFFS PROPERLY PLEAD THEIR FRAUD-BASED CLAIMS

### A.   The Economic Loss Doctrine Does Not Bar Plaintiffs' Consumer and Common Law Fraud Claims under Pennsylvania and Texas Law.

Contrary to Polaris's argument, courts in Pennsylvania have made it clear that the economic loss rule does not bar Pennsylvania common law fraud and UTPCPL claims.  In support of their argument, Polaris relies on the Third Circuit's ruling in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3rd Cir. 2002).[19]  However, Polaris fails to note that numerous courts have rejected *Werwinski* based on subsequent Pennsylvania appellate court decisions.  *See, e.g.*, *McDonough v. State Farm Fire and Casualty Co.*, 365 F. Supp. 3d 552, 559-60 (E.D. Pa. 2019) (collecting cases and following Pennsylvania's intermediate appellate courts in finding that the economic loss rule does not bar the plaintiff's UTPCPL

---

advertising created an artificially high market price that Plaintiffs paid.  Plaintiffs' overpayment can thus be traced directly to GM's alleged actions." *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 586 (E.D. Mich. 2017).

[19] The other cases cited by Polaris all rely on *Werwinski*.

claim).   The same is true for Pennsylvania common law fraud claims. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 276 (E.D. Pa. 2003) (collecting cases reflecting "apparent[] unanim[ity]" among Pennsylvania state courts "in refusing to apply the economic loss doctrine even in common law intentional fraud claims").   Based on the foregoing, this Court should follow the decisions of the Pennsylvania state courts and find that the economic loss rule does not bar Plaintiff's common law and consumer fraud claims.

Second, Polaris's suggestion that the economic loss rule in Texas bars all fraud claims other than fraud in inducement directly contradicts Texas law.   *See Meza v. Honorcare Home Health, Inc.*, 2018 WL 6793839, at *1 (Tex. App. Dec. 27, 2018) ("In making reference to actions for unintentional torts in discussing the economic loss rule, the Texas Supreme Court recognized exceptions to the economic loss rule exist for intentional torts like breach of fiduciary duty and fraud.") (citations omitted); *see also Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 62 (Tex. App. 2013) ("Therefore, while the economic loss rule has been applied to bar negligence and products liability causes of action when the injury alleged was also the subject matter of a contract, ***it has not been extended*** to bar recovery for fraud or fraudulent inducement.") (citations omitted) (emphasis added); *see also JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 467 (Tex. App. 2014) ("As previously discussed, however, there is evidence of fraud, a cause of action for which purely economic losses are recoverable.") (citations omitted); *Bank of Am., N.A. v. Barth*, 2013 WL 5676024, at *11 (Tex. App. Oct. 17, 2013) (concluding that even with the economic loss rule "[e]conomic losses may be recovered in tort for negligent misrepresentation, legal or accounting malpractice, breach of fiduciary duty, fraud,

fraudulent inducement, tortious interference with contract, nuisance, wrongful death claims related to loss of support from the decedent, business disparagement, and some statutory causes of action.") (citation and quotations omitted).

In making this argument, Polaris fails to provide this Court with a key distinction made by Texas courts when deciding whether to apply the economic loss rule: Does the claim involve an intentional tort or an unintentional tort? *See Meza*, 2018 WL 6793839, at *1. In addition, "to determine whether the economic loss rule applies, [Texas courts] consider both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Peterson Grp.*, 417 S.W. 3d at 62 (quotations and citations omitted). "The duty not to commit fraud is different from and independent of the duty to comply with the terms of a contract." *Id.* at 63 (citation omitted). Here, Plaintiffs allege, among other things, that Polaris failed to disclose the Excessive Heat Defect, and had they known of the defect, they would have not purchased their Class Vehicles or would have paid less for them. (Compl. ¶¶ 884-890.) This tortious conduct exists independent of any such contractual relationship between the parties.[20]

In challenging Plaintiffs' Texas DTPA claims, Polaris relies on cases where the plaintiff based its DTPA claim on a promise to perform under a contract. *See BCC*

---

[20] Even if Polaris were correct that the Texas economic loss rule bars Plaintiffs' fraudulent omission claim (and they are not), it admits that in Texas the economic loss doctrine does not bar fraudulent inducement claims. Plaintiffs' allegations are sufficient to plead fraudulent inducement. (*See* Compl. ¶ 890); *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 377–78 (Tex. App. 2012).

*Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 461-62, 469-70 (N.D. Tex. 2015); *see also Polley v. Odom*, 957 S.W.2d 932, 940 (Tex. App. 1997), *judgment withdrawn*, 963 S.W.2d 917 (1998).  However, as these cases make clear, DTPA claims based on a promise to perform a contract are treated differently than DTPA claims that are not.

Here, Plaintiffs' claims are governed by the DTPA because they are not based on a promise to perform under a contract.  Plaintiffs have alleged that Polaris's specific omissions caused harm: Because of Polaris's misleading and deceptive conduct, Plaintiffs purchased vehicles they either would not have purchased or would have paid significantly less for had the Excessive Heat Defect been disclosed. (Compl. ¶¶ 93, 100.)  Plaintiffs also allege alternative designs on the market that do not suffer from the Excessive Heat Defect that they may have opted to purchase had Polaris not omitted such crucial information.  (*Id.* ¶¶ 149-161.)  Accordingly, the economic loss rule does not bar Plaintiffs' Texas DTPA claim.

**B.      Polaris Had a Duty to Disclose the Excessive Heat Defect to Plaintiffs Forrest, Rodriguez, Elkin, and Turgeon under Their Respective State Laws.**

The laws regarding the duty to disclose in Pennsylvania, South Dakota, and Texas are much broader than what Polaris claims.  In fact, all three states impose a duty to disclose when there is an imbalance of information between the plaintiff and the defendant, if a plaintiff cannot reasonably discover the information known to the defendant, or if the defendant becomes aware of information showing a previous representation was misleading.

33

In Pennsylvania, there are several exceptions to the rule limiting a duty to disclose to confidential and fiduciary relationships.  First, active concealment effectively eliminates any requirement that a confidential or fiduciary relationship must exist for there to be a duty to speak.  *See Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp. 3d 849, 859 n.6 (E.D. Pa. 2015) ("[t]he Third Circuit has observed that in cases of 'active concealment' a 'duty to disclose is not always a required element of common-law fraud when there has been a material nondisclosure'"); *see also In re Chrysler–Dodge–Jeep EcoDiesel Mktg., Sales Practices, and Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1009–10 (N.D. Cal. 2018) (rejecting manufacturer's argument in automotive defect case that duty to disclose under Pennsylvania law did not exist).  Second, "[a] duty to speak may also arise as a consequence of an agreement between parties, or as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means."  *City of Rome v. Glanton*, 958 F. Supp. 1026, 1038-39 (E.D. Pa. 1997).  Third, "[a] duty to speak may also occur when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; where subsequently acquired knowledge makes a previous representation false; or where the undisclosed fact is basic to the transaction."  *Id.*

In South Dakota, "[a] party to a business transaction is under a duty to disclose facts basic to the transaction: (1) if he knows that the other party is about to enter into it under a mistake as to the facts, (2) if he knows that the other party would reasonably expect disclosure of the facts because of the relationship between them, the customs of the trade, or other objective circumstances; and (3) if the information is not otherwise discoverable

by reasonable care." *Lindskov v. Lindskov*, 800 N.W.2d 715, 719 (S.D. 2011). This analysis "is best suited to cases 'in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community and is so extreme and unfair as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware.'" *Id.* (internal citations omitted).

Finally, the Texas Supreme Court just this past year also concluded that a duty to disclose may arise outside a confidential or fiduciary relationship:

> An informal relationship giving rise to a duty may also be formed from a moral, social, domestic or purely personal relationship of trust and confidence. There may also be a duty to disclose when the defendant: (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019) (quotations and citation omitted); *see also North Presidio, LLC v. Lowe's Home Centers, LLC*, 2019 WL 3414264, at *6 (N.D. Tex. Jul. 29, 2019) (quotations and citation omitted). The Texas courts also found that "a duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth." *See W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 776 (Tex. App. 2008).

Here, Plaintiffs unequivocally allege throughout their Complaint that Polaris concealed the existence of the Excessive Heat Defect and attempted to obscure the inherent nature of the defect with improper and inadequate repairs and recalls. Among other things,

Plaintiffs allege that Polaris: (1) became aware of the Excessive Heat Defect and potential fire hazards as early as 2011, the same year the ProStar engine was released (Compl. ¶¶ 128, 183); (2) continued to use the same engine configuration in Class Vehicles year after year despite knowing of the Excessive Heat Defect (*id.* ¶¶ 120, 129-33); (3) engaged in a pattern of behavior that hid and diminished the significant risks of the defect (*id.* ¶¶ 181-216); (4) issued a string of recalls from 2013 through 2018, but continually deflected blame to a number of other root causes rather than disclosing the ultimate cause of the design defect—the engine configuration (*id.* ¶¶ 7-9, 181-216); and (5) conducted inadequate recalls, many of which had to be expanded because the proposed repairs were ineffective (*id.* ¶¶ 128, 186-188, 190, 192, 197, 199, 200, 202-204, 207, 209-210, 214).

Furthermore, Plaintiffs did not have an opportunity to reasonably discover the Excessive Heat Defect despite these recalls, because Polaris refused to divulge the whole truth regarding the defective design of the engine configuration.  (*Id.* ¶¶ 8-9, 15, 204-05, 215.)  Plaintiffs Forrest, Rodriguez, Elkin, and Turgeon are individual consumers who were unaware of the facts surrounding the Excessive Heat Defect plaguing their Class Vehicles. (*Id.* ¶¶ 55-56, 85-86, 91-92, 98-99.)  Moreover, Polaris's concealment of the Excessive Heat Defect made it so that Plaintiffs did not have an equal opportunity to discover the truth.  Accordingly, under Pennsylvania, South Dakota, and Texas law, Polaris had a duty to disclose the Excessive Heat Defect.

### C. Plaintiff Luna Has Successfully Pled His Consumer and Common Law Fraud Claims.

Polaris next argues that Plaintiff Luna's common law and consumer fraud claims fail because he does not allege that he "communicated with anyone from Polaris or reviewed or relied on any materials or representations made by Polaris." (Defs.' Mem. at 36.) However, this argument ignores California law.

The Ninth Circuit rejected a near-identical argument in *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015). In *Daniel*, the plaintiffs alleged that Ford committed fraud under California's UCL and CLRA in the sale of Ford Focus vehicles by failing to disclose an inherent defect known to Ford. *Id.* at 1220-21. Prior to their purchase, the plaintiffs "did *not* research the Focus or view brochures, websites, or advertisements about the Focus. Nor did they read the warranty, maintenance, or owner's guides that came with the new vehicles prior to purchasing them. However, [they] did speak to authorized Ford dealership sales representatives about the Focus when they made their purchases." *Id.* (emphasis added). Based on these conversations, the Ninth Circuit found that "a reasonable fact finder could conclude that Ford knew that its customers depended at least in part on its authorized dealerships for information about its vehicles and that Ford's authorized dealerships would have disclosed the alleged rear suspension defect to consumers if Ford had required it." *Id.* at 1227.[21]

---

[21] The plaintiffs in *Daniel*, in opposing summary judgment, were able to provide the district court with evidence "that Ford communicates indirectly through its authorized dealerships." *Id.* at 1227. Plaintiffs contend that, at the appropriate stage of this litigation, they will be able to provide this Court the same type of evidence.

The *Daniel* Court also sided with the plaintiffs with respect to the reliance element of their fraudulent omission claims under the UCL and CLRA.  In its analysis, the Ninth Circuit noted that under California Law:

> To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct.  A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision.  A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently.  That one would have behaved differently can be presumed, or at least inferred, when the omission is material.  An omission is material if a reasonable consumer would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.  Alleged defects that create unreasonable safety risks are considered material.

*Daniel*, 806 F.3d at 1225 (citations and internal quotations omitted).  Here, Plaintiff Luna has alleged that "Polaris did not disclose the Excessive Heat Defect[.]"  (Compl. ¶ 380.) Polaris failed to disclose even though it had the opportunity to do so by, for example, placing a label or sticker on the seat disclosing the defect.

Plaintiff also allege that Polaris knew of the Excessive Heat Defect as early as 2011, and still chose to utilize the defective ProStar engine configuration in subsequent ROV models.  (Compl. ¶¶ 120, 129-33, 183.)  Plaintiffs allege that through a string of recalls, Polaris repeatedly blamed other root causes for the excessive heat and fire risks in the Class Vehicles rather than disclosing that the engine design was the underlying defect.  (*Id.* ¶¶ 7-9, 181-216.)  Plaintiffs also allege that Polaris has unjustly benefited from its unconscionable delay in recalling the defective Class Vehicles, as it has avoided the cost of repairing, if even possible, the Class Vehicles for many years.  (*Id.* ¶¶ 15, 17.)  Finally,

Plaintiff Luna alleges that he purchased their Class Vehicles without knowledge of the Excessive Heat Defect.  (*Id.* ¶¶ 31, 55.)  And, if "Defendants [had] disclosed the existence of the Excessive Heat Defect, and the fact that the component parts on Plaintiff Luna's Class Vehicle would not only degrade from normal use of the Class Vehicle, but that the defect also posed a significant and unreasonable safety risk, he would not have purchased the vehicle or would have paid significantly less [for it]." (*Id.* ¶ 33.)  In short, Plaintiff Luna's allegations are more than sufficient to maintain a fraudulent omission claim under California's common law and consumer fraud laws.

### D.    Plaintiff Guthrie Can Bring a Claim under the LPLA Alongside His Redhibition Claim.

Polaris argues that all but Plaintiff Guthrie's redhibition claim must be dismissed because of the exclusivity provision of Louisiana's Products Liability Act ("LPLA"). (Defs.' Mem. at 36.)   As plaintiffs argued in Section III.C., *supra*, in addition to the redhibition claim, Guthrie's breach of warranty for fitness for ordinary use may be brought simultaneously with his breach of express warranty claim under the LPLA.

## CONCLUSION

For the foregoing reasons, Polaris's motion to dismiss should be denied.

**DATED:**  August 23, 2019                    Respectfully submitted

/s/ Karl L. Cambronne
Karl L. Cambronne
Bryan L. Bleichner
Jeffrey D. Bores
**CHESTNUT CAMBRONNE, PA**
17 Washington Avenue North, Suite 2200
Minneapolis, Minnesota  55401
Telephone:  612-339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com

*Plaintiffs' Liaison Counsel*

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
**BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone:  334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com

Roland K. Tellis
David Fernandes
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, #1600
Encino, California  91436
Telephone:  818-839-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

*Plaintiffs' Interim Co-Lead Counsel*

Kirk J. Wolden
Clifford L. Carter
**CARTER WOLDEN CURTIS, LLP**
1111 Exposition Boulevard, Suite 602
Sacramento, California  95815
Telephone:  916-567-1111
kirk@cwclawfirm.com
cliff@cwclawfirm.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland  20874
Telephone:  703-901-1660
courtney@thedavenportlawfirm.com

Charles E. Schaffer
Daniel C. Levin
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone:  215-592-1500
cschaffer@lfsblaw.com
dlevin@lfsblaw.com

*Additional Counsel for Plaintiffs and the
Proposed Classes*